IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

RECEIVED
2018 SEP 18  P 3:58

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
M... ... ...A

| | | |
|---|---|---|
| DR. MICHAEL L. STERN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:18-cv-807 |
| | ) | |
| AUBURN UNIVERSITY, | ) | |
| | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW the Plaintiff, **DR. MICHAEL L. STERN**, by and through his

attorneys of record, and for his Complaint against the Defendant, **AUBURN**

**UNIVERSITY**, states as follows:

## NATURE OF THE CASE

1.     This is a lawsuit brought by the Plaintiff, Dr. Michael L. Stern, who has

been affected by the actions of defendant as alleged in the claims set forth below,

seeking permanent relief from unlawful retaliatory practices that violated plaintiff's

civil and constitutional rights. The practices committed by Defendant violate

Plaintiff's rights under the First Amendment to the Constitution of the United States,

1

via 42 U.S.C. § 1983 ("§ 1983"), and the law of the State of Alabama.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over this cause of action pursuant to 42 U.S.C. §2000e, *et seq*.

3.     Plaintiff has fulfilled all conditions precedent to the institution of this action.

4.     Defendant, Auburn University (hereinafter "Auburn" or "Defendant"), is a state-supported educational institution and is located within this judicial district and division.

## PARTIES

5.     Plaintiff, Dr. Michael L. Stern ("Plaintiff," or "Stern"), is a forty year-old white male resident of Auburn, Lee County, Alabama. At all times material herein, he was employed by Defendant Auburn University as a professor of economics and, until he was recently retaliated against, was Chairman of the Department of Economics in the College of Liberal Arts ("CLA").

6.     Defendant Auburn University is, upon information and belief, governed by a Board of Trustees comprised of officials who are responsible for policy and governance of Auburn University, wherein Plaintiff was employed. At all times relevant to this suit, Defendant Auburn was the employer of Plaintiff.

2

## STATEMENT OF FACTS

7.    **Fall Semester 2007 – Spring Semester 2008.** The College of Business Administration sold out to the Koch Foundation and engaged in rigged hiring in exchange for money. Most of this was hidden from the majority of the Economics Department faculty, who found out about it from Auburn University President Jay Gogue in early 2008. Dr. Robert Lawson, a Koch Foundation supporter originally out of Florida State University, was hired into a tenured position in the Finance Department, even though he had virtually zero finance qualifications. Despite the fact that Dr. Lawson was an economist with expertise in the supposed measurement of "economic freedom", the College of Business Administration knew that the majority of the Economics Department faculty would never go along with such a scheme, hence the use of the far more compliant Finance Department. The illegitimately imposed Chair of the Economics Department brought in Dr. Frank Mixon, with Koch money and no search whatsoever.

8.    **Late Spring Semester 2008 and Summer 2008.** The majority of the Economics Department faculty successfully collapsed the illegitimately imposed chair and the Economics Department was put under direct administration of the College of Business upper administration (Associate Dean Dr. Amit Mitra) for purposes of retaliation.

3

9.    **Fall 2008.** Plaintiff worked with a local reporter (Jacque Kochak) to publish an article in a local paper (The Auburn Villager) to begin exposing the Koch Foundation scandal. The article sent the University Administration into a state of panic. President Jay Gogue quickly negotiated a transfer of administrative authority over the Economics Department directly to the Provost's Office. While the Memorandum of Understanding was signed by the Provost, it was negotiated between Plaintiff and President Gogue via Dr. Rajan Nataraajan (Chairman of the Marketing Department).

10.    **Summer 2009.** The new Provost from West Virginia, Dr. Mary Ellen Mazey, believed that right-wing money (Koch Foundation and BB&T) were the key to a successful marriage between the Economics Department and the College of Business because that is what she was accustomed to at West Virginia University. She personally handled the negotiations, bringing in Plaintiff to represent the majority of the Economics Department. She considered Plaintiff the perfect choice to represent those generally opposed to the influence of the Koch money because Plaintiff was untenured and was beginning his application for tenure through her office (thus she believed that she would have complete control over Plaintiff) during the 2009-10 cycle. She was wrong. Plaintiff resisted and exposed her repeatedly to President Gogue.

4

11.    **Fall 2009 – Spring 2010.** Provost Mazey retaliated and moved the Economics Department into the College of Liberal Arts ("CLA") (with no discussion or preparation whatsoever), and also into the windowless Haley Center basement (where the Economics Department would remain until the summer of 2017). Provost Mazey forced CLA to process Plaintiff's tenure application (even though Plaintiff had never worked there a single day in his career). Provost Mazey got the CLA Dean (who had never administered nor been around an Economics Department in her entire career) to write a misguided letter opposing Plaintiff's tenure, despite the fact that Plaintiff won the vote of the Economics Department faculty. The CLA Tenure and Promotion Committee abstained from the process in protest. Provost Mazey denied Plaintiff's tenure in the Spring of 2010. President Gogue invited Plaintiff's appeal, and granted Plaintiff tenure in May of 2010.

12.    **August 2010.** Plaintiff became the unanimously-elected Chairman of the Economics Department. The then-CLA Dean (Dr. Anna Gramberg) turned on Provost Mazey and developed an excellent relationship with Plaintiff. Several years later (2013) the new Provost, Dr. Timothy Boosinger, ran off CLA Dean Anna Gramberg and brought in Dr. Joseph Aistrup to keep the Public Administration major open at the behest of Auburn athletics.

