IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| DR. MICHAEL L. STERN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:18-CV-807-WKW |
| | ) | [WO] |
| STEVEN LEATH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

In 1964, Marvin Pickering, a public high school teacher in Will County, Illinois, wrote a letter to his local newspaper's editor, criticizing the school board's allocation of funding for athletic programs to the detriment of academic integrity. That unpopular letter got him fired but ultimately won him and all public employees First Amendment freedoms.  *See Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 574 (1968).

Fast forward a half century later to Lee County, Alabama, where Plaintiff Michael L. Stern, Ph.D.—a tenured economics professor at Auburn University—had gained a reputation as a vocal critic of the College of Liberal Arts' public administration major for its disproportionate number of scholarship student-athletes, particularly those in the football program.  Dr. Stern believed that the university was

behind the clustering of student-athletes into this athletic-friendly major and that its athletic department had fought to retain the major against its recommended closure. He began vocalizing these concerns in 2014 at Auburn University's senate meetings and in news publications with national and state readership. Dr. Stern's criticism attacking the integrity of the public administration major and the Auburn athletic program was unpopular among university administrators, including Defendants.

In May 2018, Dr. Stern was removed as chair of the Department of Economics, a position he had held since 2010. His removal as chair was the last straw in what Dr. Stern categorizes as a campaign of harassment by university officials to discourage him from exercising his First Amendment rights to speak out against what he discerned was a scandalous academic major protecting star athletes.

In this 42 U.S.C. § 1983 action, Dr. Stern brings First Amendment retaliation claims against five Auburn University officials: President Jay Gogue in his official capacity; former President Steven Leath in his individual capacity; former Provost William Hardgrave in his individual capacity; former Provost Timothy R. Boosinger in his individual capacity; and former Dean of the College of Liberal Arts Joseph Aistrup in his individual capacity.[1]  Dr. Stern requests back pay, punitive damages,

---

[1] Boosinger and Hardgrave no longer work for Auburn University, and Aistrup has stepped down as dean of the economics department. The official-capacity suits against them, therefore, are no longer appropriate. Also, the official-capacity claims against Boosinger, Hardgrave, and Aistrup were unnecessary because they were redundant of the official-capacity claims against President Gogue. *See generally Penley v. Eslinger*, 605 F.3d 843, 854 (11th Cir. 2010) ("Official-

injunctive relief, and that "he be placed in the position in which he would have worked absent the Defendants' retaliatory conduct" or, alternatively, that he receive front pay.  (Doc. # 47, at 50.)

A prior order granted summary judgment in favor of Defendants on the conspiracy claims in Counts 2 and 3.  This opinion addresses Defendants' motion for summary judgment on the First Amendment retaliation claims (Count 1).  (Doc. # 82.)  The motion is fully briefed with accompanying evidentiary submissions. (Docs. # 83–84, 89–90, 96–97, 103–04.)  Based upon careful consideration of the evidence, the arguments of counsel, and the relevant law, the motion is due to be granted in part and denied in part.  The claims that survive are:  Dr. Stern's First Amendment retaliation claim challenging his removal as chair on May 25, 2018, against Dean Aistrup in his individual capacity; Dr. Stern's First Amendment retaliation claim challenging his failure to receive an annual evaluation in 2017, against former Provost Boosinger in his individual capacity; and Dr. Stern's First Amendment retaliation claims challenging the denial of a raise for the 2018–19 academic year and of a one-time merit supplement in December 2018, against former Dean Aistrup and former Provost Hardgrave in their individual capacities.

---

capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." (citation and quotation marks omitted)).

These claims also remain pending against President Gogue in his official capacity for prospective injunctive relief.

## II.  JURISDICTION AND VENUE

The court exercises subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights jurisdiction).  Personal jurisdiction and venue are not contested.

## III.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the evidence, and all reasonable inferences drawn from it, in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id.*  Or a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R.

Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials . . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Celotex Corp.*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## IV.  BACKGROUND

The parties' familiarity with the evidence is presumed. Only those facts necessary for resolution of the pending motion for summary are set out here.

### A.  <u>Parties</u>

Dr. Stern is an associate professor in the Department of Economics in the College of Liberal Arts at Auburn University. (*See* Doc. # 83-1, at 8–9 (Pl. Dep.).)[2] He received tenure during the 2009–10 academic year. In 2010, the faculty in his department elected him as chair. He was reelected two more times, in 2013 and

_____

[2] Where a deposition is cited, the cited pages refer to the deposition pages. Record citations otherwise use the pagination as listed in CM/ECF.

5

2016, but was removed midway in his third term by Dean Aistrup.  (Doc. # 83-1, at 110–17, 369.)  Dr. Stern continues to serve as an associate professor in the department.  (Doc. # 83-1, at 28–29.)

Dean Aistrup became the dean of the College of Liberal Arts in September 2013, having come to Auburn University from another institution.  (Doc. # 83-3, at ¶ 1 (Aistrup Decl.).)  Dean Aistrup reported directly to the provost, Auburn University's chief academic officer.  (Doc. # 83-3, at ¶ 2; Doc. # 83-5, at ¶ 2 (Boosinger Decl.).)  Dr. Boosinger served as Auburn's provost from June 2012 until his retirement in December 2017.  In January 2018, Dr. Bill Hardgrave succeeded Dr. Boosinger as provost.  (Doc. # 83-9, at ¶¶ 1–2 (Hardgrave Decl.).)

The provost reports to Auburn University's president.  (Doc. # 83-3, at ¶ 2.)  From 2007 until June 2017, Auburn's president was Dr. Jay Gogue.  Dr. Steven Leath succeeded Dr. Gogue as Auburn's president in June 2017 and served in that position until his resignation in June 2019.  (Doc. # 83-8, at ¶ 1 (Gogue Decl.); Doc. # 83-12, at ¶ 1 (Leath Decl.).)  Dr. Gogue returned as Auburn's president shortly thereafter.  (Doc. # 83-8, at ¶ 1.)

Some background is helpful here about the governance of the economics department and the professional relationships between Dr. Stern and Defendants. During President Gogue's tenure from 2007–17, Dr. Stern was among the faculty members who interacted regularly with President Gogue as President Gogue had a

"fairly 'open door'" policy.  (Doc. # 83-8, at ¶ 5.)  Dr. Stern frequently brought up matters with President Gogue about various aspects of Auburn University, and particularly about the Department of Economics, in person, by phone, or through email.  As a result of their interactions, President Gogue learned that the working relationship between Dean Aistrup and Dr. Stern had become difficult.  (Doc. # 83-8, at ¶¶ 5, 6.)  That relationship become so strained that toward the end of President Gogue's 2007–17 presidency, Dr. Stern asked President Gogue to remove the Department of Economics from the College of Liberal Arts and to place it elsewhere within Auburn's organizational structure.  To provide an interim solution while further consideration was given to the economics department's future, on January 6, 2017, President Gogue directed that Dr. Stern would begin reporting to the provost's office, specifically to Associate Provost Emmett Winn, instead of to Dean Aistrup. This temporary change administratively moved the economics department out of the College of Liberal Arts.  Provost Boosinger was not in favor of the new arrangement. (Doc. # 83-8, at ¶ 8; Doc. # 83-5, at ¶ 25.)

When President Leath became the new president in June 2017, Provost Boosinger recommended that the economics department return to the College of Liberal Arts.  President Leath agreed, and in July 2017, he reinstated the Department of Economics to the College of Liberal Arts with the normal chair-to-dean chain of command restored.  (Doc. # 83-12, at ¶¶ 4–6; Doc. # 83-5, at ¶¶ 25, 27, 28.)  The

Department of Economics remained under the reporting structure of the College of Liberal Arts after Hardgrave succeeded Boosinger as provost.  (Doc. # 83-12, at ¶ 11.)

This action proceeds against Leath, Hardgrave, Boosinger, and Aistrup in their individual capacities.  President Gogue is sued only in his official capacity.

**B.**   **The Speech and Retaliatory Acts**

At his deposition, Dr. Stern summarizes that his protected speech occurred principally in three publications (the *Wall Street Journal*, the *Chronicle of Higher Education*, and the *Alabama Gazette*) and in a public forum (the Auburn University Senate).  (Doc. # 83-1, at 23.)  In his summary judgment brief, Dr. Stern categorizes fifteen instances of protected speech occurring in news articles, and at university senate and committee meetings.  The speech spans from February 4, 2014, to May 18, 2018.  (*See* Doc. # 90, at 21–22 n.7, at 31, at 88.)  Thirteen instances of speech involve Dr. Stern's protests about the clustering of athletes in the public administration major, expressed through different outlets; the fourteenth instance concerns his speech appearing in an article in the *Auburn Plainsman* in December 2014, which addressed his efforts to move the economics department out of the Haley Center's windowless basement; and the fifteenth instance occurred during a meeting with then-President Leath in September 2017.  (Doc. # 83-1, at 293–97.)  Dr. Stern alleges that in the aftermath of his speech, he endured a series of retaliatory

8

employment actions from Defendants.  Discussion of the speech and allegedly retaliatory actions follows.

### 1. Speech

#### a. University Senate Meeting, February 4, 2014

Because some of Dr. Stern's speech occurred at University Senate meetings, some background about the University Senate is helpful.  The University Senate has faculty and student representatives, and its monthly meetings are open to the public.  (Doc. # 83-1, at 43, 166–67.)  After a presenter speaks, the floor opens for discussion and questions.  Any attendee—be it a student, a senator, or a member of the public—can ask questions or make comments.  (Doc. # 83-1, at 39–41, 43.)  The purpose of the University Senate, as set out in the University Senate Constitution, is as follows:

> The University Senate is advisory to the president.  In this capacity it is the body having primary concern for the general academic policies of the University, including those involving curricula, programs, standards, faculty appointment, evaluation and development, student academic affairs and libraries.  The University Senate is also concerned with issues that affect all members of the University community, such as the budget, employee welfare programs, the calendar, and facilities.

(Doc. # 96, at 29.)

At the University Senate meeting on February 4, 2014, the faculty athletics representative, Mary Boudreaux, gave a presentation addressing the NCAA's concerns about improper clustering of student-athletes in specified majors, but she reported that Auburn University "didn't have this problem."  (Doc. # 83-1, at 46.)

Dr. Stern, who at the time served as a senator, questioned her about the accuracy of her report.  He argued that there was an overrepresentation of student-athletes from the football program in the public administration curriculum and that this circumstance suggested academic misfeasance.  (Doc. # 83-1, at 40–46, 140–43.)

Dr. Stern engaged the faculty athletics representative, Mary Boudreaux, as follows[3]:

> Mike Stern, senator, Economics: You showed an interesting slide and made some statements about the clustering of athletes in regards to colleges (is what you showed). I wonder what percentage of football players this past season who saw significant playing time were public administration majors?
>
> Mary Boudreaux . . .: I don't have that information. I don't know.
>
> Mike Stern, senator, Economics: My colleague actually studied that fact and I think he found something like, there are 20 times more likely to be a public administration major than the average student at the university. It was an amazing number. They were all in the exact same major. So I am not sure about the slide and the statement you made about clustering in the programs, but incurring the football team players especially those that saw playing time, majors, we saw an awful lot of a specific repeated major for the football team. But I don't know if you have broken it out by majors and particular athletic programs as opposed to athletics broadly speaking because a lot of the concerns about selection of majors, let's face it, tends to be with the money support. They are the money supports and that's what the typical claims are. So it would be nice to see with respect to the particular sports programs that people are most concerned about in that regard, to see actually what the distribution is in those particular programs, such as football or basketball. Thank you.

---

[3] The minutes and transcript from the February 4, 2014 University Senate meeting can be found at https://www.auburn.edu/administration/governance/senate/minutes/2013-2014/min_02_04_14. html (last visited Mar. 23, 2022).

Mary Boudreaux . . .:  I am not familiar with public administration as a major and I certainly would not want to say it's an easy or bad major. I have no problem with public administration, sounds like a good major to me. But anyway, thank you.

**b.      December 2014 *Auburn Plainsman*'s article titled, *Economics Department Tries to Relocate After Five Years in Haley Center***

In December 2014, an article was published in the student newspaper, the *Auburn Plainsman*, titled, *Economics Department Tries to Relocate After Five Years in Haley Center*.  The article discussed the economics department's offices in the Haley Center basement, and Dr. Stern is quoted.  (*See* Doc. # 89-5.)  Although discussion of this article surfaces in Dr. Stern's summary judgment response (Doc. # 90, at 31), Dr. Stern disclaimed during his deposition that he suffered retaliation based on his speech in this article.  (*See* Doc. # 83-1 at 106–07, 130.)

**c.      February 3, 2015 University Senate Meeting**

At the February 3, 2015 University Senate meeting, the faculty athletics representative made her annual presentation.  Dr. Stern, who was serving as a senator, aggressively challenged the faculty athletics representative about the clustering of athletes in the public administration major.  (Doc. # 83-1, at 130–55.)[4]

---

[4] The minutes and transcript from the February 3, 2015 University Senate meeting can be found at https://www.auburn.edu/administration/governance/senate/minutes/2014-2015/min_02_03_15.html (last visited Mar. 23, 2022).

### d.      March 12, 2015 Senate Executive Committee Meeting

After the February 3, 2015 University Senate meeting, Dr. Stern received official documents pertaining to the academic program review committee's recommendation to close the public administration major. Those documents revealed "disparaging statements" about the major and contradicted the faculty athletics representative's annual presentation. (Doc. # 83-1, at 161–63.) Dr. Stern wanted to report what he had learned to the University Senate executive committee, which he did on March 12, 2015. (Doc. # 83-1, at 158–61, 169–72.)

### e.      Senate Steering Committee Meetings, April 23, 2015, and May 7, 2015

The steering committee is the committee of the University Senate that develops the agenda for the senate meetings. (Doc. # 83-1, at 178.) Dr. Stern went before the senate steering committee twice—on April 23, 2015, and on May 7, 2015—to get placed on the University Senate's agenda. He wanted to make a presentation addressing the improper clustering of athletes in that major and the academic program review committee's recommendation to close the public administration major. (Doc. # 83-1, at 179, 194–203; Doc. # 91-2, at ¶ 11.)