5

13.     **February 4, 2014.** Auburn University's Faculty Athletics Representative ("FAR"), Dr. Mary Boudreaux, put on a presentation in the University Senate wherein she claimed that there was no clustering of athletes by any major at Auburn. Plaintiff questioned her in relation to the Public Administration program and football, given the contrasting information Plaintiff was told by a colleague. (During the 2013 Iron Bowl, Dr. Randy Beard (Economics professor and Plaintiff's colleague) noticed that almost all of the star players on the football team had Public Administration as a major). Dr. Joseph Aistrup (new College of Liberal Arts Dean at the time) ran up to Plaintiff on the way out of the Faculty Senate. He looked green and like he was going to cry. He said, "Oh my God, Mike, I can't believe you mentioned our program. I'm going to hear about this."

14.     **February 5, 2014.** Dr. Steve Brown, Chair of the Auburn Political Science Department, called Plaintiff on the phone in the morning to learn more about what Plaintiff said at the University Faculty Senate meeting. He revealed to Plaintiff that they had just attempted to close the Public Administration major (PUBA), but the Provost (Dr. Timothy Boosinger) wouldn't let them. Late in the evening, Aistrup emailed Plaintiff his infamous lecture on diplomacy. That email appeared later in an article about Plaintiff, Auburn, athletics, and the Public Administration scandal in the Chronicle of Higher Education. The email was clearly designed to intimidate

6

Plaintiff.

15.   **February 20, 2014.** Plaintiff's exchange in the University Faculty Senate with the Faculty Athletics Representative must have been brewing plenty of trouble behind the scenes as evidenced by the critical email between Dr. Gary Waters (Associate Athletics Director for Athletics) and Dr. Boosinger (Provost) uncovered by the Plaintiff's FOIA request (Summer 2015). The information in that email appeared in both the Wall Street Journal article and the Chronicle of Higher Education article. The Journal used the data and the Chronicle highlighted the forward curricular conspiracy at the end of the email.

16.   **March 4, 2014.** Plaintiff has his annual review meeting with Aistrup. Aistrup said that he would like to replace Plaintiff with an externally-hired department head and that the Provost would pay for it. He suggested that Plaintiff consider stepping aside even though it was only the first year of his second term and Plaintiff was unanimously elected (twice). Plaintiff declined.

17.   **March 5, 2014.** Aistrup sent Plaintiff an email informing him (Plaintiff) not to tell anyone else about what he (Aistrup) had just said to Plaintiff the previous day. Even though Aistrup suggested returning to the issue a couple of weeks later, he did not. Plaintiff remained quiet on the issue of PUBA and athletics for the remainder

7

of 2014.

18.   **October, 2014**. Plaintiff's annual raise was down to 2%.

19.   **December 5, 2014.** John Urschel of the Baltimore Ravens discovered the large cluster of football players in PUBA at Auburn and wrote about it in his "Math Meets Football" blog. Mr. Urschel calculated the odds that the amazingly high density of football players in the PUBA major could have occurred randomly at roughly 1 in 3,000,000,000,000,000,000,000,000,000,000,000,000 (1 in three undecillion).  Pretty low odds.

20.   **February 3, 2015**. The Faculty Athletics Representative (Dr. Mary Boudreaux) made her annual presentation to the University Faculty Senate. She continued to intentionally deceive regarding PUBA. She was aggressively challenged by Plaintiff. Boudreaux's continued deceit despite the already public revelations by John Urschel told the Plaintiff there must have been something very wrong, something worse than what he already knew or suspected.

21.   **February 4, 2015**. The Chair of the University Faculty Senate, Dr. Patricia Duffy, began talking to Plaintiff. She leaked the process documents related to the closure of PUBA to Plaintiff. Plaintiff did not know at the time that Dr. Duffy was the target of an institutional bribe from Auburn Athletics.

8

22.     **March 12, 2015.** Dr. Stern met with the Executive Committee of the Faculty Senate at Dr. Patricia Duffy's invitation. Plaintiff informed them of what he knew regarding the clustering of football players in PUBA and the blocked attempt at closing the troubled program. He still remembers the quotation from Dr. Larry Crowley (immediate past Faculty Senate Chair), "This is explosive!" Plaintiff requested that he be added to the agenda of an upcoming Faculty Senate meeting so that he could make a presentation to the full University Faculty Senate.

23.     **April 29, 2015.** Dr. Dan Larocque (former Associate Dean of the College of Liberal Arts during the process to close the PUBA program) sent Plaintiff some incredible behind-the-scenes correspondence from 2013 related to the attempted closure of PUBA.

24.     **April 30, 2015.** A FOIA request for documents from Plaintiff's then-attorney in Birmingham was sent to Mr. Lee Armstrong, University Counsel. A wide array of documents, data, and emails are requested in relation to the closure of the PUBA program and presence of athletes in the program.

25.     **May 7, 2015.** Plaintiff attended the Steering Committee (the committee in charge of the Faculty Senate agenda) to make a presentation, and requested that they add him to the agenda of the upcoming University Faculty Senate meeting.

9

Aistrup dispatched Dr. Steve Brown, Chair of the Political Science Department (home of the PUBA program), to mislead the Committee. For example, he claimed to have never spoken to Plaintiff about this issue even though he was the very first person to talk to Plaintiff and told him how they did everything they could to close the program but the Provost wouldn't let them. The Steering Committee members, fearful of the Provost, voted against adding Plaintiff to the agenda (even though they voted to put Dr. Mary Boudreaux on it twice to make misleading presentations to the Faculty Senate).