At the April 23, 2015 steering committee meeting, Provost Boosinger was supposed to be in attendance, but he did not show up. Because Provost Boosinger was absent, the chair of the senate delayed consideration of Dr. Stern's request until

the next meeting in early May.  (Doc. # 91-2, at ¶ 11.)  At the May 7, 2015 steering committee meeting, the committee voted against Dr. Stern's request to address the Senate.  (Doc. # 83-1, at 208–10; Doc. # 90, at 25.)

### f.    August 28, 2015 *Wall Street Journal* Article

The *Wall Street Journal* published an article on August 28, 2015, titled *At Auburn, Athletics and Academics Collide*.  The article discussed suspicious student-athlete clustering in Auburn's public administration major, an academic program review committee's vote to close the major, and Provost Boosinger's and Dean Aistrup's override of that vote after they received strong opposition from the athletic department.  (Doc. # 89-6.)  The article was based in part on the documents Auburn University provided in response to a public records request that Dr. Stern and other faculty members in the economics department had initiated through an attorney. (Doc. # 83-1, at 189.)  Dr. Stern is quoted in the article:  "Michael Stern, the chairman of Auburn's economics department and a former member of the faculty senate, said athletics is so powerful at Auburn that it operates like a 'second university.' Whenever athletic interests intersect with an academic matter, he said, 'it's a different kind of process.'"  (Doc. # 89-6, at 2.)

### g.    October 20, 2015 Senate Meeting

At a University Senate meeting on October 20, 2015, Dr. Stern engaged in a discussion about clustering of athletes in the public administration major with a

psychology professor who had served on the intercollegiate athletics committee. Dr. Stern also confronted Provost Boosinger about a "forward curricula conspiracy" and the clustering of athletes in the public administration major. (Doc. # 83-1, at 265–73, 280.) Dr. Stern describes the forward curricula conspiracy as a plan between Provost Boosinger and the athletics department to create or revise additional majors that have sufficient flexibility and electives to accommodate a scholarship athlete's schedule. (Doc. # 83-1, at 270–72.)

### h.    November 1, 2015 *Alabama Gazette* Article titled, *All the Speaker's Men and the Collapse of AU Athletics*

On November 1, 2015, the *Alabama Gazette* published an article, titled *All the Speaker's Men and the Collapse of AU Athletics*. (Doc. # 97-2; Doc. # 89-29 at ¶ 3 (Sophocleus Aff.).) This article referenced the clustering of athletes in the public administration major and reported on the public administration controversy previously exposed by the *Wall Street Journal*. (Doc. # 97-2; Doc. # 89-29 at ¶¶ 3, 4; Doc. # 83-1, at 273–77.) There is no mention of this article in the governing complaint. (Doc. # 47.)

### i.    August 22, 2017 Senate Meeting

At the August 22, 2017 University Senate meeting, Dr. Stern asked then-President Leath about the replacement for the retiring faculty athletics representative. Although Dr. Stern testified at his deposition that he "may have"

brought up the clustering of athletes in the public administration major (Doc. # 83-1, at 287–90), the transcript of the August 22, 2017 University Senate meeting, belies that assertion. *See* https://www.auburn.edu/administration/governance/senate/minutes/2017-2018/ min_08_22_17.html (last visited Mar. 23, 2022). Dr. Stern did not mention the clustering issue at this meeting.

### j.    September 27, 2017 Meeting with then-President Leath

Dr. Stern met with President Leath on September 27, 2017. (Doc. # 83-1, at 293–98.) Dr. Stern requested the meeting because he "had a lot of issues with the faculty athletics representative." (Doc. # 83-1, at 294.) At his deposition, recalling his discussion with President Leath, Dr. Stern said: "[W]e talked about . . . the faculty athletics representative position, what he was looking for in it, you know my concerns, you know, what had happened in the past." (Doc. # 83-1, at 295.) Dr. Stern requested that President Leath appoint him as the faculty athletics representative, but President Leath declined. (Doc. # 83-1, at 296–97.) At the end of the meeting, Dr. Stern and President Leath "turned to talk a little bit about economics." (Doc. # 83-1, at 297.) Dr. Stern recounted his displeasure "'with what [was] going on,'" and President Leath agreed that "[t]hings [had] not been handled correctly . . . .'" (Doc. # 83-1, at 297.) There are no other details about the discussion in the record, and, according to Dr. Stern, he and President Leath "didn't have time to get into it." (Doc. # 83-1, at 298.)

### k.      February 16, 2018 *Chronicle of Higher Education* Article

On February 16, 2018, the *Chronicle of Higher Education* published an article, *Inside Auburn's Secret Effort to Advance an Athlete-Friendly Curriculum*. (Doc. # 89-7.)  This article reignited and relived Dr. Stern's involvement in exposing student-athlete clustering in the public administration major.   The article also discussed Dr. Stern's public records request, his "leak[ing] "everything to *The Wall Street Journal*," and his and Dean Aistrup's strained relationship.   (Doc. # 89-7, at 11, 15.)  Dr. Stern is pictured and quoted in this article:

> "What they have done to me is necessary to keep people in line, or you will have other people speak out," says Stern, who provided *The Chronicle* with documents that he had previously given to *The Wall Street Journal* and other materials he obtained afterward.  "There must be penalties for those who don't play ball, and there have to be rewards for those who do.  Auburn has been cleansed of dissent."

(Doc. # 89-7, at 15.)

### l.      March 1, 2018 *Alabama Gazette* Article, *The Auburn Greed*

On March 1, 2018, a column titled, *The Auburn Greed*, was published in the *Alabama Gazette*.  (Doc. # 97-3; Doc. # 89-29, ¶ 6.)  The column credited Dr. Stern with exposing the public Administration "scandal."  (Doc. # 97-3, at 3.)  The article contains no statements or quotes by Dr. Stern.  Nor does the article identify Dr. Stern as a source of the article.  (Doc. # 97-3, at 2–4.)

16

**m.    University Senate Meetings, March 20, 2018, and May 15, 2018**

In the weeks that followed *The Auburn Greed* article, Dr. Stern attended two University Senate meetings, one on March 20, 2018, and one on May 15, 2018.  At each meeting, he engaged the new faculty athletics representative about the allegedly improper clustering of athletes in the public administration major.  (*See* Doc. # 83-1, at 292–93; 358–69.)[5]  At each of these meetings, Dr. Stern spoke as a substitute for an elected senator.

### 2.    Acts of Alleged Retaliation

Dr. Stern alleges that, as a consequence of his protected speech, he suffered twenty-three acts of retaliation.  (*See* Doc. # 90, at 136–37 (Pl.'s Chart of Allegedly Retaliatory Acts).)  Because, as discussed below, some of these acts are barred by the statute of limitations, discussion of the untimely acts is unnecessary.  Other acts of retaliation also do not survive summary judgment because they either are acts of non-parties or are institutional decisions that are not characteristic of adverse employment actions.  Discussion of these acts' demise is in Part V.C.

---

[5] The minutes and transcript from the March 20, 2018 University Senate meeting can be found at https://www.auburn.edu/administration/governance/senate/transcripts/TrScrpt2017-2018/transcript_03_20_18. html (last visited Mar. 23, 2022).  The minutes and transcript from the May 15, 2018 University Senate meeting can be found at https://www.auburn.edu/administration/governance/senate/minutes/2017-2018/min_05_15_18.html (last visited Mar. 23, 2022).

Below are the acts of alleged retaliation that merit more detailed analysis, even though not all of them ultimately survive summary judgment. These acts include Dr. Stern's removal as chair, as well as the denial of raises and bonuses in the 2016–17, 2017–18, and 2018–19 academic years.

### a.    Raise for the 2016–17 Academic Year

In October 2016, Dr. Stern received a raise of 3.5% for the 2016–17 academic year. At this time, the economics department was in the College of Liberal Arts. Other chairs in the College of Liberal Arts received higher raises. The chair of the psychology department, for example, received a 4% raise. Dr. Stern contends that his raise should have been at least 4.5%.[6] (Doc. # 91-2, at ¶ 19.) He argues that Dean Aistrup and Provost Boosinger awarded him a 3.5% raise in retaliation for his protected speech. The protected speech addressed the allegedly improper clustering of athletes in the public administration major and the academic program review committee's recommendation to close the major. Dr. Stern spoke on these issues,

---

[6] Dr. Stern also asserts that his one-time bonus of 2% in December 2016 was marginal when compared to his colleagues' bonuses ranging from 5% to 7%; however, it turned out that the 2% calculation was an accounting error. Dean Aistrup confirmed that a mistake had been, and thereafter Provost Boosinger awarded Dr. Stern a 7% bonus, which he admits "place[d] him at the top of the CLA [College of Liberal Arts] administrative distribution." (Doc. # 91-2, at ¶ 20; Doc. # 83-4, at 2–3; Doc. # 83-5, at ¶ 20.) To the extent that Dr. Stern contends that his initial 2% raise was retaliatory, that argument is rejected. As Defendants correctly point out, there is no evidence that the accounting error was "the product of intentional retaliation by Dean Aistrup." (Doc. # 84, at 69.) Further discussion on this point is not needed.

as chronologically significant, at an October 20, 2015 University Senate meeting and as reported in the August 28, 2015 *Wall Street Journal* article.

### b.   Failure to Receive an Annual Evaluation on March 6, 2017

In March 2017, Dr. Stern reported to the provost's office, specifically to Associate Provost Emmett Winn, instead of to Dean Aistrup. Because this was Dr. Stern's first year under the governance of the provost's office, Dr. Stern and Dr. Winn had to decide how to handle Dr. Stern's annual evaluation. (Doc. # 91-2, at ¶ 22.) The two tentatively decided that Dr. Winn would author the evaluation, subject to the approval of Winn's superiors. A few days later, on March 6, 2017, Dr. Winn emailed Dr. Stern, stating that: Provost Boosinger "touch[ed] base with Dr. Gogue," and "the decision is not to put you through [an annual evaluation] this year." (Doc. # 91-2, at 51.) Because positive annual evaluations are used to support raises and to document good performances, Dr. Stern believes that the absence of an annual evaluation in 2017 hindered his raises going forward. (Doc. # 83-1, at 510–11.)

In his summary judgment response, Dr. Stern attributes his failure to receive an annual evaluation on March 6, 2017, to President Leath and Provost Boosinger. (Doc. # 90, at 137.) He does not point to any evidence, however, demonstrating that President Leath, who "became employed by Auburn University on June 1, 2017"

(Doc. # 83-12, at ¶ 1), was involved in this decision.  This act goes forward only as to Provost Boosinger.

   **c.**  **Raise and One-Time Merit Supplement for the 2017–18 Academic Year**

   Dr. Stern received a 3% raise for the 2017–18 academic year and a 3% one-time merit supplement in December 2017.  (Doc. # 91-2, at ¶ 24.)  He originally had agreed to the 3% raise and one-time merit supplement because at the time the economics department was operating independently from the College of Liberal Arts.  As Dr. Stern explains it, "[A]ny dollar that I received beyond 3% would come at the expense of the money available for the raises of my faculty."  (Doc. # 91-2, at ¶ 23.)  "This was not the case when we were mixed in with the large budget entity of Liberal Acts, as I could get higher raises at the expense of inferior administrators in the College rather than at the expense of my faculty."  (Doc. # 91-2, at ¶ 23.)  But by the time the 2017–18 academic year rolled around, Dr. Stern's department had been returned to the College of Liberal Arts.  Because the economics department was back under the governance of the College of Liberal Arts, Dr. Stern contends that he should have received a higher raise and one-time merit supplement as those payments "would not have come at the expense of [his] faculty."  (Doc. # 91-2, at ¶ 24.)  He attests that he was due a higher raise and one-time merit supplement

because he was "by objective measures, the best chair in the College of Liberal Arts." (Doc. # 91-2, at ¶ 24.)

Dr. Stern contends that Dean Aistrup and Provost Boosinger gave him a 3% raise and 3% one-time merit supplement in retaliation for his protected speech. (Doc. # 90, at 137.)   The protected speech addressed the allegedly improper clustering of athletes in the public administration major and the academic program review committee's recommendation to close the major.  Dr. Stern spoke on these issues, as chronologically significant and as stated above, at an October 20, 2015 University Senate meeting and as reported in the August 28, 2015 *Wall Street Journal* article.[7]

### d.   Events Surrounding Removal as Chair on May 25, 2018

### 1.   Protected Speech Immediately Preceding Dr. Stern's Removal as Chair

On March 20, 2018, and May 15, 2018, Dr. Stern spoke during two University Senate meetings.  At these meetings, Dr. Stern addressed the allegedly improper clustering of athletes in the public administration major and the academic program review committee's rejected recommendation to close the major.  Also, on February 16, 2018, the *Chronicle of Higher Education* article was published in which Dr.

---

[7] As explained later in this opinion, Dr. Stern did not speak on these issues during the August 22, 2017 University Senate meeting.

Stern was quoted concerning his involvement in exposing student-athlete clustering in the public administration major.  (Doc. # 89-7.)

In late April to early May 2018, Dean Aistrup decided to remove Dr. Stern as chair.  He implemented that decision on May 25, 2018, officially demoting Dr. Stern from chair to an associate professor in the economics department.  (Doc. # 83-3, at ¶ 41.)  When Dean Aistrup removed Stern as chair, he also provided him with a memorandum reflecting that Dean Aistrup had evaluated his performance for 2017 as "unacceptable."   Dean Aistrup's memorandum downgrading Dr. Stern's evaluation stated:  "Dr. Stern, you did not provide me with your annual performance review materials for 2017.  In accordance with Provost Hardgrave's directive of April 6, 2018 (attached), you are given an evaluation of unacceptable."  (Doc. # 91-2, at 48, 49; Doc. # 83-3, at ¶ 41.)