26.    **May 8, 2015**. At the end of the CLA leadership retreat at Callaway Gardens, Georgia, Aistrup began to verbally assault Plaintiff over his pursuit of the PUBA scandal and used some of the other department chairs to threaten Dr. Stern. It was suggested to Plaintiff that "life could get tough for you in the college." Plaintiff suggested the discussion was highly inappropriate and left to return to Auburn. Aistrup confronted him out in the parking lot, got up in Plaintiff's face, yelling that he doesn't want to see any articles as they would destroy the college. Plaintiff avoided any physical confrontation, got in his car with his wife, and drove back to Auburn. When he got back, the internal letter from Lee Armstrong seeking documents pursuant to the FOIA request was in his mailbox. Hence, Plaintiff presumed it was also in Aistrup's mailbox.

10

27.     **May 9, 2015**. Aistrup sent Plaintiff an email at 5 a.m. on Saturday morning inquiring as to whether he (Plaintiff) had been recording their conversations. Plaintiff presumed this sudden high level of panic/paranoia was brought about by the FOIA letter distributed by Mr. Lee Armstrong, University Counsel.

28.     **May 11, 2015**. Once having confirmed that he was not on tape, Aistrup now wanted to join the investigation of PUBA; Aistrup emailed Plaintiff for a copy of his presentation so that he (Aistrup) could also investigate the PUBA scandal.

29.     **July 2, 2015**. Auburn sent out the FOIA box to the Plaintiff's Birmingham attorney. Due to the 4th of July holiday, it took a few days to get the box back down to Auburn. Despite the massive number of documents contained in the very large FOIA box, the institutional bribe and the correspondence involving Athletics officials had been placed right on top. Plaintiff was stunned.

30.     **Mid-July through Early August, 2015**. Plaintiff worked with Ben Cohen of the Wall Street Journal to produce a story based, in large measure, on the FOIA documents. The Journal held the story until right before the start of the football season for maximum readership.

31.     **August 24, 2015**. Aistrup requested a meeting with the Economics Department to propose hiring an external Department head to replace Plaintiff and

11

said Tim Boosinger would pay for it. A lot of hostility surfaced during the meeting, and Aistrup was generally unable to articulate why the faculty should support his proposal.

32.    **August 27, 2015**.  The <u>Wall Street Journal</u> published "At Auburn: Athletics and Academics Collide" as the lead article of their sports section. The article presented the disturbing outline of the Athletics Department's direct interference in the process to close the Public Administration major, including the explicit offer of Athletics Department money to fund the troubled academic program and pay professors' salaries (i.e., an institutional bribe). The corrupting influence of athletics on the governance of academic curricula at Auburn University, a state university, is a matter of major public concern. The article specifically quoted the Plaintiff:

*"Michael Stern, the chairman of Auburn's economics department and a former member of the faculty senate, said athletics is so powerful at Auburn that it operates like a "second university." Whenever athletic interests intersect with an academic matter, he said, "it's a different kind of process.""*

Numerous major media outlets covered the <u>Wall Street Journal</u> article, and several specifically ran the Plaintiff's quotation, including <u>Forbes</u> and <u>USA Today</u>. The line

of local media trucks coming into Auburn University that morning was amazing. The College of Liberal Arts Dean's secretary said that she gave up answering the phone because it was always some reporter asking questions.

33.    **August 30, 2015**. Aistrup was informed that the Faculty Senate had unanimously rejected his proposal to hire an external Department Head to replace Plaintiff.

34.    **October, 2015**. Plaintiff received an extremely small salary raise (1%). Plaintiff deemed that disproportionate salary increase as retaliation for his engaging in First Amendment protected speech.

35.    **December 4, 2015**. Plaintiff received an extremely small merit bonus (1%). Likewise, Plaintiff viewed that disproportionary small salary bonus as retaliatory.

36.    **March 10, 2016**. The Economics Department faculty unanimously recommended Plaintiff's re-appointment as Chair. The Dean was informed of the recommendation. He delayed action, and asked for a meeting with Dr. Randy Beard. At that meeting, he told Dr. Beard that he had some "ideas" regarding a role for Plaintiff related to the College and the new budget model that would leave him with insufficient time to continue as Chair. Dr. Beard suggested to the Dean that he ought

13

to discuss such ideas with Plaintiff. The Dean replied that he would, and then get back with Dr. Beard. The Dean never discussed anything of the sort with Plaintiff, nor did he ever get back with Dr. Beard.

37.    **May 6, 2016.** The five-year review of Plaintiff's administrative service was completed by a committee comprised of both faculty and staff inside the Department and representatives from outside the Department. The Chair of the committee was Dr. Andrew Gillespie, who worked in the Provost's Office. He had been involved in a number of these reviews around the University and he indicated to the members of the committee that this was one of the most positive reviews he had ever seen. (Other individuals who have seen many of these type of reviews, such as Dr. Emmett Winn (associate provost), indicated the same to Plaintiff.)

38.    **August 30, 2016.** Plaintiff's second term had already expired and no one had discussed his re-appointment with either Plaintiff or the Department. Furthermore, his review had been completed and submitted nearly four months prior. Dr. Randy Beard asked in an email what was going on, and copied the President, Dr. Gogue.

39.    **Early September 2016.** Based on Plaintiff's conversation with President Gogue in December 2016, it was his belief that a meeting had taken place in the

14

President's office around that time period wherein Aistrup and Boosinger advocated getting rid of Plaintiff and the President "told them the way it was going to be."

40.     **September 8, 2016.** Plaintiff finally received his administrative review via Aistrup. Aistrup's snide comment regarding "external relations" invariably referred to the Wall Street Journal article. Aistrup did not want to meet with Plaintiff, nor did he refer in any way to Plaintiff's continuation or re-appointment as Chair.

41.     **October 31, 2016.** Plaintiff receives a raise of 3.5%. That amount appeared to be tied for the lowest among the CLA chairs despite Plaintiffs outstanding five-year review, combined with a unanimous re-election vote from his faculty. Other chairs who would soon resign due to difficulties (Drs. Peter Chen and Sara Baird) received higher raises. More importantly, Dr. Steve Brown (Political Science), who helped cover-up the PUBA scandal with Aistrup, appeared to receive a raise of more than 5%. This, clearly, is an act of retaliation.