Dr. Stern continued to receive the same salary and benefits through the end of his scheduled third term as chair (*i.e.*, from June 2018 through August 2019).  (Doc. # 83-3, at 130, 144.)  After that, Dr. Stern's pay reverted to that of an associate professor, which resulted in a $41,000 reduction in his annual salary.  (*See* Doc. # 90, at 164.)

**2.     Dean Aistrup's Prior Attempts to Remove Dr. Stern as Chair, As Told by Dr. Stern**

Dr. Stern contends that his removal as chair was the culmination of a plan Dean Aistrup devised in 2014 to oust him as chair for speaking out publicly against the public administration major.  That plan, as laid out by Dr. Stern, was as follows.

In the spring of 2014, which was after Dr. Stern had challenged the faculty athletics representative at the February 5, 2014 University Senate meeting, Dean Aistrup met with Dr. Stern for his annual evaluation.  At that meeting, Dean Aistrup initiated the topic of hiring an outside chair for the economics department to replace Dr. Stern, but then followed up in an email asking Dr. Stern to keep quiet this discussion "between [Dr. Stern] and the Dean's office."  (Doc. # 83-1, at 100–01, 524–26; Doc. # 89-18 (Mar. 5, 2014 email).)

In August 2015, which was after Dr. Stern had again brought up the public administration controversy at the February 2015 University Senate meeting, Dean Aistrup discussed with Dr. Stern his desire to hire an outside chair for the economics department.  Dr. Stern strongly opposed the proposal of hiring an external chair.  (Doc. # 91-2, at ¶¶ 14, 15.)  As a result of Dr. Stern's opposition, in August 2015 (which was "just days before" the *Wall Street Journal* article), Dean Aistrup held a meeting with the economics faculty for a vote to replace Dr. Stern as chair with an "external hire"; to sweeten the offer, Dean Aistrup explained that the chair would be

paid from Provost Boosinger's budget, and not from the economics department's budget. The faculty, however, voted unanimously against replacing Dr. Stern. (Doc. # 83-1, at 524–25; *see also* Doc. # 83-2, at 66–73; Doc. # 91-2, at ¶ 15.)

A few months later, after Dr. Stern spoke out against the public administration major at the October 20, 2015 University Senate meeting, Dean Aistrup tried to create new policies for the College of Liberal Arts related to the chair position. (Doc. # 83-1, at 526–27; *see also* Doc. # 89-21 (Aistrup's Nov. 11, 2015 email requesting a vote on changes to the "Chair Election Policy").) According to Dr. Stern, these policies would have permitted the dean to "reject without any sort of real reason the department's vote" on a chair. (Doc. # 83-1, at 527.) Finally, by Dr. Stern's account, on January 12, 2017, Dean Aistrup "admitted that he had been on a long campaign to replace [Dr. Stern] as Chair, but that he had just been doing it 'for [Dr. Stern's] own good.'" (Doc. # 91-2, at ¶ 20.)

Based on the foregoing facts, Dr. Stern contends that Dean Aistrup, with the support of Provost Hardgrave and President Leath, removed him as chair in retaliation for his protected speech, dating back to 2014.[8] Dr. Stern also contends that Dean Aistrup's reason for the unacceptable evaluation is pretextual because

---

[8] When Dean Aistrup made the decision to remove Dr. Stern as chair, Dr. Hardgrave had succeeded Dr. Boosinger as provost. (Doc. # 83-9, at ¶¶ 1–2 (Hardgrave Decl.).)

Provost Hardgrave's directive in the memorandum discussed a chair's evaluation of a faculty member, not a dean's evaluation of a chair.  (Doc. # 91-2, at ¶ 33.)

### 3.    Dean Aistrup's Prior Attempts to Remove Dr. Stern as Chair, as Told by Dean Aistrup

Dean Aistrup admits that he, as well as Provost Boosinger, opposed Dr. Stern's serving a third term as chair, even though the economics department faculty had voted in favor of Dr. Stern for a third term commencing in September 2016. (Doc. # 83-3, at ¶ 25; Doc. # 83-5, at ¶ 19.)  Dean Aistrup expressed his opposition in a meeting with President Gogue and Provost Boosinger, but President Gogue supported Dr. Stern's third term as chair.[9]  Following this meeting, Dean Aistrup was resigned to re-appoint Dr. Stern to a third term, unless he could convince Dr. Stern to step aside voluntarily.  (Doc. # 83-3, at ¶ 25.)

In April 2016, Dean Aistrup met with Dr. Stern for that purpose.  Dean Aistrup told "Dr. Stern that [he] believed his continued service as chair was stunting his growth as an academic" and that Dr. Stern "would be better served by focusing on research and publications as opposed to administrative duties" to help him obtain a

---

[9] In the chart set out in his summary judgment response, Dr. Stern says that this meeting occurred in September 2016.  (Doc. # 90, at 137; *see also* Doc. # 90, at 35 ("In or around September 2016, Aistrup and Boosinger met with President Gogue, and Aistrup and Boosinger again advocated to Gogue that Stern be removed as Chair." (citing Doc. # 83-1, at 525, 527)).)  The cited evidence, which is Dr. Stern's deposition testimony, does not indicate the date the meeting occurred.  Dean Aistrup testified, and his testimony is unrebutted, that the meeting occurred in April 2016 (Doc. # 83-3, at ¶ 24.)

promotion from associate to full professor.  (Doc. # 83-3, at ¶¶ 24–25.)  Dr. Stern did not agree to step aside as chair.  Hence, Dean Aistrup told Dr. Stern in that meeting that he would reappoint him as chair.[10]  (Doc. # 83-3, at ¶ 25.)

### 4.   The Reasons Dean Aistrup Asserts for Removing Dr. Stern as Chair

Dean Aistrup declares that his decision to remove Dr. Stern as chair of the economics department was based primarily on grounds of insubordination.  The most egregious episodes of Dr. Stern's insubordination, according to Dean Aistrup, were (1) Dr. Stern's refusal to acknowledge that the arrangement whereby the economics department (and thus Dr. Stern) reported to Associate Provost Winn had ended in July 2017; (2) Dr. Stern's corresponding refusal to follow the proper chain-of-command and, instead of seeking to address concerns and obligations with Dean Aistrup or other the College of Liberal Arts leadership, going directly to the President's or Provost's offices; (3) Dr. Stern's refusal to hire senior faculty for the Department of Economics as directed by Dean Aistrup; (4) Dr. Stern's failure to timely and properly submit tenure and promotion ("T&P") files to Dean Aistrup and instead to deliver the department's T&P files to the Provost's Office; (5) Dr. Stern's

---

[10] Dr. Stern says that, as of September 2016, Dean Aistrup had not formally reappointed him as chair.  (Doc. # 83-1, at 115 ("I received no documents stating that I had been reappointed chair of the economics department."); *see generally* Doc. # 83-1, at 115–21, 519–36; Doc. # 84, at 156–58.)  Dr. Stern admits though that, after his reelection to a third term, he continued to perform all the duties of chair and to receive a chair's salary.  (Doc. # 83-1, at 116, 121.)

removal of Dean Aistrup from email distribution lists or refusal to include him at all;
(6) Dr. Stern's refusal to participate in the 2017–18 academic program review
process for the Economics Department (before that process was postponed by
Provost Hardgrave); and (7) Dr. Stern's refusal to participate in leadership meetings
for the College of Liberal Arts.  (*See* Doc. # 83-3, at ¶¶ 32, 35–38, 41; Doc. # 83-5,
at ¶ 31; Doc. # 83-9, at ¶¶ 6, 8; Doc. # 83-12, at ¶¶ 9–10, 14.)

Dean Aistrup also argues that Dr. Stern's removal as chair had nothing to do
with Dr. Stern's protected speech at the University Senate meetings on March 20,
2018, and May 15, 2018.  That is because he says he was unaware that Dr. Stern had
spoken at these University Senate meetings.  (Doc. # 83-3, at ¶ 42.)

### e.      Denial of a Raise for the 2018–19 Academic Year and of a One-Time Merit Supplement in December 2018

Dr. Stern did not receive a merit raise for the 2018–19 academic year.  He also
did not receive a one-time merit supplement in December 2018.  (Doc. # 91-2,
at ¶ 35 ("In October of 2018 and December of 2018, I did not receive any raise or
one-time merit supplement. That was consistent with me [sic] not receiving a raise
letter in September of 2018 like every other faculty member in the Department.").)
Dr. Stern also was the only professor in his department who was not awarded a one-
time merit supplement in 2018, and he contends that Dean Aistrup's cursory
performance rating of "unacceptable" in May 2018 is to blame.  (Doc. # 83-1, 521–

27

23; Doc. # 90, at 115, 162.)  This also was the only year he did not receive a bonus since his appointment as chair of the economics department, despite his having received excellent performance reviews throughout his tenure as chair. (*See* Doc. # 89-3 (performance evaluations); Doc. # 90, at 164 (citing record).)

Dr. Stern contends that these monetary sanctions were in retaliation for "new instances of protected speech."  (Doc. # 90, at 162.)  He points to his having served as a source for the *Chronicle of Higher Education*'s February 2018 article, which discussed the issue of student-athlete clustering in the public administration major. He also points to his speech at the March 2018 and May 2018 University Senate meetings.  (Doc. # 90, at 162–63.)

Because the University Guidelines provide that the provost had to approve any raise of 0% (Doc. # 91-2, at ¶ 35), Dr. Stern seeks to hold Provost Hardgrave responsible, as well as Dean Aistrup, for denying him a raise.  Dr. Stern also contends that Provost Boosinger is liable for this act (Doc. # 90, at 137 (chart)), but he does not point to any evidence or argue any theory for holding Provost Boosinger responsible.  Provost Boosinger retired from Auburn University in December 2017. These First Amendment retaliation claims proceed therefore against Provost Hardgrave and Dean Aistrup, but not against Provost Boosinger.

## V. DISCUSSION

Defendants assert myriad challenges. They invoke Eleventh Amendment immunity and raise the statute of limitations as a bar to most of the allegedly retaliatory acts. Defendants also argue that they had no notice (via the Second Amended Complaint or otherwise) of some instances of protected speech, that other of Dr. Stern's speech does not receive First Amendment protection, that they are not vicariously liable for acts by non-parties, and that none of the adverse acts is causally connected to the protected speech. Defendants also raise qualified immunity as an affirmative defense to some of the claims. Dr. Stern counters these arguments.

Bottom line, Defendants' arguments are persuasive as to all but the following of Dr. Stern's First Amendment claims for relief for allegedly retaliatory acts: Dr. Stern's First Amendment retaliation claim challenging his removal as chair on May 25, 2018, against Dean Aistrup in his individual capacity; Dr. Stern's First Amendment retaliation claim challenging his failure to receive an annual evaluation in 2017, against former Provost Boosinger in his individual capacity; and Dr. Stern's First Amendment retaliation claims challenging the denial of a raise for the 2018–19 academic year and of a one-time merit supplement in December 2018, against former Dean Aistrup and former Provost Hardgrave in their individual capacities.

A. <u>**Eleventh Amendment Immunity**</u>

Defendants raise Eleventh Amendment immunity as a bar to the official-capacity claims against President Gogue for monetary damages. (Doc. # 84, at 4 n.1.) Dr. Stern has not rebutted Defendants' invocation of Eleventh Amendment immunity, and appropriately so.

Dr. Gogue has Eleventh Amendment immunity in his official capacity, except as to claims for prospective injunctive relief. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity. . . should be treated as suits against the State."); *Ex parte Young*, 209 U.S. 123, 159–60 (1908). This immunity forecloses Dr. Stern's request, not only for monetary damages, but also for an award of back pay. *Lussier v. Dugger*, 904 F.2d 661, 669 (11th Cir. 1990) (Back pay is "retroactive relief" that "would constitute the payment of money damages from the state treasury in a suit against state officials" and, thus, is barred by the Eleventh Amendment). Accordingly, Defendants' motion for summary judgment based on Eleventh Amendment immunity is due to be granted.

B. <u>**Instances of Protected Speech that Are Not Properly Before the Court**</u>

Defendants argue that three instances of speech related to the controversy about the public administration major are not properly before the court because they are not mentioned in the governing second Amended Complaint. Additionally, they

point out that Dr. Stern affirmatively abandoned reliance on one of these instances of speech.

In his summary judgment response, Dr. Stern relies on an article in the *Alabama Gazette*, titled *All the Speaker's Men and the Collapse of AU Athletics*, which was published in November 2015.  (Doc. # 97-2.)  This article referenced the clustering of athletes in the public administration major and reported on the public administration controversy previously exposed by the *Wall Street Journal*.  (Doc. # 97-2 (article); Doc. # 89-29, at ¶¶ 3, 4; Doc. # 83-1, at 273–77.)  Dr. Stern also identifies the October 20, 2015 University Senate meeting as a forum in which he engaged Provost Boosinger (and another faculty member) about the forward curricula conspiracy and the athletic scandal surrounding the public administration major.  (*See* Doc. # 90, at 88.)  Dr. Stern's summary judgment response (Doc. # 90 at 96–98) also relies on the article titled, *Economics Department Tries to Relocate After Five Years in Haley Center*, that was published in December 2014 in Auburn University's student newspaper, the *Auburn Plainsman*.  The article discusses the economics department's offices in the Haley Center basement, and Dr. Stern is quoted.  (*See* Doc. # 89-5.)

The governing Second Amended Complaint, which contains 181 paragraphs, does not mention Dr. Stern's speech in the November 2015 *Alabama Gazette* article, his speech at the October 20, 2015 University Senate meeting, or his speech in the

December 2014 *Auburn Plainsman* article.   And there is no factual basis in the allegations to read Dr. Stern's First Amendment retaliation claims as resting on these three occurrences of speech.   A plaintiff may not amend the complaint through summary judgment briefing.   *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).   Defendants are entitled to notice of a plaintiff's claims in the complaint, and defendants are not required to "infer all possible claims that could arise out of facts set forth in the complaint."   *Id.*   To permit Dr. Stern to proceed on First Amendment claims arising from this speech would subvert the purposes of notice pleading under Federal Rule of Civil Procedure 8(a), which are "to enable the responding party to identify the pleader's claim, [to] frame a responsive pleading, and to permit the court to determine which facts are intended to support which claims."   *Stinson ex rel. K.R. v. Maye*, 824 F. App'x 849, 855 (11th Cir. 2020) (citing *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015)). Dr. Stern's belated attempts to bring First Amendment retaliation claims on these instances of speech comes too late.