42.     **December 2, 2016.** Plaintiff received a tiny merit bonus compared to all other administrators in the College of Liberal Arts. Plaintiff's bonus amounted to 2%, while all others fell in the range of 5% to 7%. Plaintiff would not know the amount that others received until the public disclosure of the December payroll in early January. But he knew instantly that he must have been very low, as the budget situation was excellent and the bonuses could not have been that small (i.e., only 2%).

15

43. **December 13, 2016.** Once Plaintiff had finished his work and classes for the semester, he set up a meeting with President Jay Gogue, as his (Plaintiff's) situation had grown intolerable.

44. **December 16, 2016.** Plaintiff met with President Gogue, alone. Plaintiff informed him of three items: (1) The failure of anyone to meet with him or attempt to re-appoint him as Chair; (2) The likely hatchet job on his merit bonus; and (3) The failure of anyone to contact him regarding the Department's pending much desired move from the Haley Basement to Miller Hall.

45. Gogue was extremely disturbed, and revealed to Plaintiff that Boosinger and Aistrup came to meet with him back at the beginning of the fall semester and that they advocated getting rid of him, Stern, as Chair. Gogue claimed that he laid down the law and told them Plaintiff was going to continue as Chair. Gogue also picked up the phone and called Dan King, Vice President of Facilities, to find out about Miller Hall and the needed renovations for the Department's move. King confirmed that little to no work or planning had yet been done.

46. Gogue informed Plaintiff that he didn't want him to do anything, and he wanted him back in his office as soon as the University re-opened in January. He also asked Plaintiff to send him the data on the merit bonus when it became available. Plaintiff surmised that Gogue feared Boosinger and Aistrup had become

16

insubordinate, failing to meet with and formally re-appoint Plaintiff, failing to work on their major facilities move, savaging his bonus, etc., and that they were going to wait out Gogue's retirement. The search to replace Gogue was already underway. Plaintiff concluded they would likely move against him once Gogue left office.

47.    **January 6, 2017**. The President's secretary set up a short meeting between Plaintiff and the President for January 11, 2017.

48.    **January 9, 2017.** Plaintiff was able to access the public payroll records update to cover the merit bonus payments from early December. He pieced together the merit raises for the CLA administration and sent it to the President.

49.    **January 11, 2017.** Plaintiff met alone with President Gogue. It was a very intense meeting. Gogue informed Plaintiff that he had to make some decisions. He said that he wanted the Economics Department out of CLA and wanted Plaintiff to report directly to the Provost's Office. Gogue said it would be a good thing because he would make sure the Department had its revenue under the new budget model (it was millions in surplus) and it could simply move its curriculum to the University College. Plaintiff questioned the President as to how he could expect Plaintiff to report to, and work with, Tim Boosinger, the Provost. He said that Plaintiff wouldn't have to deal with Boosinger, that they both got along with Associate Provost Dr. Emmett Winn, so Plaintiff would report to Winn and he, the President, would

17

maintain contact with Winn. From that point forward, Boosinger and Aistrup were effectively out and the reporting chain was to become Plaintiff to Winn to Gogue. Plaintiff agreed, and Gogue told him to wait one day and then call Emmett. Gogue presented Plaintiff with a memorandum that he, Gogue, wrote a few days prior to Boosinger and told Plaintiff to be very careful with it, and only use it if it was absolutely necessary. At the end of the meeting. Gogue told Plaintiff that he, Gogue, sent the merit raise data to Winn and told him to take care of it. As Plaintiff and President Gogue both got up to leave the meeting, Gogue warned Plaintiff that when he, Gogue, left office, "they will be out to get you."

50. **January 12, 2017.** Plaintiff called Dr. Winn. Winn indicated that in his discussions with the President, it would be preferred that we renamed the department a school and we simply transferred our CLA curriculum to the independent School of Economics rather than use the University College. Plaintiff agreed, and Winn asked him to draft a proposal and submit it to the faculty for a vote and to the academic program review (APR) committee for review (the APR committee reviews the transfer of curricula between academic units).

51. **January 17, 2017 to February 1, 2017.** Plaintiff drafted the independent school proposal, revised it via Gogue and Winn, and submitted it to the Economics Department faculty, whose members unanimously approved it. Finally,

Plaintiff submitted it to the APR committee. The budget estimates for the Department as an independent budget entity were nearly two million dollars in surplus. Winn informed the chair of the APR committee (Tillson) that the Provost's Office and the President's Office supported the proposal.

52.    **January 31, 2017.** An additional 5% merit bonus ($7,445) showed up on Plaintiff's January pay stub. Combined with the 2% raise from December, this made a total of 7%, placing Plaintiff at the very top of the CLA distribution (confirming his outstanding 5-year independent evaluation and unanimous re-election). Yet, his permanent raise from October 2016 remained at the bottom of the distribution, not to mention 2015.

53.    **February 13, 2017.** Emmett and Plaintiff tabled the APR proposal as there were some questions from committee members about budget, staffing, student advising, and the like. They figured that it was better to set everything up in relation to the new school prior to a review of the curriculum transfer by the APR committee.

54.    **March 6, 2017.** Emmett informed Plaintiff that they were not going to perform an annual evaluation on him regarding 2016. Plaintiff was never told why this was the case.

55.    **April 11, 2017.** All of the Department's financial and personnel approval queues in the computer systems were removed from the CLA and transferred directly

to the Provost's Office. This effectively made the Department operationally independent from CLA.