Also, Defendants point out that, during his deposition, Dr. Stern renounced the third instance of speech.   When asked if he was alleging retaliation by Defendants because of his participation in the December 2014 *Auburn Plainsman* article, Dr. Stern replied:  "No, that is not my contention for this specific retaliation here that we are seeking redress for.  I don't attribute those acts to that article."  (Doc. # 83-1

at 106–07, 130.)   And Dr. Stern's post-deposition affidavit does not attempt to resurrect this speech as actionable.  (Doc. # 91-2.)  Defendants argue, and the court agrees, that Dr. Stern "cannot now change his mind (or his pleadings) in an attempt to avoid summary judgment."  (Doc. # 96, at 54.)

## C.   The Allegedly Retaliatory Acts (Adverse Employment Actions)[11]

Dr. Stern enumerates twenty-three allegedly retaliatory acts dating back to 2014.  The list identifies each act, the date of each act, and who is responsible for the act.  (Doc. # 90, at 136–37.)  The alleged acts range from written and oral criticisms against Dr. Stern's protests about the public administration major, inferior treatment of the economics department, repeated efforts to remove Dr. Stern as chair of the economics department, and the denial of full raises and bonuses.  Those committing these transgressions against Dr. Stern include Defendants and non-Defendant university officials.

For the reasons discussed in the following four subparts, seventeen of the alleged retaliatory acts are insufficient to support a First Amendment claim of retaliation.

---

[11] In this opinion, the phrases, "adverse employment action," "acts of retaliation," and "retaliatory acts" are used interchangeably.

### 1.      The Statute of Limitations and the Continuing Violation Doctrine

The statute of limitations on § 1983 claims brought in Alabama is two years.
*See Powell v. Thomas*, 643 F.3d 1300, 1303 (11th Cir. 2011).  The two-year statute
of limitations under § 1983 begins to run when the plaintiff knows or has reason to
know "(1) that [he] ha[s] suffered the injury that forms the basis of [his] complaint
and (2) who has inflicted the injury."  *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th
Cir. 2003).  Therefore, the triggering date for the running of the statute of limitations
on a § 1983 First Amendment retaliation claim is the date the plaintiff learns that a
defendant has retaliated against him for engaging in protected speech.   The
retaliatory act—not the protected speech—is the significant event for measuring the
start date of the statute of limitations.

Defendants argue that all the acts of alleged retaliation occurring outside the
two-year period preceding September 18, 2018—the date Dr. Stern commenced this
action—are time barred.  (Doc. # 84, at 45.)  Dr. Stern acknowledges that the
retaliatory acts that accrued prior to September 18, 2016, fall outside the statute of
limitations.  (*See, e.g.,* Doc. # 90, at 136, 146.)  He argues, though, that the
continuing violation doctrine permits him to sue on these otherwise time-barred
claims.  (Doc. # 90, at 107–08.)  For the reasons to follow, the two-year statute of
limitations establishes the temporal parameters of Dr. Stern's timely claims, and the
continuing violation doctrine is inapplicable.  As a result, the two-year statute of

limitations narrows Dr. Stern's § 1983 First Amendment retaliation claims from twenty-three to fifteen.

The continuing violation doctrine resurrects "an otherwise time-barred claim when additional violations of the law occur within the statutory period." *McGroarty v. Swearingen*, 977 F.3d 1302, 1307 (11th Cir. 2020) (quoting *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006)). The doctrine is constrained "to situations in which a reasonably prudent plaintiff would have been unable to determine that a violation had occurred." *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1335 (11th Cir. 2006). "If an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1221–22 (11th Cir. 2001) (holding that the continuing violation doctrine did not save the plaintiff's untimely charge where the plaintiff "suspected age discrimination when he resigned"). In other words, the continuing violation doctrine does not apply to discrete acts of discrimination that occur outside the statute of limitations. Each discrete act starts a new clock, and "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

The continuing violation doctrine originated in Title VII jurisprudence, *see id.*, but the Eleventh Circuit has extended the doctrine to claims under § 1983. *See City of Hialeah v. Rojas*, 311 F.3d 1096, 1101–02 (11th Cir. 2002) (applying the continuing violation doctrine to claims under § 1983); *see also O'Connor v. City of Newark*, 440 F.3d 125, 127–28 (3d Cir. 2006) ("[T]he *Morgan* rule that individually actionable allegations cannot be aggregated is of particular import in the context of First Amendment retaliation claims."); *MacKenzie v. City of Miami Beach*, Case No. 07-21357-Civ-Ungaro, 2008 WL 11331842, at *7 (S.D. Fla. Apr. 16, 2008) (concluding that, as to a § 1983 claim, *Morgan* "effectively abolish[ed] the 'continuing violation' doctrine as applied to discrete acts." (quoting *Morgan*, 536 U.S. at 113)).

Here, the facts are not suited for the continuing violation doctrine. The evidence establishes that the alleged harms were discreet and were known to Dr. Stern. Dr. Stern testified that, at the time of each allegedly retaliatory act, he believed that his First Amendment rights had been violated. He also testified that he knew, as early as 2014, that Defendants were taking retaliatory actions against him for his speech. (*See, e.g.*, Doc. # 83-1, at 100, 450–51 (Answer: "I believe . . . retaliation began after that February '14 . . . Senate meeting." Question: "And you knew . . . in 2014 that retaliatory actions were being taken against you, correct?" Answer: "Correct." Question: "Same thing is true for 2015, correct?" Answer:

"Yeah, 2014 forward.").)  Dr. Stern's position in his summary judgment response is consistent with his deposition testimony.  He argues that each act of retaliation is adverse under First Amendment jurisprudence (Doc. # 90, at 138–44) and that "many of these individual retaliatory acts, alone, are sufficient to stand as adverse actions that would, from an objective point of view, deter a person of ordinary firmness from continuing to engage in protected speech . . . ."  (Doc. # 90, at 146 & n.96 (citation and internal footnote omitted); *see also* Doc. # 90, at 109 (contending that the "diplomacy email" in February 2014 "could easily be seen as a reprimand" in response to his comments made at the university senate meeting); Doc. # 90, at 136 ("Most, if not all, of the alleged retaliatory acts are actionable as 'adverse actions' under First Amendment jurisprudence[.]" (all caps omitted)).  The acts of which Dr. Stern complains, in his own words, are discrete, actionable acts of retaliation.  Dr. Stern was aware of his injuries when the acts occurred; therefore, it is reasonable to expect that he should have filed a lawsuit alleging retaliation within two years of each act.

Dr. Stern argues that the alleged retaliatory actions are timely because they involved an ongoing campaign of harassment.  (Doc. # 90, at 107–11.)  He contends that the alleged campaign of harassment is equivalent to a single claim that began prior to but extended into the limitations period.  This argument relies on *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005), but that reliance is misplaced.

37

In *Bennett*, the plaintiffs alleged that law enforcement officers subjected them to a campaign of harassment in retaliation for their support for a county referendum that the sheriff opposed.  423 F.3d at 1248.  The issue was whether the plaintiffs had shown that the "retaliatory conduct adversely affected the protected speech," as required to demonstrate the second element of a First Amendment retaliation claim.  The *Bennett* court did not address the statute of limitations or the continuing violation doctrine; its decision does not help Dr. Stern's argument for saving untimely retaliatory acts.  As another district court in this circuit recently explained, "the *Bennett* court focused on whether the pattern of harassment satisfied the substantive elements of a retaliation claim . . . ."  *Davis v. Chapman*, No. 3:19-CV-24 (CAR), 2021 WL 4442358, at *4 (M.D. Ga. Sept. 28, 2021).  It did not examine a "pattern of harassment in the statute of limitations context" or hold that "a campaign of harassment alters the statute of limitations rule."  *Id.* (rejecting the continuing violation doctrine as sufficient to save time-barred acts of retaliation brought under the First Amendment).

In sum, Dr. Stern filed his lawsuit on September 18, 2018.  All Dr. Stern's claimed injuries that stemmed from Defendants' allegedly retaliatory acts occurring more than two years prior to September 18, 2018, are time-barred.  The continuing violation doctrine does not apply to save these discrete claims.

The time-barred acts total eight and encompass (1) Dean Aistrup's "diplomacy" email in February 2014, (2) Dean Aistrup's proposals in 2014 and 2015 to hire an external senior faculty member to replace Dr. Stern as the chair of the economics department, (3) Dr. Stern's negative performance review for the 2014 year, (4) the University Senate steering committee's May 2015 vote not to include Dr. Stern on the senate's agenda, (5) comments Dean Aistrup made to Dr. Stern at the May 2015 College of Liberal Arts retreat, (6) the delay in providing Dr. Stern with his five-year administrative review in the spring of 2016, and (7)–(8) Dr. Stern's low raises and bonuses in 2014 and 2015.[12]  (*See* Doc. # 84, at 48.)  These eight allegedly retaliatory acts are time barred and cannot form the basis of an actionable First Amendment claim.

The following fifteen alleged acts of retaliation are not time barred:

| Acts of Alleged Retaliation | Date of Occurrence | Individual Responsible |
| --- | --- | --- |
| (1) Refusal to help with moving the economics department out of the Haley Center basement | September 18, 2016 through 2017 | Dean Aistrup and Provost Boosinger |
| (2) Failure to formally reappoint Dr. Stern for the third term as Chair | September 8, 2016 through May 25, 2018 | Dean Aistrup |
| (3) Provost Boosinger's instruction not to give Dr. Stern an annual evaluation (which laid the groundwork for denying Dr. Stern an annual raise and one-time merit supplement in 2018) | March 6, 2017 | Provost Boosinger |

---

[12] It is not necessary, therefore, to address Defendants' other arguments challenging these acts.

| | | |
|---|---|---|
| (4) The return of the Department of Economics to the governance of the College of Liberal Arts | July 5, 2017 | Provost Boosinger and President Leath[13] |
| (5) Refusal to create an independent School of Economics | July 5, 2017 | Provost Boosinger, Dean Aistrup, and President Leath |
| (6) Elimination of budget, blocking of IT hire, other hiring obstacles, *etc.* | Fall 2017–Spring 2018 | Dean Aistrup and Provost Boosinger |
| (7) Removal as Chair[14] (and acts leading up to the removal, including Dean Aistrup's failed attempts to have Dr. Stern removed either voluntarily or involuntarily) | May 25, 2018 | Dean Aistrup, Provost Hardgrave, and President Leath |
| (8) Low annual raises for the 2016–17 and 2017–18 academic years and low bonus in 2017 | September 18, 2016 through December 2017 | Dean Aistrup and Provost Boosinger |
| (9) No annual raise or bonus for the 2018–19 academic year | 2018 | Dean Aistrup and Provosts Boosinger and Hardgrave |
| (10) Attempts to have staff keep information and students away from Dr. Stern | June 12, 2018 | Dr. Kim and Dr. Aditi Sengupta |
| (11) Excluded as Senator | July 30, 2018 | Dr. Kim |
| (12) Replacement of Dr. Stern's wife (Liliana Stern) as senator | July 30, 2018 | Dr. Kim |
| (13) Removal of Dr. Stern's access to budgetary information through the Banner system | November 9, 2018 | Dr. Kim |
| (14) Failure to appoint to departmental committees | July 2018 through Spring 2019 | Dr. Kim |
| (15) Removal from graduate student's dissertation committee | April 2019 | Dr. Kim |

---

[13] In his chart (Doc. # 90, at 136–37), Dr. Stern lists Dean Aistrup as a third administrator who was involved in this decision, but he cites no evidence of Dean Aistrup's involvement.  The evidence Dr. Stern cites (*see* Doc. # 90, at 154 n.104) is a July 5, 2017 memorandum from Provost Boosinger to Dean Aistrup, informing Dean Aistrup that "I [Provost Boosinger] have made the following decisions related to the Department of Economics," including that "[t]he Department of Economics will remain in the College of Liberal Arts."  (Doc. # 83-5, at 31.)

[14] In his chart, Dr. Stern lists as separate retaliatory acts a 2016 meeting in which Dean Aistrup and Provost Boosinger advocated unsuccessfully to President Gogue for Dr. Stern's removal as chair and (2) Dean Aistrup's failure to formally reappoint Dr. Stern for the third term as chair.  (Doc. # 90, at 137.)  Going forward, these acts are considered not as separate acts, but as part of the context leading up to Dr. Stern's removal as chair.  This avoids any statute of limitation bar as well, *see supra* note __.

(*See* Doc. # 90, at 137 (Pl.'s Chart).)

Notably, the chart above does not include any acts by President Gogue.  Dr. Stern testified that he is unaware of any retaliatory action taken against him by President Gogue (Doc. # 83-1 at 467–68), and for that reason, Dr. Gogue is sued in his official capacity only.

### 2. *The Sufficiency of the Adverse Employment Actions to Sustain a Claim of Retaliation Under the First Amendment*

"[W]hether an employee suffered an 'adverse employment action' is a 'preliminary matter' that must be resolved first" when an employee alleges a First Amendment retaliation claim.  *Buending v. Town of Redington Beach*, 10 F.4th 1125, 1135 (11th Cir. 2021).  With the tightening of the claims to timely acts of alleged retaliation, the court turns to two additional challenges to Dr. Stern's assertions of adverse employment actions:  (1) that the retaliatory acts by non-parties are not actionable; and (2) and that some of the acts of alleged retaliation are institutional decisions that are not characteristic of adverse employment actions.  Defendants' arguments on these points are persuasive.

#### a. Acts of Retaliation by Non-Parties

In (10) through (15) in the above chart, Dr. Stern sets forth six acts of retaliation by Dr. Hyeongwoo Kim and one act of retaliation by Dr. Aditi Sengupta.  (*See also* Doc. # 90, at 137 (chart); Doc. # 90, at 170–81.)  Dr. Kim succeeded Dr.