56.   **Mid April to Early June, 2017.** Plaintiff worked with Amanda Malone (Provost Office budget staff) to set up the Department's independent budget. Likewise, Plaintiff worked on the renovation and moving plans for Miller Hall. In early June, Winn's information technology expert, Joe Carlson, evaluated the Economics Department IT needs and recommended that they move forward hiring their own dedicated IT person.

57.   **June 9, 2017.** Plaintiff set up a final meeting with President Jay Gogue for his last week in office. This meeting was requested by Gogue through Dr. Barry Burkhart (psychology professor and supervisor of Plaintiff's wife). Gogue told Burkhart on the golf course in early June that Tim Boosinger "hates Michael" and that Plaintiff should get in touch with his secretary and set up a meeting. This time, both Winn and Boosinger were going to be invited.

58.   **June 12, 2017.** The meeting occurred in the President's Office. Gogue, Winn, and Boosinger were all present. Boosinger was extremely hostile and said that he wanted to return Plaintiff to CLA and rip up the Department's new budget. Gogue, Winn, and Plaintiff all rejected Boosinger's proposal to reverse everything. Gogue ended the meeting by reiterating his agreement with Plaintiff, ordered Winn to

continue administering Plaintiff (to which Winn responded with a loud "Yes Sir!"), and instructed Plaintiff to work with the new President to finish the work on the school. When Plaintiff left the President's office, Dr. Steven Leath, the incoming President, was standing outside, waiting for the next meeting. Plaintiff shook his hand and introduced himself.

59.   **June 13, 2017 to June 15, 2017.** Plaintiff continued his work on the budget and the IT hire. They were now ready to "operationalize" their independent budget. Plaintiff also began work on their departmental raises/bonuses with the Provost Office's staff.

60.   **June 16, 2017.** This was President Gogue's last day in office. Plaintiff was informed that the Provost's Office had determined that his raise and merit bonus will both be 3% this year. Since they didn't perform any annual evaluation, Plaintiff's big five-year review would be the most recent review on file. It is unclear what peer group Plaintiff was supposed to be compared to in order to determine his relative merit. Given that he would be returned to CLA shortly, his raise and bonus were once again too low if his relevant peer group is CLA, as objective measures and independent evaluations demonstrate he is the best chair in CLA.

61.   **June 19, 2017.** Dr. Steven Leath officially became President.

62.   **June 20, 2017.** Plaintiff turned in the raises/bonuses for his faculty to the

21

Provost Office staff.

63.    **June 23, 2017.** By the end of the week, the Provost Office staff had begun to go silent on Plaintiff. Plaintiff's secretary asked for an update on the IT hire paperwork. Instead of a response about the IT hire, Kerry Ransel (Provost human resources staff) set up a meeting for Plaintiff with Boosinger for early July. Plaintiff checked on who his supervisor was in their computer systems. It was Dr. Winn, precisely as had been agreed upon with Gogue.

64.    **July 6, 2017.** Plaintiff met with Boosinger and Winn. Boosinger spent most of the meeting discussing with Plaintiff things that were wrong with CLA. He told Plaintiff that he was going to fix CLA and that Plaintiff would "see his engagement over the next several weeks". Plaintiff didn't believe him for even one second. At the end of the meeting Boosinger slipped Plaintiff and Winn a copy of the letter he had written the day before to Aistrup. The letter indicated that he was going to throw Plaintiff back into CLA and take away his new budget. Plaintiff didn't react to the letter, he simply took his copy and left the room with Winn. The letter also indicated that a copy was sent to Leath.

65.    **July 20, 2017.** The Department's financial and personnel approval queues were returned to CLA in clear violation of Plaintiff's agreements with Gogue.

66. **July 24-28, 2017.** Plaintiff executed the move of the Economics Department from the Haley basement to Miller Hall.

67. **August 10, 2017.** Plaintiff met with Aistrup to discuss the budget and hiring for the upcoming academic year. This was Plaintiff's first contact with Aistrup in eight months. Plaintiff was specifically looking for any evidence that Boosinger had engaged to fix CLA, but observed none. Plaintiff discussed how CLA needed to reform the way it handles the new budget model. Aistrup claimed he agreed with Plaintiff but articulated no forward plan. The Department was massively in surplus and had two upcoming senior retirements, hence Plaintiff indicated that they needed to run a junior ad for multiple positions. Aistrup agreed. The meeting went well but Aistrup was distant and weak as if Aistrup had no actual authority. Plaintiff didn't believe a word Aistrup said.

68. **August 23, 2017.** Plaintiff requested a meeting with President Leath following up on a discussion in the University Faculty Senate regarding a new Faculty Athletics Representative (replacing Boudreaux).

69. **September 1, 2017.** Another three weeks passed. Plaintiff had witnessed no attempt to reform CLA, nor had he seen any "engagement" from Boosinger. He saw the perfect opportunity to object and copy Leath.

23

70.    **September 5, 2017.** Boosinger announced his retirement (although it would not take effect until the end of the calendar year). Due to Labor Day, this was the very next business day after Plaintiff's September 1 email that was cc'd to Leath.

71.    **September 24, 2017.** Plaintiff got an email on Sunday evening from Gogue checking on his welfare.

72.    **September 27, 2017.** Plaintiff met with President Leath right in the middle of the FBI – Chuck Person scandal. They discussed the Faculty Athletics Representative position. The conversation was rather shocking. At the end of the meeting, Plaintiff brought up the situation with the Economics Department. Leath said that he wouldn't have handled things the way they've been handled, and that they needed to discuss the matter, but that he needed to deal with the crisis in athletics first.