Stern as chair of the economics department.  As the new chair, Dr. Kim selected Dr. Sengupta as co-director of the economics graduate program.  (*See* Doc. # 90, at 53 n.38.)  Neither Dr. Kim nor Dr. Sengupta is a party to this lawsuit.

Defendants contend that they cannot be held liable for the acts of their subordinates—Dr. Kim and Dr. Sengupta—because vicarious liability is not available under § 1983 and because Dr. Stern has not presented evidence suggesting that Defendants are responsible for the acts of either Dr. Kim or Dr. Sengupta.  (Doc. # 84, at 40 n.15, 71; Doc. # 96, at 7.)  They are correct, which presumptively is why Dr. Stern has not addressed this argument in his summary judgment response.

Under § 1983, a supervisor can be held liable for his or her personal acts; however, "[i]t is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (citation and internal quotation marks omitted); *see also Monell v. N.Y. City Dep't of Social Serv.*, 436 U.S. 658 (1978).

In his summary judgment brief, Dr. Stern has not argued any theory or presented any evidence to attach liability to any Defendant for the allegedly retaliatory acts of Dr. Kim and Dr. Sengupta.  Dr. Stern refers to his deposition testimony (*see, e.g.,* Doc. # 90, at 176, 178), but that testimony relies on nothing more than speculation.  Namely, Dr. Stern "suspects" that Dr. Kim "believes that

they [Hardgrave and Aistrup] are pleased by [his] discomfort," (Doc. # 83-1, at 489–90), but he has not connected that suspicion to any direct or inferential evidence. (*See* Doc. # 90, at 178; Doc. # 83-1, at 475–77, 482–97; Doc. # 96, at 55–56.)  The other evidence he cites, which includes his and Jennifer Bruno's affidavits (*see* Doc. # 90, at 173–180), also does not link Dr. Kim's acts to any directive of a Defendant. Dr. Stern's hunch that Defendants commanded Dr. Kim and Dr. Sengupta to deny Dr. Stern job-necessary information, committee assignments, and a senator position, no matter how steadfastly believed by him, is insufficient to survive summary judgment.  *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Unsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion.  Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (cleaned up)).  Accordingly, summary judgment is due to be entered in Defendants' favor on the First Amendment retaliation claims predicated on the allegedly retaliatory acts of third parties, Dr. Kim and Dr. Sengupta.[15]

---

[15] Defendants raise other challenges to these third-party acts, including that they do not qualify as adverse employment actions (*see* Doc. # 84, at 48–53); however, it is unnecessary to address these arguments.

### b.    Alleged Adverse Employment Actions by President Leath, Provost Boosinger, and Dean Aistrup Pertaining to Institutional Decisions Affecting the Economics Department

Defendants contend that some of the allegedly retaliatory acts are large-scale institutional decisions that "are simply not of the nature to constitute an adverse action against Stern." (Doc. # 84, at 51.)  Those acts, which are set out in (1), (4), (5), and (6) in the above chart, encompass the following:  (1) Dean Aistrup's and Provost Boosinger's failure to provide adequate assistance in connection with the relocation of the economics department out of the Haley Center basement; (4) the related decision in 2017 to return the economics department to the College of Liberal Arts;  (5) President Leath's decision in 2017, at Provost Boosinger's recommendation, not to establish an independent school of economics; and the (6) cryptic "[e]limination of budget, blocking of IT hire, other hiring obstacles, etc."[16]  Although the parties have not cited, and this court has not found, on-point

_____

[16] In his response to the summary judgment motion, Dr. Stern captions the retaliatory acts in (6) as including the "[e]limination of budget, blocking of IT hire, other hiring obstacles, etc." (Doc. # 90, at 151 (heading 2); *see also* Doc. # 90, at 137 (chart).)  He alludes to these acts in a footnote, stating only that, after the Department of Economics was returned to the College of Liberal Arts in July 2017, Provost Boosinger and Dean Aistrup retaliated against him by "blocking the budget, staffing, and hiring of an IT person." (Doc. # 90, at 154 n.104.)  Dr. Stern then cites six pages of his deposition testimony.  (Doc. # 83-1, at 251–53 (testifying that his speech "is certainly responsible for various negative things that happened to the unit [economics department], from blocking hiring, which hurts everybody, from not proceeding as we had agreed with our school.  Not having millions of dollars of surplus in the budget benefits everybody's career in the unit"); at 475 (testifying that President Leath conspired to "get rid of my budget, block hiring and so forth"); at 509 (testifying that the July 5, 2017 memorandum from Provost Boosinger included the "blocking of that IT hire at that time . . . "); at 509–10 (testifying that Dr. Boosinger's retaliation

caselaw, this circuit's precedent defining adverse employment actions in the First Amendment public employment context supports Defendants' position.

The circuit's recent decision in *Bell v. Sheriff of Broward County*, 6 F.4th 1374 (11th Cir. 2021), which was decided after briefing on the summary judgment motion closed, is instructive.

In *Bell*, the Eleventh Circuit acknowledged that its precedent is "muddled" when it comes to defining an adverse employment action for a First Amendment retaliation claim brought by a public employee. *See* 6 F.4th at 1377. The *Bell* court examined its prior decisions on the subject. It explained that in 2004 it had held that retaliatory adverse actions implicate "'important condition[s] of employment,'" such as "'discharges, demotions, refusals to hire or promote, and reprimands.'" *Id.* (quoting *Stavropoulos v. Firestone*, 361 F.3d 610, 618 (11th Cir. 2004), *abrogated as to Title VII standard by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The next year in 2005, it decided *Bennett*, holding that "'a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely

---

included "everything involved" with the "supposed return to liberal arts or the hire blocking and so forth and elimination of new budget and so forth").

This testimony does not establish what staffing was blocked or what the circumstances were surrounding the "hiring of an IT person." Also, Dr. Stern's testimony does not elucidate on what the "etc." and "so forth" are. The absence of meaningful discussion and context about these events requires guesswork as to how these actions qualify as adverse employment actions suffered by Dr. Stern. From what can be gleaned, these actions occurred as a result of the decision to return the economics department to the College of Liberal Arts. Because that decision meant that the economics department would not have its own budget or its own staff, these non-descript events are analyzed here.

deter a person of ordinary firmness from the exercise of First Amendment rights.'"
*Id.* (citing *Bennett*, 423 F.3d at 1250). The *Bennett* decision "distinguished
*Stavropoulos*" for claims brought by private citizens, *id.* (citing *Bennett*, 423 F.3d
at 1250), because "[p]lainly, private citizens cannot suffer adverse employment
actions at the hands of public officials who are not their employers." *Id.* (citing
*Bennett*, 423 F.3d at 1252). However, the Eleventh Circuit then recognized that to
confuse matters, more than a decade later, in a "case involving the First Amendment
retaliation claim of a police officer, [the Eleventh Circuit] applied *Bennett* without
mentioning *Stavropoulos*." *Id.* (citing *Bailey v. Wheeler*, 843 F.3d 473, 477, 480–
81 (11th Cir. 2016)). In *Bell*, the Eleventh Circuit found a "way out of the
precedential conundrum" because the deputy sheriff did not suffer an adverse
employment action "under both the *Stravropoulos* and *Bennett* standards." *Id.*
at 1378. Hence, while in *Bell* the Eleventh Circuit thought it was important to flag
the "potential intra-circuit conflict," it did not have to resolve the issue. *Id.*

The conundrum also is avoidable here. First, a reasonable, university
department chair would not have been dissuaded from exercising his personal
constitutional rights because higher-ranking university officials made institutional
decisions with which he disagreed. Here, one decision pertained to the physical
location of the economics department, and another decision was that the economics
department should be part of the College of Liberal Arts instead of a free-standing

college.  A department chair may be professionally affected by these decisions, but he or she does not suffer a sufficient personal effect from the decisions that is distinct from the effect on the University generally.

Second, these decisions affected the entire economics department; they are not synonymous with a discharge, demotion, or reprimand.  They are not the types of decisions and actions that support a First Amendment retaliation claim under the circuit's guiding principles.  Dr. Stern cites no authority that supports a contrary finding.

 Accordingly, Defendants are entitled to summary judgment on Dr. Stern's First Amendment claims predicated on President Leath's decision, at Provost Boosinger's recommendation, not to establish an independent school of economics; the related decision to return the economics department to the College of Liberal Arts; and Dean Aistrup's and Provost Boosinger's failure to provide adequate assistance in connection with the relocation of the economics department out of the Haley Center basement.[17]

---

[17] Alternatively, as to the decision in July 2017 to administratively move the Department of Economics back to the College of Liberal Arts and the related refusal to support the proposal for an independent School of Economics, these acts are not temporally related to any of Dr. Stern's protected speech.  The *Wall Street Journal* article was published in August 2015—twenty-three months before these decisions were made.  Dr. Stern did not engage in protected speech between the *Wall Street Journal* article and the *Chronicle of Higher Education* article, which was published in February 2018.  Dr. Stern cannot create an inference of causation based on a 23-month temporal gap.

### c.     Summary of Surviving Acts of Alleged Retaliation

The following acts of alleged retaliation remain for further analysis:

| Acts of Alleged Retaliation | Date of Occurrence | Individual Responsible |
| --- | --- | --- |
| (1) Provost Boosinger instructed Winn not to give Dr. Stern an annual evaluation, which laid the groundwork for denying Dr. Stern an annual raise and one-time merit supplement in 2018. | March 6, 2017 | Provost Boosinger |
| (2) Removal as Chair (and acts leading up to the removal, including Dean Aistrup's failed attempts to have Dr. Stern removed either voluntarily or involuntarily) | May 25, 2018 | Dean Aistrup, Provost Hardgrave, and President Leath |
| (3) Low annual raises for the 2016–17 and 2017–18 academic years and low bonus in 2017 | September 18, 2016 through December 2017 | Dean Aistrup and Provost Boosinger |
| (4) No annual raise for the 2018–19 academic year or bonus in 2018 | 2018 | Dean Aistrup and Provosts Boosinger and Hardgrave |

(*See* Doc. # 90, at 137 (Pl.'s Chart).)

### d.     Qualified Immunity

Defendants argue that they are entitled to qualified immunity as to some, but not all, claims.  (Doc. # 84, at 56–61.)  All claims upon which Defendants moved for qualified immunity in their opening brief have been disposed of on other grounds, as set out in the preceding discussion.  It is, thus, unnecessary to address this defense. In their reply brief (to which Dr. Stern has responded), Defendants raise a new qualified immunity argument, which is addressed below.

48

C.     **Principles Governing First Amendment Retaliation**

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (citations omitted). "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v Barlett*, 139 S. Ct. 1715, 1722 (2019) (citation and quotation marks omitted). However, "a public employee's right to freedom of speech is not absolute." *Carter v. City of Melbourne*, 731 F.3d 1161, 1168 (11th Cir. 2013). A public employee does not enjoy an unqualified right to freedom of speech because "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering*, 391 U.S. at 568. Thus, the aim is to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id*. (alteration added).

In the public employment context, a four-part test governs to strike the balance whether the employee has proven a First Amendment retaliation claim. The sequential inquiries are, first, "whether the employee spoke as a citizen on a matter of public concern," *Garcetti*, 547 U.S. at 418; second, "whether the employee's

interest in speaking outweighs the government's legitimate interest in efficient public service"; third, "whether the speech played a substantial part in the government's challenged employment decision"; and fourth, "whether the government would have made the same employment decision in the absence of the protected conduct." *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1563–64 (11th Cir 1995) (citation omitted). The first two inquiries are "questions of law" for the court. *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015) (citation omitted). The third and fourth inquiries focus on the causal link between the speech and the adverse employment action, and "are questions of fact" for the jury, "unless the evidence is undisputed." *Id.*

As to the burden of proof, the employee must prove the first three elements by a preponderance of the evidence. *Battle v. Bd. of Regents for Georgia*, 468 F.3d 755, 760 (11th Cir. 2006). If the employee meets that burden, the burden shifts to the employer to prove the fourth element by a preponderance of the evidence. *See id.*

**D.    Protected Speech**

To qualify as protected speech, a public employee must demonstrate (1) that the speech "addressed a subject of public concern" and (2) that he "spoke in his capacity as a citizen, rather than as an employee." *Moss*, 782 F.3d at 618 (citing *Garcetti*, 547 U.S. at 421). Speech relates to a matter of public concern when it is

"fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). To decide this issue, courts scrutinize "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48. The "public concern" requirement serves "to prevent the federal courts from becoming 'a roundtable for employee complaints over internal office affairs.'" *Carter*, 731 F.3d at 1168 (quoting *Connick*, 461 U.S. at 149). The Eleventh Circuit has "emphasized that 'a public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run.'" *Id.* (quoting *Ferrara v. Mills*, 781 F.2d 1508, 1516 (11th Cir. 1986)).

Furthermore, when deciding whether an employee is speaking "as a citizen," the Supreme Court has looked at whether the speech was made pursuant to the employee's official duties. *See Garcetti*, 547 U.S. at 421. "Under *Garcetti*, the central inquiry is whether the speech at issue owes its existence to the employee's professional responsibilities." *Alves v. Bd. of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1161 (11th Cir. 2015) (cleaned up). In other words, the court must ask "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Carollo v. Boria*, 833 F.3d 1322, 1329 (11th Cir. 2016) (quoting *Lane v. Franks*, 573 U.S. 228, 239 (2014)).

The Eleventh Circuit also has addressed First Amendment speech in the public higher-education setting.   On the one hand, it has recognized that "speech that concerns internal administration of the educational system and personal grievances will not receive constitutional protection."  *Maples v. Martin*, 858 F.2d 1546, 1552 (11th Cir. 1988) (illustrating that speech criticizing salaries, tenure decisions, a proposed course syllabus, and course assignments is unprotected (collecting cases)). On the other hand, the Eleventh Circuit has concluded that "teachers whose speech directly affects the public's perception of the quality of education in a given academic system find their speech protected."  *Id.* at 1553 (illustrating that protected speech includes speech that addresses funding issues, admission policies, and accreditation standards (collecting cases)).