73.    **October 9, 2017.** The Economics Department had six tenure and promotion applications and they badly needed to run a junior ad for the upcoming American Economic Association meetings. Plaintiff spoke with Winn and he had no idea what was going on. They agreed that Plaintiff would send him an email and attach a hiring memorandum addressed to him and Leath. Leath immediately responded, acknowledged the unusual situation in Economics and said he would talk to Boosinger. At that time, Dr. Winn was still listed as Plaintiff's supervisor in the

24

computer system.

74.   **October 11, 2017.** Boosinger sent Plaintiff an email basically telling him to get stuffed. Boosinger copied Leath on his email. Plaintiff responded strongly to Leath and, for the first time, Plaintiff unveiled the memorandum that Gogue gave him back in January for the very first time. Winn did not know it existed and Plaintiff doubts Leath did either.

75.   **October 12, 2017.** After Plaintiff unveiled the Gogue memorandum, Leath hid behind his interim chief of staff, Brian Keeter, who asks Plaintiff to delay, awaiting the selection of a new Provost.

76.   **October 20, 2017.** Boosinger and Aistrup got nervous over the Economics Department's six tenure and promotion candidates. Brian Keeter called Plaintiff to ask about just giving the packets over to CLA. Plaintiff objected and drafted a memorandum for Leath. Plaintiff also mentioned that the failure to authorize their junior search would have significant negative consequences.

77.   **October 24, 2017.** President Leath asked Plaintiff to give their tenure and promotion packets to CLA and suggested his new Provost would get the Department out of CLA.

78.   **October 27, 2017.** Plaintiff turned over the tenure and promotion packets to CLA based on the request by Leath.

79.    **November 10, 2017.** The Board of Trustees installed Dr. Bill Hardgrave, Dean of the Business School, as the new Provost even though there were much better candidates. Hardgrave was to officially start January 1, 2018. This was a very negative development. Plaintiff and the Economics Department's relationship with Hardgrave was historically very negative. Keeter approached Plaintiff at the Board meeting. They then spoke on the phone later in the afternoon. Plaintiff told him that he was not waiting any longer and either Leath could start speaking with Plaintiff or he would have to begin taking action to protect himself. Keeter immediately spoke to Leath and Plaintiff received an email, delaying once again.

80.    **November 15, 2017.** Plaintiff checked again to see who his supervisor was in their computer system. It had been changed to Aistrup. Plaintiff viewed this as an obvious act of bad faith and was a total violation of his agreement with Gogue.

81.    **November 28, 2017.** Plaintiff contacted Jack Stripling, a senior reporter for the Chronicle of Higher Education.

82.    **November 30, 2017.** Plaintiff cancelled his reservations at the American Economic Association meetings in January as their junior search was never approved and they had no advertisement.

83.    **December, 2017.** Plaintiff worked with Jack Stripling to develop an article that would become the front cover story for the national print edition of the

Chronicle of Higher Education. He went silent in terms of his interactions with the Auburn University administration.

84.    **January 11, 2018.** Everything was largely set with the Chronicle and Jack Stripling had started making contact with others at Auburn, so Plaintiff reached out to Dr. Bill Hardgrave, the new Provost, using his prior correspondence with Brian Keeter. He did not receive any reply.

85.    **January 24, 2018.** Plaintiff emailed Winn and made a last ditch effort at hiring via the senior assistant market. Winn called Plaintiff and asked him what he wanted him to do. Plaintiff told him to give the memorandum to Hardgrave and also mention that the Provost didn't even reply to Plaintiff's earlier email asking for a discussion.

86.    **January 25, 2018.** Plaintiff got a reply from Winn just tossing back what Hardgrave had said. Hardgrave finally responded to Plaintiff's earlier email with more delay. When Hardgrave later visited CLA, he did not visit the Economics Department. Plaintiff also got an email from Aistrup's secretary proposing some sort of "listening session", which Plaintiff ignored. The time for "listening" was two years ago. They were all in the proverbial bunker awaiting the Chronicle article.

87.    **February 16, 2018.** The Chronicle published online the article titled, "Unrivaled Power: Inside Auburn's secret effort to advance an athlete-friendly

27

curriculum." The article was then published on the front cover of their national print edition the following week. The article exposed numerous shocking details left out of the <u>Wall Street Journal</u> article related to the efforts to keep the troubled public administration major open to benefit athletics. It also exposed the serious racial issues surrounding the scandal and a broader curricular conspiracy between the provost and athletics officials to create weak academic programs for the benefit of athletes. Finally, the article told the story of the Plaintiff's efforts to publically speak about these matters of serious public concern and the repeated acts of retaliation he experienced as a result. The article had a photo of the Plaintiff together with the large box of documents from his public-records request. The Plaintiff is also quoted in the article:

*""What they have done to me is necessary to keep people in line, or you will have other people speak out," said Stern, who provided the Chronicle with documents that he had previously given to the Wall Street Journal and other material he obtained afterwards. There must be penalties for those who don't play ball, and there have to be rewards for those who do. Auburn has been cleansed of dissent.""*

88.   **February 26, 2018.** Plaintiff tested Leath with some correspondence that he received from a professor at the University of North Carolina after the <u>Chronicle</u> article broke. He replied with a short sentence a week later.

28

89. **March 1, 2018.** Mr. John Sophocleus, Instructor in the Department of Economics, published his monthly column in the <u>Alabama Gazette.</u> The column was titled "The Auburn Greed" and is a response to the public outcry over the revelation that Jay Jacobs, Auburn's former Athletics Director, was going to be receiving the largest retirement check in the history of the Retirement System of Alabama. Sophocleus exposed how Jacobs' chief lieutenant in the PUBA scandal, Dr. Gary Waters, was receiving very special raises to inappropriately increase his retirement check via the Retirement System of Alabama. Sophocleus compared the massive raises given to Jacobs and Waters to those of the Plaintiff.