In *Maples*, the Eleventh Circuit held that tenured engineering professors at Auburn University engaged in protected speech when they published a report that questioned the mechanical engineering department's accreditation status based upon "weaknesses in the curriculum, inadequate facilities, a low faculty-to-school ratio, . . . the poor performance of Auburn graduates on the professional licensing exams for engineers, all of which endanger[ed] the ability of the Department to prepare students for professional engineering careers."  *Id.*  "The status of an academic department's accreditation is the type of subject usually held to be of interest to the general public."  *Id.*

### 1.    Dr. Stern's Protected Speech

Defendants accept that Dr. Stern's speech appearing in the articles in the *Wall Street Journal* and in the *Chronicle of Higher Education*, as well as Dr. Stern's remarks made to the University Senate and its committees, are protected speech. (*See* Doc. # 84, at 40–41.)  Through these mediums, Dr. Stern criticized the public administration major.  (*But see* Part IV.C.3.a. below.)  He questioned the quality of the courses in the public administration major, the major's long-term educational value, and the major's ability to prepare graduates for employment in the field.  He also honed in on the major's alleged syphoning of star athletes to safeguard their athletic scholarships and academic eligibility.

Based on *Maples*, these instances of speech touch on matters of public concern, and Dr. Stern lodged these criticisms as a private citizen, and not pursuant to his professional job responsibilities.  *See* 858 F.2d at 1553.  Hence, Dr. Stern engaged in protected speech when his speech on these issues was published in the *Wall Street Journal* and in the *Chronicle of Higher Education* and when he made his remarks to the University Senate and its committees.

    **2.**    ***Dr. Stern's Speech that Is Not Protected***

    **a.**    **Dr. Stern's Speech at the August 22, 2107 University Senate Meeting**

Dr. Stern overlooks that he did not speak about the number of scholarship athletes majoring in public administration at the August 22, 2017 University Senate meeting.  Although Dr. Stern testified at his deposition that he "may have" brought up the clustering issue (Doc. # 83-1, at 287–90), the transcript of the August 22, 2017 meeting reveals that he did not.  *See* https://www.auburn.edu/administration/governance/senate/minutes/2017-2018/min _08_22_17.html (last visited Mar. 23, 2022).  Dr. Stern asked President Leath about whether he had selected someone to replace the retiring faculty athletics representative, but Dr. Stern is not claiming in this lawsuit that this line of speech is protected under the First Amendment.  Because Dr. Stern did not discuss a topic at the August 22, 2017 meeting that falls within the parameters of what he is alleging is protected speech, Dr. Stern's dialogue with President Leath at the August 22, 2017 meeting will not be considered in the First Amendment analysis.

    **b.**    **Speech Pertaining to the Economics Department's Facilities**

Defendants contend that Dr. Stern's vocal effort to move the economics department out of the Haley Center is not protected speech.  (Doc. # 96, at 3–6; *see* Doc. # 83-1, at 35–36, 208, 211–12, 415, 465, 530, 532, 545–48.)  This speech encompasses

Dr. Stern's statements in an *Auburn Plainsman*'s article titled, *Economics Department Tries to Relocate After Five Years in Haley Center*, in December 2014. As already discussed, Dr. Stern has disavowed that he is claiming retaliation for his speech in this article.  (Doc. # 96, at 3; Doc. # 83-1 at 106–07, 130.)  Even if Dr. Stern were pursuing a retaliation claim based on this speech, the claim would not succeed.  When Dr. Stern engaged in speech and conduct related to his desire—as chair of the Department of Economics—to move the department out of the Haley Center's windowless basement into better office space, he did so as an employee of Auburn and in his capacity as chair, not as a private citizen.  The evidence concedes this point.  In his 2014 self-assessment, Dr. Stern belabored his inability to achieve the relocation of the economics department from the basement as one of his failures as chair.  (Aistrup Decl. at ¶ 15, Ex. E.)  This speech was inextricable from his duties and responsibilities as chair of the economics department.  *See Maples*, 858 F.2d at 1553.

Second, Defendants argue that Dr. Stern's discussion about the economics department in his meeting with then-President Leath on September 27, 2017, is not protected speech.  (Doc. # 90, at 98.)  The court agrees.  Dr. Stern admits that his statements to President Leath lacked substance.  Dr. Stern testified that "towards the end [of the meeting], we turned to talk a little bit about economics"; "I said, you know, '[I'm] . . . very displeased with what is going on,'" to which President Leath

replied, 'Things have not been handled correctly . . . .'" (Doc. # 83-1, at 297.)  Dr. Stern does not contend that there was any more to the conversation.  Rather, he confirmed at his deposition that he and President Leath "didn't have time to get into it." (Doc. # 83-1, at 298.)  This is not the sort of stuff of which protected speech is made.

### c.   The March 2018 *Alabama Gazette* Article

Defendants also argue that the March 2018 article that ran in the *Alabama Gazette—The Auburn Greed*—does not contain speech *by* Dr. Stern.  Dr. Stern responds that he "contributed significantly" to the article.  (Doc. # 90, at 92.) Defendants have the better argument.

This article credits Dr. Stern with his having "first exposed internally" the public administration major "scandal," as reported in the August 2015 *Wall Street Journal* article.  (Doc. # 97-3, at 3.)  The *Alabama Gazette* summarized the *Wall Street Journal* article, but it does not contain new speech by Dr. Stern.  The article also contains no statements made by Dr. Stern, and Dr. Stern is not identified in the article as having supported or contributed to the March 2018 article.  While the article's author has submitted an affidavit that Dr. Stern "contributed significantly to the article" (Doc. # 89-29), there is no evidence that any Defendant knew of Dr. Stern's behind-the-scenes involvement in the article's making.  Dr. Stern's involvement cannot be gleaned from the article itself since it gives Dr. Stern no

attribution.  Categorizing this article as containing protected speech by Dr. Stern is too tenuous.

### d.    Qualified Immunity

In their reply brief, Dean Aistrup and Provost Boosinger raise a new qualified immunity argument as to Dr. Stern's speech about the public administration major before the University Senate and its committees.  (Doc. # 96, at 28–30.)  Defendants "concede[]" that Dr. Stern's "speech delivered in the University Senate in 2014, 2015, and 2018 was protected by the First Amendment."  (Doc. # 96, at 28.)  But they argue that they are entitled to qualified immunity in their individual capacities because it is "not clearly established in Eleventh Circuit or United States Supreme Court precedent—and is not to this day—that Stern appeared and spoke in the Senate (or a Senate committee) as a citizen rather than as an Auburn employee," given that the "University Senate exists as part of the 'shared governance' concept."  (Doc. # 96, at 28–30.)  Defendants also point out that Dr. Stern spoke either as a senator or as a senator substitute at these meetings.  In his sur-reply, Dr. Stern counters that his "official duties as both a professor and Senate representative ended when he began speaking about the Public Administration major, which had absolutely nothing to do with his role as an economics professor or a Senate representative for the Economics Department."  (Doc. # 103, at 3–8.)

Under the doctrine of qualified immunity, "courts may not award damages against a government official in his personal capacity unless the official violated a statutory or constitutional right, and the right was 'clearly established' at the time of the challenged conduct." *Lane v. Franks*, 573 U.S. 228, 243 (2014) (citation and quotation marks omitted). A constitutional right—the First Amendment—is at issue in this case. One element of the First Amendment inquiry is "whether the speech at issue was made primarily in the employee's role as citizen, or primarily in the role of employee." *Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir. 1988). Here, Defendants focus on the clearly established prong of the qualified immunity inquiry. "[T]he salient question . . . is whether the state of the law" at the time of the adverse employment actions was clearly established so as to provide "fair warning" to Defendants that, at the university senate and its committee meetings, Dr. Stern was speaking primarily as a citizen, rather than as an employee, when he criticized a college major that was not in his department or under his governance as chair of the economics department. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation and quotation marks omitted).

*Garcetti* is instructive. In *Garcetti*, the Supreme Court held that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.

"The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at 240. "Factors such as the employee's job description, whether the speech occurred at the workplace, and whether the speech concerns the subject matter of the employee's job may be relevant, but are not dispositive." *Garcetti*, 547 U.S. at 420–21. "*Garcetti* instructed that '[t]he proper inquiry is a practical one.'" *Moss*, 782 F.3d at 618 (quoting *Garcetti*, 547 U.S. at 424). However, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane*, 573 U.S. at 240. Significantly, for purposes of this opinion, the Eleventh Circuit has held that "*Garcetti* gave reasonable public officials fair warning that it violates the First Amendment to terminate a colleague in retaliation for speaking about matters of public concern that are outside the scope of his ordinary job responsibilities." *Carollo*, 833 F.3d at 1334.

Dr. Stern spoke seven times about the public administration major and athletic clustering at University Senate meetings and at its committee meetings. He spoke at the University Senate, once in 2014, once in 2015, and twice in 2018. He also addressed the topic at three committee meetings—at a senate executive committee meeting and at two senate steering committees—all in 2015. (*See* Doc. # 83-1, at 23, 165–72, 179, 186–88, 194–203, 208–10, 292–93, 358–59.)

Dr. Stern has submitted evidence that his speech about the public administration major was outside the scope of his ordinary job responsibilities as chair of the economics department. Dr. Stern emphasizes that his job description as chair did not concern the academic integrity of the public administration program. The public administration major was housed in the political science department, not in the economics department, and he exercised no governance over that major. (Doc. # 90, at 76 (record citations omitted).) To bolster his position, Dr. Stern relies on evidence that he did not obtain information about the public administration major through his job as chair of the economics department. Rather, he had to rely on third parties and a FOIA request. (Doc. # 90, at 76–77 (record citations omitted).) And, while his speech at the University Senate meetings occurred on Auburn University's campus, it did not occur in the halls of Dr. Stern's department. Also, Dr. Stern used multiple public forums to voice his complaints about the public administration major, including the *Wall Street Journal*. In other words, Dr. Stern did not limit his forums to those affiliated with Auburn University, and Dean Aistrup and Provost Boosinger knew that. (*See, e.g.*, Doc. # 91-2, at ¶ 16 (notifying the steering committee at its May 7, 2015 meeting, which Provost Boosinger attended, that he (Dr. Stern) was going to work with a reporter on an article to expose the public administration major's flaws).) The *Garcetti* factors weigh decidedly in Dr. Stern's favor. *See* 547 U.S. at 420–21.

Defendants, though, point to the faculty handbook's provisions providing that the University Senate is the mechanism through which faculty members are involved "in the formulation and review of institutional policies which affect the academic and professional welfare of the University and the Faculty." (Doc. # 96, at 29.) Defendants argue that, when Dr. Stern spoke in the forum of the University Senate, he spoke as an employee about institutional policies pertaining to an academic major. Defendants' argument that the forum takes the speech out of the parameters of *Garcetti*'s fair warning is not convincing. The University Senate is a public forum open for anyone to ask questions of a presenter. That is what Dr. Stern did; he questioned the accuracy of the faculty athletics representative's presentation in a public meeting. Defendants' argument might be stronger had Dr. Stern been the one giving the presentation. But the steering committee, which sets the agenda for the University Senate meetings, denied his request to make a formal presentation addressing the suspicious clustering of athletes in the public administration major and the rejected recommendation of the academic program review committee to close the major. (Doc. # 83-1, at 208–10.) The steering committee did not think that Dr. Stern's speech was appropriate fodder for a University Senate meeting.

Because the evidence, construed in the light most favorable to Dr. Stern, shows that the matters of public concern upon which Dr. Stern spoke were "outside the scope of his ordinary job responsibilities," *Garcetti*'s fair warning stands.

61

*Carollo*, 833 F.3d at 1334.  Based upon the evidence at summary judgment and *Garcetti*'s pronouncements, qualified immunity is improper on Defendants' argument that it was not clearly established that Dr. Stern spoke at senate and committee meetings as a citizen rather than as an employee.

### 3.    Summary

The following chart delineates the instances of speech and adverse employment actions, in chronological order, that go forward for an analysis of causation.[18]  Because each adverse employment action is a discreet act, each action constitutes a separate First Amendment retaliation claim.

| Speech | February 4, 2014 Senate meeting | Dr. Stern confronts the faculty athletics representative about improper clustering of athletes in the public administration major |
| --- | --- | --- |
| Speech | February 3, 2015 Senate meeting | Dr. Stern questions the faculty athletics representative more aggressively regarding clustering of athletes in the public administration major |
| Speech | Senate Executive Committee Meeting—March 12, 2015 | Dr. Stern met with the University Senate Executive Committee to discuss what he had learned regarding the Academic Program Review documents and clustering of athletes in the public administration major. |
| Speech | Two Senate Steering Committee Meetings—April 23, 2015 & May 7, 2015 | Dr. Stern went before the University Senate Steering Committee twice in an effort to get placed on the Senate's agenda to speak about the academic program review documents and clustering of athletes; his requests were denied. |
| Speech | *Wall Street Journal* Article—Aug. 28, 2015 | This article exposed the clustering of athletes in the public administration major. |

---

[18] Causation, for example, addresses the arguments pertaining to temporal proximity.

| | | |
|---|---|---|
| Adverse Act | March 6, 2017 | Provost Boosinger instructed Winn not to give Dr. Stern an annual evaluation, which laid the groundwork for denying Dr. Stern an annual raise and one-time merit supplement in 2018. |
| Adverse Acts | September 18, 2016 through December 2017 | Dean Aistrup and Provost Boosinger awarded Dr. Stern low annual raises for the 2016–17 and 2017–18 academic years and a low bonus in 2017 |
| Adverse Act | 2018 | Dean Aistrup and Provost Boosinger denied Stern an annual raise and one-time merit supplement in 2018 |
| Speech | *Chronicle of Higher Education* Article—*Inside Auburn's Secret Effort to Advance an Athlete-Friendly Curriculum*—Feb. 16, 2018 | This article further exposes the clustering of athletes in the public administration major, as well as Auburn University administration's attempt to cover it up through a "forward curricula conspiracy" and the athletics department's attempt to stack the public administration program with athletes before it was closed. |
| Speech | March 20, 2018 University Senate meeting | Dr. Stern questioned the new faculty athletics representative about the clustering of athletes in the public administration major. |
| Speech | May 15, 2018 University Senate Meeting | Dr. Stern discussed the clustering of athletes in the public administration major. |
| Adverse Act | May 25, 2018 removal as chair (and acts leading up to the removal, including Dean Aistrup's failed attempts to have Dr. Stern removed either voluntarily or involuntarily) | Dean Aistrup, Provost Hardgrave, and President Leath were involved in Stern's removal as chair. |

## E. Whether the Employee's Interest in Speaking Outweighs the Government's Legitimate Interest in Efficient Public Service (*Pickering Balancing*)

The second element of the four-part *Beckwith* test considers "whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service." *Beckwith*, 58 F.3d at 1563. Defendants' arguments on this

element are limited.  (*See* Doc. # 84, at 53–56; Doc. # 96, at 21–23.)  As to the First Amendment claims that go forward for additional analysis, Defendants have not brought a challenge under this element.  Rather, Defendants focus on the third and fourth elements of the *Beckwith* test to which the discussion turns.