90. **March 7, 2018.** One of the Economics Department's young faculty members took a job at another university. This, combined with their two retirements and their lack of tenure-track hiring, left the Department with only twelve tenure-track faculty members for the fall, a number insufficient to properly continue with their PhD program. Plaintiff informed the Provost's Office Human Resources person and copied Winn and Leath.

91. **March 9, 2018.** Plaintiff suggested to Leath that they now proceed as previously agreed with Gogue given that his "hardship" was now over (new Provost and new Athletics Director in place). Plaintiff received no response.

92.   **March 20, 2018.** The new Faculty Athletics Representative, Dr. Beverly Marshall, put on a presentation at the University Faculty Senate regarding the academic performance of athletes. The presentation was devoid of critical detail and most notably lacked racial data and did not break out majors by program, gender, or race. It appeared that maximum aggregation was once again used to cover up the reality. Plaintiff challenged her and she promised to bring more detailed data to a later Faculty Senate meeting.

93.   **March 22, 2018.** The Economics Department's Director of Graduate Studies, Dr. Alan Seals, had enough and he communicated his displeasure with President Leath. Leath responded, and Seals was more than happy to agree to his offer of a meeting with himself and the Provost.

94.   **March 23-25, 2018.** Plaintiff increased the pressure on President Leath by directly sending his recommendations concerning professorships and emeritus applications to him.

95.   **March 26, 2018.** Plaintiff forwarded to Leath his exchange with Dr. John Carvalho and Dr. Beverly Marshall (the new Faculty Athletics Representative) that shows highly qualified people like Carvalho were never even interviewed by Leath for the Faculty Athletics Representative position.

96.   **March 26-29, 2018.** Plaintiff weighed in on the Seals & Leath situation and proposed a broader meeting involving himself and the Chair of the Faculty Senate, Dr. Dan Svyantek, instead of the new Provost, Dr. Hardgrave (who had consistently avoided communicating with Plaintiff). President Leath surprisingly accepted and appeared to rope in his chief of staff, Miles Lackey. Leath's secretary set the day and time for the meeting.

97.   **April 1, 2018.** At 9 p.m. on Easter Sunday, President Leath decided to back out of the scheduled meeting.

98.   **April 2, 2018.** Dr. Leath still refused to meet as was scheduled. Further, he has Aistrup threaten Plaintiff while copying him, Hardgrave, and Maran White, a lawyer in the counsel's office.

99.   **May 4, 2018.** Dr. Paula Bobrowski (CLA Associate Dean) sent Plaintiff some data from the Provost's Office demonstrating how poorly CLA treats the Economics Department in terms of funding (tenure-track personnel) and yet reflecting how outstandingly the Department performs. The Department was in the 34th percentile compared to peers in tenure track personnel, yet it hit the 60th and 78th percentile in instructional and scholarly production compared to peers. The Department of Economics was clearly the most outstanding department in CLA according to the data.

31

100.   **May 15, 2018.** Dr. Marshall returned to the Faculty Senate (following up on the March senate meeting) with the new Athletics Director, Allen Greene. Marshall put on a short slideshow with a small amount of racial time series data regarding six-year graduation rates for male athletes. Plaintiff responded with a devastating slide show of his own showing the potential role the PUBA scandal played in the data she presented. AD Greene did not look happy.

101.   **May 25, 2018.** Ten days later (and on the Friday before the long Memorial Day weekend), at approximately 10:00 a.m., Plaintiff's access to the administrative computer system (Banner) went dead. At the time, Plaintiff was actually trying to open up a couple of extra seats in a class for the Camp War Eagle session later that afternoon. Soon thereafter, they cut off his secretary's access as well (they would restore her access a few days later, claiming they had turned it off because Plaintiff could have pressured her to "do something bad".)

Approximately 11:00 a.m: Aistrup stormed into Plaintiff's office. He had no appointment. He said he wanted to perform Plaintiff's annual evaluation (yet annual evaluations had been due back on April 30th). What he handed Plaintiff did not look like any annual evaluation that Plaintiff had ever seen and Aistrup wanted Plaintiff to sign it above his own name. Plaintiff refused. Then Aistrup told Plaintiff that he was being relieved of his duties as Chair, effective immediately. Aistrup handed

Plaintiff a memorandum to that effect. Interestingly, however, the memorandum stated that Plaintiff was to continue to be paid as if he remained Chair all the way until August 15 of 2019! Robin Jaffe, the facilities liaison for the College of Liberal Arts, then walked into Plaintiff's office and informed him that he needed to take his key (it was a master key for Miller Hall). Plaintiff replied that it was the only key he had so how would he get into his office? Aistrup remarked that he can have his secretary let him in his office - - an odd statement since she was actually no longer "his" secretary. Plaintiff remarked that she had already left on leave for Memorial Day weekend. Plaintiff made it clear that he was not giving them his key unless they presented him a new one that would work on his office (he had a lot of work to do). Plaintiff proposed that Robin Jaffe meet him over at the access control office at noon (after he picked up his son from swimming) and they could swap keys. They agreed and left his office. Aistrup apparently headed back over to his office in Tichenor Hall. Aistrup then immediately sent an email to other department chairs and college staff announcing that Plaintiff was no longer chair of the Economics Department. The email was openly copied to Hardgrave and Maran White in the Counsel's Office. He directed people with questions or concerns to Paula Bobrowski (rather than himself), yet based on Plaintiff's discussions with her, Aistrup had never told her anything and she had no meaningful information to give anyone. Aistrup then proceeded to send

33

an email to the Economics Department Graduate Programs Officer, Dr. Seals, stating that he was relieved of his duties, effective immediately. Seals was literally in the middle of administering a qualifying exam for PhD students when he received the email. Aistrup sent nothing to Department faculty, graduate students, or other departmental employees and he would not do so for another five days. Plaintiff forwarded Aistrup's email to Leath and the general counsel, Jaime Hammer. Dr. Seals also forwarded his email to them.