## F.   Whether the Speech Played a Substantial Part in the Challenged Employment Decisions

Defendants argue that there is an absence of evidence on the third *Pickering* factor.  (Doc. # 84, at 61.)  To get his claims before the jury, Dr. Stern "ha[s] to present enough evidence for a reasonable jury to conclude that his protected speech was a 'substantial' motivating factor in the decision to" remove him as chair and to deny him raises and bonuses.  *Beckwith*, 58 F.3d at 1564.  In *Beckwith*, the Eleventh Circuit explained that "the employee's burden is not a heavy one."  *Id.  Beckwith* illustrated its point with a discussion of the Supreme Court's decision in *Waters v. Churchill*, 511 U.S. 661 (1994):

> In *Waters*, Churchill brought a § 1983 claim against a state hospital alleging that her termination was in retaliation for protected speech. Briefly addressing the intent issue, the Court concluded that a material issue of fact was created by evidence of Churchill's criticism of hospital policy, evidence of management "sensitivity" about the criticisms, and evidence of conduct that, viewed in the light most favorable to the plaintiff, showed management hostility because of the criticisms.  The Court relied on a sudden drop in Churchill's performance evaluations, criticism of her relationship with a doctor, and a supervisor's unusual ordering of Churchill out of an operating room as significant evidence of management hostility.  Thus, purely circumstantial evidence, taken

> in the light most favorable to the plaintiff, can create a jury question on
> the issue of the government's motive.

*Beckwith*, 58 F.3d at 1564–65 (internal citations and footnotes omitted).

There is no "single" or bright-line standard for measuring whether an employee meets his or her "burden of demonstrating that a retaliatory intent was a 'substantial' or 'motivating factor' behind a government employment decision." *Beckwith*, 58 F.3d at 1564. "[P]urely circumstantial evidence, taken in the light most favorable to the plaintiff, can create a jury question on the issue of the government's motive." *Id.* at 1565. A plaintiff could point to, for example, a "temporal relationship between the protected speech and the adverse action," evidence that the asserted reason for the adverse employment action was pretextual, "any comments made, or actions taken, by the employer indicating that the discharge was related to the protected speech," shifting reasons for implementing the adverse employment action, or "evidence of management hostility to the speech in question." *Stanley v. City of Dalton*, 219 F.3d 1280, 1290 n.18 (11th Cir. 2000). A plaintiff also could rely on a "sequence of events" between the first protected expression and the adverse employment action to demonstrate "a relatively slow and deliberate process to terminate" an employee: "the delay does not operate to destroy an inference of causation." *Beckwith*, 58 F.3d at 1564.

### 1.   *Removal as Chair*

Dr. Stern alleges that Dean Aistrup removed him as chair of the economics department on May 25, 2018, in retaliation for his speech regarding clustering of student-athletes in the public administration, dating back to 2014.  Dr. Stern also testified that Provost Hardgrave, who assumed the provost position in January 2018, and President Leath were involved in the retaliatory act of removing him as chair. (Doc. # 83-1, at 476–78; Doc. # 90, at 137 (chart).)

### a.   **Dean Aistrup**

Defendants argue that, while Dr. Stern's speech was protected by the First Amendment, Dr. Stern has failed to produce sufficient evidence for a reasonable jury to find "any causal connection" between Dr. Stern's dismissal as chair and his protected speech.  According to Defendants, Dean Aistrup did not know about Dr. Stern's protected speech at the March 2018 and May 2018 University Senate meetings.  Dean Aistrup has submitted a declaration that he did not attend these two meetings and did not learn about Dr. Stern's speech at those meetings until after he had removed Dr. Stern as chair.  (Doc. # 83-3, at ¶ 42.)  Defendants argue that, because Dean Aistrup "did not have any knowledge of Stern's speech," Dr. Stern "cannot show that his spring 2018 discussions about [the public administration major] in the University Senate substantially motivated Dean Aistrup to make the decision to remove him as Chair."  (Doc. # 84, at 66–67; *see also* Doc. # 96, at 34

(pointing out that Dr. Stern "completely ignores Defendants' uncontradicted evidence that Dean Aistrup, who made the decision to remove Stern as Chair, had no knowledge whatsoever of Stern's March 2018 or May 2018 Senate presentations").)

Dr. Stern bears the burden to "establish that the employer was actually aware of the protected expression at the time it took adverse employment action." *Roberts v. Rayonier, Inc.*, 135 F. App'x 351, 358 (11th Cir. 2005); *cf. Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155–56 (11th Cir. 2002) (holding that the plaintiff could not prove causation on a Title VII retaliation claim where there was no evidence rebutting the decisionmaker's affirmative attestation that he lacked knowledge of the speech at the time he transferred the plaintiff). As this court has said in the context of a First Amendment retaliation claim, "[n]o knowledge means no motive." *Tipton v. Houston Cnty. Bd. of Educ.*, No. 1:17-CV-588-WKW, 2019 WL 2176174, at *5 (M.D. Ala. May 20, 2019). Dr. Stern's summary judgment response is devoid of any argument or citation to the record that raises a genuine dispute of material fact that Dean Aistrup knew about Dr. Stern's speech at these two University Senate meetings. Dr. Stern has not pointed to any evidence from which to infer Dean Aistrup's knowledge, and his arguments do not address Dean Aistrup's explicit declaration. The court is not required to scour the record in search of arguments and evidence to support a claim. *See Resolution Trust Corp. v. Dunmar*

*Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments . . . ." (internal citation omitted)). Dean Aistrup's declaration—affirmatively denying knowledge of Dr. Stern's speeches at the March 2018 and May 2018 university senate meetings—stands unrebutted. There is, therefore, no evidence from which to infer a causal connection between Dr. Stern's removal as chair and his protected speech at the March 2018 and May 2018 University Senate meetings. Accordingly, Dr. Stern has failed to create a genuine dispute of material fact that Dean Aistrup removed him as chair in retaliation for his speech at the March 2018 and May 2018 University Senate meetings.

Dr. Stern's silence on this point does not defeat his claim that Dean Aistrup removed him as chair in retaliation for his protected speech in the *Chronicle of Higher Education* article. Dean Aistrup admits his knowledge of the *Chronicle* article, but he argues that the "three-month gap between the February 16, 2018 *Chronicle* article and the May 25, 2018 removal [as chair] cannot, on its own, support an inference of causation because the time period is not sufficiently close" in time." (Doc. # 84, at 67 (citation omitted).) This argument must fail.

In the First Amendment retaliation context, the Eleventh Circuit has opined that "gaps of time, standing alone, do not preclude [a plaintiff] from producing

enough evidence for a reasonable jury to conclude that protected speech was a substantial factor in the decision to terminate him." *Stanley*, 219 F.3d at 1291 (citing *Beckwith*, 58 F.3d at 1567; *Schneider v. Indian River Comm. College Found., Inc.*, 875 F.2d 1537, 1543 n.9 (11th Cir. 1989)).  In *Beckwith* and *Schneider*, lapses of ten and fourteen months between the protected speech and adverse employment actions were not fatal to the employees' First Amendment retaliation claim.  *See Beckwith*, 58 F.3d at 1567 (fourteen-month lapse in time); *Schneider v. Indian River Comm. College Found., Inc.*, 875 F.2d 1537, 1543 n.9 (11th Cir. 1989) (ten months).  Considering these precedents, Defendants have not shown that the three-month gap, "standing alone," precludes Dr. Stern from establishing that his protected speech was a substantial factor in the decision to remove him as chair.  Rather, "*all* the evidence and *any* logical inferences drawn from that evidence" must be considered.  *Beckwith*, 58 F.3d at 1564.

Dr. Stern has submitted sufficient circumstantial evidence, construed in favor of the non-movant, to take his claims to the jury.  This evidence includes the nature of the actions and comments by Dean Aistrup toward Dr. Stern's speech about the suspicious clustering of student-athletes the public administration major and Dean Aistrup's attempts to remove Dr. Stern as chair that followed close on the heels of Dr. Stern's protected speech.  *See Stanley*, 219 F.3d at 1291 n.20; *Beckwith*, 58 F.3d at 1564.

First, Dr. Stern's evidence reveals that Dean Aistrup in the past had confronted Dr. Stern about his public protests that Auburn University improperly clustered athletes in the public administration major to protect their eligibility.  According to Dr. Stern, in May 2015, at a faculty retreat, Dean Aistrup told Dr. Stern that he should keep his complaints "in house" and should stay away from the press.  (Doc. # 83-1, at 238–39; *see also* Doc. # 91-2, at ¶ 16.)  Second, Dr. Stern submits evidence that, after the return of the economics department to the College of Liberal Arts in July 2017, Dean Aistrup delayed additional funding for the economics department and deferred approval of Dr. Stern's proposal for new faculty hires.  (Doc. # 91-2, at ¶¶ 25–29.)  Third, there is some evidence suggesting that the process used to appoint Dr. Stern's replacement did not follow department procedures or practices. (*Compare* Doc. # 83-7, at 110 (§ 2.3.2 of the Faculty Handbook) ("The chair or head of a department, who serves as the chief representative of the department within an institution, should be selected by departmental election or by appointment following consultation with members of the department and of related departments[.]") and Doc. # 89-7, at ¶ 5 (College of Liberal Arts' Procedures for Selection and Appointment of Department Chairs and School Directors), *with* Docs. # 89-25, at ¶ 2 (Beard Aff.), Doc. # 89-27, at ¶ 5 (L. Stern Aff.), and Doc. # 89-28, at ¶ 11 (Seals Aff.) (all attesting that they are voting faculty members in the economics department

and that Dean Aistrup did not consult with them concerning the appointment of Dr. Kim as department chair).)

The foregoing "purely circumstantial evidence, taken in the light most favorable to [Dr. Stern], can [and does] create a jury question on the issue of the [Defendants'] motive." *Beckwith*, 58 F.3d at 1565. Dr. Stern has created a genuine dispute of material fact that his speech played a substantial part in his removal as chair.

### b.    Provost Hardgrave

Dr. Stern testified that he believes that Provost Hardgrave, who became Auburn's Provost in January 2018, also was involved in the decision to remove him as chair and harbored a retaliatory motive for the removal. (Doc. # 83-1 at 477–78.) However, Dr. Stern's deposition testimony is speculative on the issue of Provost Hardgrave's allegedly retaliatory motive, fails to rebut Provost Hardgrave's declaration, and does not create a genuine dispute of material fact for trial as to Provost Hardgrave's liability. (Doc. # 83-9, at ¶¶ 8–11.) Summary judgment is due to be entered in Provost Hardgrave's favor on Dr. Stern's First Amendment retaliation claim predicated on his removal as chair.

### c.    President Leath

In the chart in his summary judgment response, Dr. Stern lists President Leath as an administrator who is responsible for his removal as chair. (Doc. # 90, at 137.)

Dr. Stern, though, does not point to any evidence or make any argument for holding President Leath accountable for that decision.  (*See* Doc. # 90, at 164–66.)  Also, in his deposition, Dr. Stern does not attribute any act pertaining to his removal as chair to President Leath.  (*See, e.g.*, Doc. # 83-1, at 475–76.)  For these reasons, President Leath is entitled to summary judgment on Dr. Stern's First Amendment retaliation claim predicated on his removal as chair.

## 2.   *Dr. Stern's Failure to Receive an Annual Evaluation in 2017 and the Subsequent Denial of a Raise for the 2018–19 Academic Year and of a One-Time Merit Supplement in December 2018*

In October 2018, Dr. Stern did not receive a raise for the 2018–19 academic year, and in December 2018, he did not receive a one-time merit supplement.  (*See* Doc. # 91-2, at ¶ 35.)  Dr. Stern contends that Dean Aistrup and Provost Hardgrave denied him a raise and a bonus in retaliation for "new instances of protected speech."[19]  (Doc. # 90, at 162; Doc. # 90, at 137 (chart).)  He points to his having served as a source for the *Chronicle of Higher Education*'s February 2018 article, which discussed the issue of student-athlete clustering in the public administration

---

[19] Dr. Stern's evidence focuses on Dean Aistrup's actions, as well as on the actions of the "Provost."  (Doc. # 91-2, at ¶ 35 ("Provost").)  He attests that "[t]he University Guidelines specifically stated that the Provost had to approve any raise of 0% . . . ."  (Doc. # 91-2, at ¶ 35.)  But Dr. Stern does not identify which "Provost" (Boosinger or Hardgrave)."  (Doc. # 91-2, at ¶ 35.)  This evidence, viewed in the light most favorable to Dr. Stern, supports a reasonable inference that Provost Hardgrave, who became provost on January 1, 2018, had to approve the decision to deny Dr. Stern a raise.

major.  He also cites his speech at the March 2018 and May 2018 University Senate meetings.  (Doc. # 90, at 162–63.)