Noon: Plaintiff met Robin Jaffe at the access control office and swapped out his master key for one that worked on his office.

102. **May 30, 2018.** Aistrup finally emailed the Department and informed them of what he had done five days previously. Aistrup had apparently been running around for several days trying to get someone outside the Department to agree to be Interim Chair. Dr. Dan Svyantek, Chair of the Faculty Senate, indicated to Plaintiff that he had been quietly asked if he was interested and he indicated that he was not. They obviously had no plan, so Aistrup claimed Paula Bobrowski would handle things and he needed "a couple weeks". Bobrowski was not copied on that email and she claimed to Plaintiff that Aistrup never discussed with her performing any duties with respect to the Economics Department. The Economics Department secretary

34

forwarded Bobrowski a copy of the email, the first she learned of her apparent new duties.

103. **May 31, 2018.** Dr. Seals sent an email to Leath and Hammer highlighting the reckless nature of their conduct.

104. **May 31, 2018 – June 1, 2018.** Dr. Charles Israel, an Associate Dean in CLA, tried to get Plaintiff to teach him how to perform certain parts of the job of Chairman. Plaintiff took the opportunity to correspond with President Leath. Interestingly enough, he immediately replied with a "self-reply" (replying to Plaintiff but also himself so that he had verification that the email was sent by the server). This typically indicates a very high level of concern or fear. Aistrup and his associates also failed to supervise the furniture delivery and installation in Miller Hall (something Plaintiff would have done), and as a result, Plaintiff's office walls were damaged, new furniture had to be ordered, and the office walls had to be repaired. In the meantime, the contents of Plaintiff's office were dumped on the floor of a different room in Miller Hall with no furniture and to which Plaintiff no longer had a key. Plaintiff worked on the floor - - no furniture - - for the next week and a half and had to ask the Department's secretary to let him into the office.

105. **June 1 - June 4, 2018.** Discussions continued behind the scenes and Plaintiff's colleague (he's published a number of papers with him), Dr. Hyeongwoo

Kim, reluctantly agreed to serve as Interim Chair out of fear of the alternative. The enticement included a salary of more than $189,000 and a zero course teaching load. Plaintiff would have to assist Kim with a large portion of the duties as he had never engaged in any preparation or training to be a department chair.

106. **June 4, 2018**. Dr. Randy Beard, the Economics Department's most senior professor, wrote a letter to the Chair (Svyantek) and Chair-elect (Baginski) of the University Faculty Senate condemning the actions of the administration against Plaintiff and Dr. Seals.

## COUNT ONE

## FIRST AMENDMENT RETALIATION -

## PURSUANT TO § 1983: AUBURN UNIVERSITY

107. Plaintiff adopts and re-alleges each and every allegation contained in this Complaint as if set out anew herein.

108. In taking the above-described actions, the Defendant University intentionally and willfully retaliated against the Plaintiff for his constitutionally-protected speech under the First Amendment, to include stripping him of his Departmental Chairmanship and awarding lower than justified raises in salary.

109. The Plaintiff's constitutionally-protected speech regarded matters of public concern, specifically, abuses in the Athletics Department, as set out in articles

36

participated in or generated by Plaintiff in the <u>Wall Street Journal</u> and <u>Chronicle of Higher Education</u> and numerous statements or presentations before the Auburn University Faculty Senate.

110.   Said speech played a substantial part in the Defendant's decision to discharge the Plaintiff as Chair of the Economics Department.

111.   As a proximate consequence of the Defendant's violation of the First Amendment, the Plaintiff has suffered and will continue to suffer damage to his professional life and future career opportunities, future pecuniary losses, emotional pain, embarrassment, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and non-pecuniary damages.

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiff demands the following relief:

      (a)   That Defendant University place him in the position in which he would have worked absent the Defendant's retaliatory treatment, or, in the alternative, front pay;

      (b)   Back pay from the date of his retaliatory removal and for the raises he should have received;

      (c)   Injunctive relief;

      (d)   Interest;

37

(e)     Attorneys' fees;

(f)     Costs; and

(g)     Such other legal or equitable relief to which Plaintiff may be

entitled.

## PLAINTIFF DEMANDS TRIAL BY A STRUCK JURY
## ON ALL CLAIMS SO TRIABLE.

Respectfully submitted,

John D. Saxon
Alabama Bar No. ASB-3258-O71J
Donna S. Cude
Alabama Bar No. ASB-7680-W18A
Mac B. Greaves, Jr.
Alabama Bar No. ASB-2356-K71F

*Attorneys for Plaintiff*

**OF COUNSEL**:

**JOHN D. SAXON, P.C.**
2119 3rd Avenue North
Birmingham, Alabama 35203
Telephone:  205.324.0223
Facsimile:   205.323.1583
E-mail:       jsaxon@saxonattorneys.com
                  dcude@saxonattorneys.com
                  mgreaves@saxonattorneys.com

## PLAINTIFF'S ADDRESS

Dr. Michael L. Stern
c/o **JOHN D. SAXON, P.C.**
2119 3rd Avenue North
Birmingham, Alabama 35203

## PLEASE SERVE DEFENDANT VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED:

**AUBURN UNIVERSITY**
c/o Grant Davis
Secretary to the Board of Trustees
105 Samford Hall
Auburn, AL 36849