Defendants proffer two arguments in support of summary judgment.  First, they argue that "[t]he absence of temporal proximity negates any inference of causation." (Doc. # 84, at 70.)  Pinpointing Dr. Stern's speech as occurring on March 20, 2018, and May 15, 2018, at the University Senate meetings, Defendants focus on the four- and six-month gaps between Dr. Stern's speech and the dates the denials of the raise and bonus went into effect.  (Doc. # 84, at 70.)  To reiterate but not to belabor the point, a four- to six-month lapse between the protected speech and the alleged retaliatory conduct is not fatal to a First Amendment retaliation claim.  *See Stanley*, 219 F.3d at 1291–92; *see Schneider*, 875 F.2d at 1543 n.9; *Beckwith*, 58 F.3d at 1566 (finding that the circumstantial evidence created a jury issue on causation, notwithstanding that the employee's protected speech occurred more than a year prior to his termination and rejecting the argument "that it takes an improbable leap over one year in time to conclude that Appellant's speech substantially motivated his termination").  The temporal gap is not conclusive in Defendants' favor.

Second, Defendants argue that multiple, legitimate reasons supported the withholding of a raise and bonus for Dr. Stern for the 2018–19 academic year.  They contend that Dr. Stern "receive[d] a 0%–0% [raise–bonus] because of his rank

insubordination [toward Dean Aistrup], his failure to complete the self-assessment requested by Dean Aistrup, and the 'unacceptable' performance review rating he received in the spring of 2018 [from Dean Aistrup]." (Doc. # 84, at 70 (citing Aistrup Decl. at ¶ 41, Exs. Z, AA, CC).) A jury may find that these reasons motivated Dean Aistrup and Provost Hardgrave in giving Dr. Stern no raise and no bonus in 2018, but there remains a genuine dispute of material fact whether these are the actual reasons or whether Dr. Stern's protected speech motivated the decisions.

To explain, Defendants rely on paragraph 41 of Dean Aistrup's declaration to rebut causation; however, in that paragraph Dean Aistrup is discussing his reasons for removing Dr. Stern as chair in May 2018, not his reasons for withholding a pay raise and bonus. (Doc. # 83-3, at ¶ 41 (explaining that, "[b]ecause of his repeated and continuing acts of insubordination, . . . I removed [Dr. Stern] as chair on May 25, 2018" and provided him with a memorandum evaluating his performance as "unacceptable" for his failure to "submit annual review documentation").) The attached exhibits—Z, AA, and CC—also do not speak to the justification for the denial of the raise and bonus. Nowhere in his affidavit does Dean Aistrup discuss the decision to withhold a raise and bonus to Dr. Stern in 2018 or argue that the reasons for removing Dr. Stern are synonymous with the reasons for denying him a raise and bonus. Hence, Defendants' reliance on Dean Aistrup's declaration as

supplying legitimate reasons for withholding a pay raise and bonus for Dr. Stern in 2018 is insufficient to establish the absence of a genuine dispute of material fact. *See Celotex Corp.*, 477 U.S. at 323.  Defendants present an inadequate evidentiary record upon which to find that these reasons are the actual reasons Dr. Stern was denied a raise and bonus in 2018.

Even if it is assumed *arguendo* that these are the reasons for the denials of the raise and bonus, Dr. Stern has submitted sufficient evidence to create a genuine dispute of material fact about the authenticity of those reasons.  First, Dr. Stern attests that in 2017, he received both a raise and a bonus, notwithstanding that his superior (Winn) decided not to require him to undergo an annual review that year. (Doc. # 91-2, at ¶ 22.)  This evidence suggests an internal inconsistency in the annual review requirements imposed on Dr. Stern in 2017 and 2018.  *See Tidwell v. Carter Prod.*, 135 F.3d 1422, 1428 (11th Cir. 1998) ("[T]he identification of inconsistencies in an employer's testimony can be evidence of pretext.").

Second, Dr. Stern has submitted the annual review Dean Aistrup gave Dr. Stern on May 25, 2018, in conjunction with his removal as chair.  The two-sentence annual review, which was for the 2017–18 academic year, assigned an "unacceptable" rating and referenced the memorandum from Provost Hardgrave concerning requirements for a department chair's evaluation of a faculty member. As Dr. Stern points out, until that date, May 25, 2018, he was a chair, not a faculty

member within the meaning of Provost Hardgrave's memorandum.  This raises the question, which Defendants do not answer, of how Dr. Stern violated Provost Hardgrave's memorandum since for the 2017 year he served as a chair.  Further, Dr. Stern has submitted evidence indicating that the annual review process for a chair evaluating a faculty member is "completely different from" the annual review process of a dean evaluating a faculty member.  (Doc. # 91-2, at ¶ 33; *see also* Doc. # 90, at 160.)  And he testified that he was not required to do a self-evaluation as part of his annual review every year as chair of the economics department, although he did them occasionally when asked by the Deans.  (Doc. # 83-1 at 214–15.)

Third, Dr. Stern has submitted evidence of his generally favorable recommendations prior to his demotion as chair.  (*See* Doc. # 89-3.)  The rating of unacceptable in 2018 was his first.  (Doc. # 91-2, at ¶ 40; *see also* Doc. # 90, at 33.)

Fourth, Dr. Stern has submitted evidence that Dean Aistrup harbored hostility toward Dr. Stern for his vocal protests concerning the university's alleged clustering of star athletes in the public administration major.  (*See* Doc. # 83-1, at 238.)  During the same time frame, Dean Aistrup also fired off an email to Dr. Stern rebuking him for his comments at the February 4, 2014 University Senate meeting concerning the substantial number of athletes majoring in public administration.  (*See* Doc. # 83-3, at 31 (email) "My most favorite chair," Aistrup wrote.  "Did you miss the lecture on diplomacy? . . . [Y]ou could have made your point about Athletic Advisors without

mentioning any department at the Faculty Senate meeting, especially in our college."
. . . "[Y]our remarks did cause collateral damage on PA [public administration], in a
very public way.").

### 3. The Calculation of Dr. Stern's Raise for the 2017–18 Academic Year and of his One-Time Merit Supplement in December 2017

In October 2017, Dr. Stern received a 3% salary increase for the 2017–18
academic year, and in December 2017, he earned a 3% one-time merit supplement.
Attributing the decision to give him a 3% raise and 3% bonus to Provost Boosinger
and Dean Aistrup, he argues that the supplements are unjustifiably low in retaliation
for his protected speech.

Defendants argue two grounds for summary judgment on this claim. First,
they contend that there is no causal link between the 2017 compensation decisions
and any protected speech. Dr. Stern did not engage in protected speech between the
publication of the *Wall Street Journal* article in August 2015 and August 2017 (when
the amount of Dr. Stern's raise and one-time merit supplement was decided). (Doc.
# 83-3, at ¶ 33.) Defendants argue that this two-year gap "negates any possibility of
a causal link." (Doc. # 84, at 69.) Second, Defendants argue that Assistant Provost
Winn (a non-party)—not Provost Boosinger or Dean Aistrup—made the decision to
cap Dr. Stern's raise and bonus at 3%. (Doc. # 84, at 69–70 (citing Doc. # 83-3, at
¶ 33).)

Defendants are correct that the two-year gap dispels any causal link between the calculation of the raise for the 2017–18 academic year and Dr. Stern's protected speech.[20]  Dr. Stern cites no case, and no case was found, in which this protracted length of time was sufficient to sustain the causal link for a First Amendment retaliation claim.  Dr. Stern argues, though, that the "continuing nature of Defendants' retaliation makes this element less critical in the overall analysis." (Doc. # 90, at 112.)  But in light of the substantial narrowing of the claims, Dr. Stern's argument loses efficacy.

The evidence contains no inferences that these 2017 pay decisions were the result of a retaliatory motive by Dean Aistrup.  In his declaration, Dean Aistrup states:

> On August 9, 2017, I became aware that Associate Provost Winn had assigned Dr. Stern a 3% merit raise and a 3% one-time salary supplement.  I emailed him with my belief that, in order to treat Dr. Stern consistently with other chairs in the College of Liberal Arts whose performance was similar to his, Dr. Stern should receive a 3.5% merit increase and one-time supplement of 4%. Associate Provost Winn's response was that Dr. Stern did not want more than 3% and that he wanted those dollars to be used to add to the salary increases for faculty members in the Economics Department. Copies of those emails are attached hereto as exhibit "S."

(Doc. # 83-3, at ¶ 33.)  The attached emails corroborate Dean Aistrup's declaration.

---

[20] The same conclusion would be reached, even if Dr. Stern's speech at the October 20, 2015 University Senate meeting had been pleaded in the Second Amended Complaint, *see supra* Part V.B.

Dr. Stern has pointed to no evidence that contradicts Dean Aistrup's, and the pertinent section of Dr. Stern's summary judgment brief does not mention Dean Aistrup in connection with these pay decisions.  (Doc. # 90, at 168–69.)  While Dr. Stern has supplied evidence that Provost Boosinger was involved in the decision to cap his raise and one-time merit supplement at 3%, the evidence indicates that Provost Boosinger at the time of the decision was "respecting [Dr. Stern's] request as the Director of the independent School of Economics."  (Doc. # 91-2, at ¶ 23.) Dr. Stern believes that Provost Boosinger's subsequent failure to increase his raise after the economics department returned to the governance of the College of Liberal Arts in July 2017 was substantially motivated by his speech.  (Doc. # 91-2, at ¶ 24.) But Dr. Stern has not tethered this belief to any evidence.  Rather, the belief is speculative.

Dr. Stern has not raised a genuine dispute of material fact that his speech played a substantial part in the calculation of his raise for the 2017–18 academic year and of his one-time merit supplement in December 2017.  Accordingly, Dean Aistrup and Provost Boosinger are entitled to summary judgment on these First Amendment retaliation claims.

### 4.   Whether Dr. Stern's Speech Played a Substantial Part in the Calculation of His Raise for the 2016–17 Academic Year

In October 2016, Dr. Stern received a raise of 3.5% for the 2016–17 academic year.  He contends that the "unjustifiably low[] permanent raise" was an act of retaliation by Dean Aistrup and Provost Boosinger and that he should have received a raise of at least 4.5%.  (Doc. # 90, at 137, 167.)   Dr. Stern does not identify the protected speech that he contends was the basis for this retaliation.  (See Doc. # 90, at 167.)

Defendants argue that Dr. Stern cannot show a causal connection between the October 2016 compensation decision and the protected speech that is temporally closest—namely, the *Wall Street Journal* article that ran in August 2015—because the two events are spatially separated by more than a year.  (Doc. # 84, at 69.)  Dr. Stern does not respond to this argument or point to any other circumstantial evidence to support causation.  (Doc. # 90, 167.)   On the record and the arguments, the fourteen-month gap between the protected speech and the 3.5% raise is too attenuated to raise a genuine dispute of material fact that Dr. Stern's speech played a substantial part in the calculation of his raise for the 2016–17 academic year. Accordingly, Defendants are entitled to summary judgment on this First Amendment retaliation claim.

## G.  Whether Defendants Would Have Made the Same Employment Decisions in the Absence of Dr. Stern's speech

### 1.  Removal as Chair

The fourth prong of the *Beckwith* test asks "whether the government would have made the same employment decision in the absence of the protected conduct." 58 F.3d at 1564.  The issue turns to whether Defendants have demonstrated that there is no genuine dispute of material fact that Dean Aistrup would have removed Dr. Stern as chair in the absence of his protected speech.  Defendants advance salient points to show that Dean Aistrup had multiple, non-retaliatory reasons for removing Dr. Stern as chair.  Those include Dr. Stern's resistance to following the chain of command after the economics department was moved back to the College of Liberal Arts, Dr. Stern's absence from leadership meetings in the College of Liberal Arts, his refusal to complete a self-evaluation in 2018, and Dean Aistrup's belief that Dr. Stern was causing lasting damage to the economics department through his speech. (*See* Doc. # 84, at 72–77; Doc. # 96, at 36.)

These facts support arguments that defense counsel can make to a jury; however, they do not establish as a matter of law that Dean Aistrup would have removed Dr. Stern as chair absent his speech in the *Chronicle* article.  Dean Aistrup is not entitled to summary judgment based on his *Beckwith* affirmative defense.

**2.      *Dr. Stern's Failure to Receive an Annual Evaluation in 2017 and the Subsequent Denial of a Raise for the 2018–19 Academic Year and of a One-Time Merit Supplement in December 2018***

Defendants also contend that they prevail on their affirmative defense as to all claims "related to Stern's raises and bonuses" because they have shown that "the same compensation decisions would have been made had Stern not engaged in any constitutionally protected activity." (Doc. # 84, at 75.) The evidence though again relies on Dean Aistrup's declaration; this declaration is insufficient to satisfy Defendants' burden for the reasons previously articulated. Namely, that declaration does not discuss the reasons for withholding a pay raise and bonus to Dr. Stern. Accordingly, Defendants Aistrup and Hardgrave are not entitled to summary judgment on their affirmative defense on the First Amendment retaliation claim predicated on the denials of a raise and one-time merit supplement in 2018.

## VI.  CONCLUSION

It is ORDERED that Defendant's motion for summary judgment (Doc. # 83) is GRANTED in part and DENIED in part.

This actions proceeds to trial on the following First Amendment retaliation claims: Dr. Stern's First Amendment retaliation claim challenging his removal as chair on May 25, 2018, against Dean Aistrup in his individual capacity; Dr. Stern's First Amendment retaliation claim challenging his failure to receive an annual

evaluation in 2017, against former Provost Boosinger in his individual capacity; and Dr. Stern's First Amendment retaliation claims challenging the denial of a raise for the 2018–19 academic year and of a one-time merit supplement in December 2018, against former Dean Aistrup and former Provost Hardgrave in their individual capacities. These claims also remain pending against President Gogue in his official capacity for prospective injunctive relief.

Summary judgment is GRANTED in Defendants' favor on all of Dr. Stern's other First Amendment retaliation claims, including all claims against former President Steven Leath.

DONE this 31st day of March, 2022.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE