## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

**Dr. Michael L. Stern,**
      Plaintiff,

**v.**

                                        **Case No.: 3:18-cv-807-CLM-JTA**

**Dr. Christopher B. Roberts, et al.,**
      Defendants.

## ORDER

The court held a pretrial conference on **October 14, 2022**. This order contains the result of the conference:

    1.    <u>Appearances</u>.  These attorneys appeared at the conference:

        For ***Plaintiff Dr. Michael L. Stern***: John D. Saxon, John D. Saxon, P.C.; Alicia K. Haynes, Haynes & Haynes, P.C.; Cynthia F. Wilkinson, Wilkinson Law Firm, PC.

        For ***Defendants Dr. Joseph Aistrup, Dr. Timothy Boosinger, Dr. Bill Hardgrave, and Auburn University President Dr. Christopher Roberts***: John G. Smith, Aria B. Allan, Charles A. Burkhart, and David R. Boyd, of Balch & Bingham, LLP, 105 Tallapoosa Street, Suite 200, Montgomery, AL 36104.

    2.    <u>Nature of the Action, Jurisdiction and Venue</u>.

        (a)    The nature of this action is as follows: Dr. Stern has alleged three claims of First Amendment retaliation pursuant to 42 U.S.C. § 1983.

        (b)    The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

(c)     All jurisdictional and procedural requirements prerequisite to maintaining this action ***have*** been met.

(d)     Personal jurisdiction and/or venue ***are not*** contested.

3.     <u>Parties and Trial Counsel</u>. Any remaining fictitious parties are hereby **STRICKEN.** The parties and designated trial counsel are correctly named as set out below:

|  | Parties: | Trial Counsel: |
|---|---|---|
| Plaintiff(s): | **Dr. Michael L. Stern** | **John D. Saxon** <br> **Alicia K. Haynes** <br> **Cynthia F. Wilkinson** |
| Defendant(s): | **Dr. Joseph Aistrup** | **John G. Smith** <br> **Charles A. Burkhart** <br> **Aria B. Allan** |
|  | **Dr. Timothy Boosinger** | Same Counsel |
|  | **Dr. Bill Hardgrave** | Same Counsel |
|  | **Dr. Christopher B. Roberts, in his official capacity only** | Same Counsel |

4.     <u>Pleadings</u>.  The following pleadings have been allowed:

- **Complaint, Doc. 1;**
- **Amended Complaint, Doc. 15;**
- **Answer to Amended Complaint, Doc. 33;**
- **Second Amended Complaint, Doc. 47; and**
- **Answer to Second Amended Complaint, Doc. 50.**

5.    Statement of the Case.

(a)    Narrative Statement of the Case.

Plaintiff Dr. Michael Stern, a tenured university professor of Economics at Auburn University, alleges that Defendants Dr. Joseph Aistrup, Dr. Timothy Boosinger, and Dr. Bill Hardgrave—who are former administrators at Auburn University—retaliated against him because of certain speech concerning a degree program offered by Auburn known as Public Administration or "PUBA." Dr. Stern alleges that Drs. Aistrup, Boosinger, and Hardgrave retaliated against him for speaking out about the PUBA program and the alleged "clustering" of student-athletes in that program. He contends that he has been injured and damaged in that he was removed as Chair of the Economics Department, has not received proper raises and bonuses, and has lost future income. He seeks lost wages and punitive damages. Defendants deny that they retaliated against Dr. Stern for any reason, much less because of his speech about PUBA, and contend that any actions taken against Dr. Stern that are claimed to be adverse were based on legitimate, non-retaliatory reasons and would have been taken regardless of Dr. Stern's speech.

(b)    Undisputed Facts.

1.    Plaintiff Michael L. Stern, Ph.D. is a tenured economics professor at Auburn University.

2.    In May 2018, Dr. Stern was removed as chair of the Department of Economics, a position he had held since 2010.

3.    Dr. Stern continues to serve as an associate professor in the department.

4.    Dr. Steven Leath was employed by Auburn University from June 1, 2017 to June 21, 2019 and served as Auburn's President from June 19, 2017 through June 21, 2019.

5.    Dr. Timothy ("Tim") Boosinger was employed by Auburn University as the Provost and Senior Vice President for Academic Affairs

from June 22, 2012 until December 31, 2017, when he retired from Auburn University.

6.       Dr. Boosinger had been employed with Auburn University since 1983.

7.       Dr. Billy ("Bill") Hardgrave was employed by Auburn University from August 2010 through March 31, 2022.

8.       Dr. Hardgrave was the dean of Auburn's Harbert College of Business from August 2010 through December 2017.

9.       From January 1, 2018 through March 31, 2022, Dr. Hardgrave was the Provost and Senior Vice President for Academic Affairs.

10.      In January 2018, Dr. Bill Hardgrave succeeded Dr. Boosinger as provost.

11.      The provost reports to Auburn University's president. From 2007 until June 2017, Auburn's president was Dr. Jay Gogue.

12.      Effective April 1, 2022, Dr. Hardgrave became the President of the University of Memphis in Memphis, Tennessee.

13.      Dr. Joseph ("Joe") Aistrup was hired as the Dean of the College of Liberal Arts at Auburn University effective September 1, 2013. Dr. Aistrup served in that capacity through June 30, 2021.

14.      Dean Aistrup became the dean of the College of Liberal Arts on September 1, 2013, having come to Auburn University from another institution.

15.      Dr. Aistrup is a tenured Professor of Political Science at Auburn University in the College of Liberal Arts.

16.     Dean Aistrup reported directly to the provost, Auburn University's chief academic officer.

17.     Dr. Christopher Roberts is the current President of Auburn University. He is sued only in his official capacity as the President.

18.     Dr. Roberts became President of Auburn University on May 16, 2022.

19.     Dr. Jay Gogue was employed as Auburn University's President from July 16, 2007 through July 1, 2017.

20.     Dr. Steven Leath succeeded Dr. Gogue as Auburn's president in June 2017 and served in that position until his resignation in June 2019.

21.     During President Gogue's tenure from 2007–17, Dr. Stern interacted directly with President Gogue.

22.     When President Leath became the president in June 2017, Provost Boosinger directed that the economics department return to the College of Liberal Arts, rather than reporting to the Provost's Office. President Leath agreed.

23.     The Department of Economics remained under the reporting structure of the College of Liberal Arts after Dr. Hardgrave succeeded Dr. Boosinger as provost.

24.     Dr. Stern was hired as an Assistant Professor in the Economics Department at Auburn University in 2004.

25.     Dr. Stern became tenured and was promoted to Associate Professor in the Economics Department. Dr. Stern is currently an Associate Professor of Economics at Auburn.

26.     Dr. Stern served a three-year term as Chair of the Economics Department from August 2010 until August 2013.

27.     In April 2013, Dr. Stern served a second, three-year term as Chair, with the second term ending in August 2016.

28.     In March 2016, the Economics faculty unanimously voted in support of Dr. Stern to serve a third term as Chair.

29.     In October 2016, Dr. Stern received a raise of 3.5% for the 2016–17 academic year.

30.     In March 2017, Dr. Stern reported to the provost's office, specifically to Associate Provost Emmett Winn, instead of to Dean Aistrup.

31.     On March 6, 2017, Dr. Winn emailed Dr. Stern, stating that: Provost Boosinger "touch[ed] base with Dr. Gogue and the decision is not to put you through [Faculty Annual Review] this year."

32.     Dr. Stern received a 3% raise for the 2017–18 academic year and a 3% one-time merit supplement in December 2017.

33.     Dr. Aistrup removed Dr. Stern as Chair of the Economics Department on May 25, 2018.

34.     In late April to early May 2018, Dean Aistrup decided to remove Dr. Stern as chair. On May 25, 2018, Dr. Aistrup notified Dr. Stern of this decision and removed him as chair.

35.     On May 25, 2018, Dean Aistrup provided Dr. Stern with a memorandum reflecting that Dean Aistrup had evaluated his performance for 2017 as "unacceptable."

36.     Dean Aistrup provided Dr. Stern with a memorandum of Dr. Stern's evaluation, which stated: "Dr. Stern, you did not provide me with your annual performance review materials for 2017. In accordance with Provost Hardgrave's directive of April 6, 2018 (attached), you are given an evaluation of unacceptable."

37.     Dean Aistrup admits that he, as well as Provost Boosinger, opposed Dr. Stern's serving a third term as chair, even though the Economics department faculty had voted in favor of Dr. Stern for a third term.

38.     Dr. Stern did not receive a merit raise for the 2018–19 academic year. He also did not receive a one-time merit supplement (bonus) in December 2018.

39.     The offices of the Economics Department were physically located in the Haley Center basement from approximately December 2009 through July 2017.

40.     The Economics Department's offices relocated to Miller Hall in July 2017.

41.     Dr. Stern's protected speech occurred principally in two publications (the *Wall Street Journal* and the *Chronicle of Higher Education*) and in a public forum (the Auburn University Senate).

42.     The *Wall Street Journal* published an article on August 27, 2015, titled *At Auburn, Athletics and Academics Collide*. Dr. Stern is quoted in the article: "Michael Stern, the chairman of Auburn's economics department and a former member of the faculty senate, said athletics is so powerful at Auburn that it operates like a 'second university.' Whenever athletic interests intersect with an academic matter, he said, 'it's a different kind of process.'"

43.     On February 16, 2018, the *Chronicle of Higher Education* published an article titled "Inside Auburn's Secret Effort to Advance an Athlete-Friendly Curriculum" online. Dr. Stern is quoted in the article. The print version of this article was published on February 23, 2018 and was titled "Unrivaled Power: Inside Auburn's Secret Effort to Advance on Athlete-Friendly Curriculum."

44.     Dr. Stern is pictured and quoted in this article:

> "What they have done to me is necessary to keep
> people in line, or you will have other people
> speak out," says Stern, who provided *The
> Chronicle* with documents that he had
> previously given to *The Wall Street Journal* and
> other materials he obtained afterward. "There
> must be penalties for those who don't play ball,
> and there have to be rewards for those who do.
> Auburn has been cleansed of dissent."

45.     The purpose of the University Senate, as set out in the University
Senate Constitution, is as follows:

> The University Senate is advisory to the
> president. In this capacity it is the body having
> primary concern for the general academic
> policies of the University, including those
> involving curricula, programs, standards,
> faculty appointment, evaluation and
> development, student academic affairs and
> libraries. The University Senate is also
> concerned with issues that affect all members of
> the University community, such as the budget,
> employee welfare programs, the calendar, and
> facilities.

(c)     <u>Plaintiff's Claims (as written by Plaintiff)</u>.

This is a First Amendment retaliation case under 42 U.S.C. § 1983. Specific
claims remaining for trial are:

1. **First Amendment Retaliation Claim against Dr. Tim Boosinger
   for Failure to Receive An Annual Performance Evaluation in
   2017**

2. **First Amendment Retaliation Claim against Dr. Joe Aistrup for
   Removal as Chair**

8

3.  **First Amendment Retaliation Claim against Dr. Joe Aistrup and Dr. Bill Hardgrave for Denial of a Raise and of a One-Time Merit Supplement in 2018**

## Facts Supporting Plaintiff's Retaliation Claims

Plaintiff, Dr. Michael L. Stern, a tenured professor at Auburn University and Chairman of the Economics Department, was a vocal critic of the College of Liberal Arts public administration program for the disproportionate number of scholarship athletes, particularly football players, clustered in the Public Administration major.  Stern believed the University was behind the clustering in the athletic-friendly major, and that its athletic department fought efforts to eliminate the major.  Dr. Stern began vocalizing his concerns in 2014 at Auburn University's Senate meetings, in school publications, and in prominent news publications, including the *Wall Street Journal* and the *Chronicle of Higher Education*.  Dr. Stern's criticism attacking the integrity of the public administration major and the Auburn athletic program was unpopular among university administrators, including the Defendants. At the February 2014 University Senate meeting, faculty athletics representative, Mary Boudreaux, gave a presentation addressing the NCAA's concerns regarding improper clustering of student-athletes in specified majors, but she reported that Auburn University "didn't have this problem." Afterward, as is permitted in the University Senate Constitution, Dr. Stern, who served as a senator at the time, questioned Boudreaux about the accuracy of her report arguing that there was an overrepresentation of student-athletes from the football program in the public administration curriculum and that this circumstance suggested academic misfeasance. In December 2014, an article was published in the school's student newspaper, the *Auburn Plainsman*, titled "Economics Department Tries to Relocate After Five Years in Haley Center."

Again, in February 2015, at a University Senate meeting, the faculty athletics representative made her annual presentation. Dr. Stern, again serving as a senator, aggressively challenged the faculty athletics representative about the clustering of athletes in the public administration major. After this meeting, Dr. Stern received official documents pertaining to the academic program review committee's recommendation to close the public administration major. Said documents revealed "disparaging statements" about the major and contradicted the faculty athletics representative's annual presentation. After this, on March 12, 2015, Dr. Stern reported what he had learned to the University Senate executive committee. Dr. Stern attempted on two separate occasions to make a presentation at the University Senate

meeting addressing the improper clustering of athletes in the major and the academic program review committee's recommendation to close the public administration major, but at the May 7, 2015 steer committee meeting, his request was struck down.

The *Wall Street Journal* published an article on August 28, 2015, titled "At Auburn, Athletics and Academics Collide," which discussed suspicious student-athlete clustering in Auburn's public administration major, an academic review committee's vote to close the major, and Provost Boosinger's and Dean Aistrup's override of that vote after they received strong opposition from the athletic department. The article was based, in part, on the documents Auburn University provided in response to a public records request that Dr. Stern and other faculty members in the economics department had initiated through an attorney.

At a University Senate meeting on October 20, 2015, Dr. Stern engaged in a discussion about clustering of athletes in the public administration major with a psychology professor who had served on the intercollegiate athletics committee. Dr. Stern also confronted Provost Boosinger about a "forward curricula conspiracy" and the clustering of athletes in the public administration major.

On November 1, 2015, the *Alabama Gazette* published an article, titled "All the Speaker's Men and the Collapse of AU Athletics," which referenced the clustering of athletes in the public administration major and reported on the public administration controversy previously exposed by the *Wall Street Journal*. At the August 22, 2017 University Senate meeting, Dr. Stern asked then-President Leath about the replacement for the retiring faculty athletics representative. Dr. Stern met with President Leath on September 27, 2017. Dr. Stern requested the meeting because he "had a lot of issues with the faculty athletics representative." Dr. Stern requested that President Leath appoint him as the faculty athletics representative, but President Leath declined. At the end of the meeting, Dr. Stern and President Leath "turned to talk a little bit about economics."   Dr. Stern recounted his displeasure "with what [was] going on," and President Leath agreed that "[t]hings [had] not been handled correctly . . . ."

In February of 2018 the *Chronicle* published on the front cover of its national print edition an article titled "Unrivaled Power: Inside Auburn's Secret Effort to Advance an Athlete-Friendly Curriculum." The *Chronicle* article addressed efforts by Auburn to keep the troubled public administration

program open to benefit athletes and told the story of Dr. Stern's efforts to publicly speak about these matters of serious public concern and the repeated acts of retaliation he experienced as a result. Dr. Stern was both pictured and quoted in the article.

On March 1, 2018, a column titled, *The Auburn Greed*, was published in the *Alabama Gazette*. The column credited Dr. Stern with exposing the public Administration "scandal." The article contains no statements or quotes by Dr. Stern. Nor does the article identify Dr. Stern as a source of the article. In the weeks that followed *The Auburn Greed* article, Dr. Stern attended two University Senate meetings, one on March 20, 2018, and one on May 15, 2018. At each meeting, he engaged the new faculty athletics representative about the allegedly improper clustering of athletes in the public administration major. At each of these meetings, Dr. Stern spoke as a substitute for an elected senator. On March 6, 2017, Dr. Winn emailed Dr. Stern stating that Dr. Winn had touched base with Dr. Gogue and decided not to give him an annual evaluation. Positive annual evaluations are used to support raises and to document good performances.

On March 20, 2018, and May 15, 2018, Dr. Stern spoke during two University Senate meetings. At these meetings, Dr. Stern addressed the allegedly improper clustering of athletes in the public administration major and the academic program review committee's rejected recommendation to close the major. Also, on February 16, 2018, the *Chronicle of Higher Education* article was published in which Dr. Stern was quoted concerning his involvement in exposing student-athlete clustering in the public administration major. On May 25, 2018, Stern was relieved of his duties as chair by Dean Joseph Aistrup, a positon he had held since 2010. Dean Aistrup provided Dr. Stern with a memorandum of Dr. Stern's evaluation, which stated: "Dr. Stern, you did not provide me with your annual performance review materials for 2017. In accordance with Provost Hardgrave's directive of April 6, 2018 (attached), you are given an evaluation of unacceptable." Dr. Stern was removed from the position and was made to be an associate professor in the Economics Department. Although Dr. Stern continued to receive the same salary and benefits through the end of his scheduled third term, his pay reverted to that of an associate professor after that, which resulted in a $41,000 reduction in his annual salary.

Dr. Stern did not receive a merit raise for the 2018–19 academic year. He also did not receive a one-time merit supplement (bonus) in December 2018. This was the only year he did not receive a bonus since his appointment as

chair of the economics department, despite his having received excellent performance reviews throughout his tenure as chair.

### Authority in Support of Plaintiff's Retaliation Claims

*Nieves v. Barlett*, 139 S. Ct. 1715 (2019); *Lane v. Franks*, 573 U.S. 228 (2014); *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Smith v. City of Greensboro*, 647 F. App'x 976, 980 (11th Cir. 2016); *Wilbourne v. Forsyth Cty. Sch. Dist.*, 306 F. App'x 473 (11th Cir. 2009); *Akins v. Fulton Cty.*, 420 F.3d 1293 (11th Cir. 2005); *Anderson v. Burke Cty.*, 239 F.3d 1216 (11th Cir. 2001); *Gupta v. Fla. Bd. Of Regents*, 212 F.3d 571 (11th Cir. 2000).

        (d)     <u>Defendants' Defenses (as written by Defendants)</u>.

1. First Amendment Retaliation Claim against Dr. Tim Boosinger (Failure to Receive Annual Performance Evaluation in 2017)

      (i)    Dr. Boosinger denies that the decision not to perform an annual evaluation of Dr. Stern in 2017 for the 2016 academic year was in retaliation for any speech in which Dr. Stern might have engaged. Dr. Boosinger denies that any decision relating to Dr. Stern's annual review (or lack thereof) was causally connected to any instance of speech or that any speech motivated Dr. Boosinger not to conduct the performance review. Dr. Boosinger had a legitimate, non-retaliatory reason for not conducting an annual performance review. At Auburn, the general practice is to conduct the performance review in the spring of the subsequent year. Thus, the 2016 year review process would occur in the spring of 2017. In January 2017, then-President Dr. Gogue made Associate Provost Dr. Emmett Winn Dr. Stern's supervisor. Dr. Winn, in turn, reported to Dr. Boosinger. Dr. Winn and Dr. Boosinger consulted on whether to conduct a performance evaluation of Dr. Stern and determined not to do so because Dr. Stern had been supervised by Dr. Winn for only a few months. Dr. Winn did not feel that he had the necessary experience or perspective to conduct a thorough or meaningful review. Nonetheless, after consulting with Dr. Stern, Dr. Winn and Dr. Boosinger awarded Dr. Stern a 3% raise and a 3% bonus in 2017.

      (ii)   The absence of a written performance evaluation is not, in and of itself, an adverse action against Dr. Stern. *See Bell v. Sheriff of*

*Broward Cnty.*, 6 F.4th 1374, 1377 (11th Cir. 2021) (citing *Stavropoulos v. Firesetone*, 361 F.3d 610, 619 (11th Cir. 2004), *abrogated as to Title VII standard by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Akins v. Fulton Cnty.*, 420 F.3d 1293, 1300–02 (11th Cir. 2005)). It is uncontested that Dr. Stern received a 3% raise and 3% bonus and therefore did not suffer from any loss of pay. *See* Doc. 123-1 at 76–77. The absence of an evaluation did not dictate the raise or bonus levels, and it did not control or otherwise affect any raises in subsequent years.

(iii)   Further, Dr. Boosinger denies that the spring 2017 decision not to perform an annual review is causally connected to Dr. Stern's speech. It is undisputed that Dr. Stern had not engaged in protected speech on the PUBA or clustering matter since the August 2015 *Wall Street Journal* article. A gap of more than 18 months negates any possibility of a causal link, based on temporal proximity, between Dr. Stern's speech and Dr. Boosinger's decision. *See Jones v. Hamic*, 875 F. Supp. 2d 1334, 1359 (M.D. Ala. 2012) (a 13-month gap "fails to support a causal connection based on temporal proximity" in a First Amendment retaliation case) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)).

(iv)   Dr. Boosinger denies that Dr. Stern's protected speech played any part whatsoever in his and Dr. Winn's decision not to perform an annual performance review in the spring of 2017. Even assuming, without conceding, that Stern could adduce substantial evidence that his speech somehow motivated Dr. Boosinger not to perform an annual evaluation in 2017, Dr. Boosinger will demonstrate that the *same decision* would have been reached even if Dr. Stern had not engaged in protected speech. *See Mt. Healthy City Sch. Dis. Bd. of Edu. v. Doyle*, 429 U.S. 274, 287 (1977); *Bryson v. City of Waycross*, 888 F.2d 1562, 1566 (11th Cir. 1989) ("This fourth stage has been referred to as a 'but for' test; the employer must show that its legitimate reason, standing alone, would have induced it to make the same decision.") (internal citation and marks omitted); *Green v. City of Montgomery*, 792 F. Supp. 1238, 1252 n. 13 (M.D. Ala. 1992); *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1276–77 (11th Cir. 2001).

2.  First Amendment Retaliation Claim against Dr. Joe Aistrup (Removal
    as Chair)

(i)     Dr. Aistrup denies that Dr. Stern's removal as Chair of the
        Economics Department was causally connected to or motivated by
        any speech in which Dr. Stern engaged. Dr. Aistrup denies that he
        knew on May 25, 2018 about Dr. Stern's speech at the March 2018
        or May 2018 Auburn University Senate meetings. *See Tipton v.
        Houston Cnty. Bd. of Edu.*, No. 1:17-CV-588-WKW, 2019 WL
        2176174, at *5 (M.D. Ala. May 20, 2019) ("No knowledge means no
        motive.")

(ii)    Dr. Aistrup denies that Dr. Stern suffered from an adverse action
        by being removed as Chair. It is undisputed that Dr. Stern
        continued to receive pay as Chair through the end of the third term
        (August 2019). It is further undisputed that Dr. Stern could not
        have run for a fourth term as Chair in 2019. Dr. Stern was,
        therefore, not adversely affected. *See Bell*, 6 F.4th at 1377; *Valdes
        v. City of Doral*, 662 F. App'x 803, 812 (11th Cir. 2016).

(iii)   Dr. Aistrup contends that he would have made the same decision
        to remove Dr. Stern as Chair based on his insubordination, even
        in the absence of any protected speech by Dr. Stern. *See Mt.
        Healthy City Sch. Dist. Bd. of Edu.*, 429 U.S. at 287. The evidence
        demonstrate that Dr. Stern was grossly and inexcusably
        insubordinate, despite receiving multiple admonitions to follow the
        chain of command from Dr. Aistrup, Dr. Hardgrave, and even
        then-President Dr. Leath. Dr. Stern refused to accept the decision
        that the Economics Department would continue to be a part of the
        College of Liberal Arts—and not an independent school with Dr.
        Stern as the director or head—and accordingly treated his
        immediate supervisor (Dr. Aistrup) without respect and as if he
        could be ignored. Dr. Stern also engaged in behavior that, in Dr.
        Aistrup's view, was damaging to the long-term growth and health
        of the Economics Department. Examples include, but are not
        limited to, Dr. Stern's resistance in submitting the Tenure &
        Promotion packets to CLA; frustrating faculty hiring efforts;
        circumventing CLA leadership in favor of reporting to Dr. Winn,
        the Provost's Office, or the President's Office; removing Dr. Aistrup
        from e-mail distribution lists or refusing to include him; refusal to

participate in the 2017–2018 Academic Program Review process for Economics (before the process was postponed by Dr. Hardgrave); refusing to participate in CLA leadership meetings; and engaging in disrespectful and antagonistic discussions with Dr. Leath about the Economics graduate program. *See* Doc. 83-3, pp. 114–42; Doc. 83-12, pp. 14–29.

3.  First Amendment Retaliation Claim against Dr. Joe Aistrup and Dr. Bill Hardgrave (0% raise and 0% bonus in 2018)

(i)     Dr. Hardgrave and Dr. Aistrup deny that the decision to award Dr. Stern a 0% raise and 0% bonus in 2018 was causally connected to or motivated by any protected speech by Dr. Stern.

(ii)    Dr. Aistrup and Dr. Hardgrave contend that there were legitimate reasons not to award Dr. Stern any raise or bonus in 2018. Dr. Stern had refused to provide Dr. Aistrup with a written self-evaluation for the 2017 academic year, despite multiple requests (and despite the fact that Dr. Stern had provided a self-evaluation in every other year that Dr. Aistrup requested one and conducted the annual evaluation). Dr. Stern attempts to show that he was not required to undergo an annual performance review because, as Chair, he was supposedly exempted. Dr. Stern's contention that he was exempt from the review process (after his supervisor specifically requested that he prepare a self-evaluation) is based upon an inaccurate reading of the Auburn University Faculty Handbook and is meritless. Dr. Stern's refusal to acknowledge Dr. Aistrup's role as his immediate supervisor justified the "unacceptable" evaluation rating, as set forth in Auburn policy and in Dr. Hardgrave's April 2018 memorandum. Dr. Stern did not receive a raise or a bonus because of his rank insubordination and the resulting "unacceptable" performance evaluation.

(iii)   Even if the jury were to conclude that Dr. Stern's protected speech motivated Dr. Aistrup's and Dr. Hardgrave's decisions, Defendants nevertheless prevail on the *Mt. Healthy* defense. The evidence shows that Dr. Aistrup and Dr. Hardgrave would have taken the same actions even in the absence of Dr. Stern's protected speech. *See Mt. Healthy City Sch. Dis. Bd. of Edu.*, 429 U.S. at 287; *Bryson*, 888 F.2d at 1566; *Green*, 792 F. Supp. at 1252 n. 13; *Wooden*, 247 F.3d at 1276–77.

(iv)  Dr. Aistrup and Dr. Hardgrave are entitled to qualified immunity to the extent that Dr. Stern's claim relies on his speech at the University Senate. The law was not clearly established that Dr. Stern was speaking as a private citizen on a matter of public concern when addressing the Auburn University Senate. *See Garcetti v. Ceballos*, 547 U.S. 410, 417–18 (2006); *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015); *Gaines v. Wardynski*, 871 F.3d 1203, 1207 (11th Cir. 2017).

6.  Discovery and Other Pretrial Procedures.

   (a)  Pretrial Discovery.

      i.  Discovery is closed.

   (b)  Outstanding Issues.

      i.    Plaintiff's Motions in Limine (Doc. 145)
      ii.   Defendants' Motions in Limine (Doc. 140)
      iii.  Whether emotional distress damages are allowed.

7.  Trial Date.

   (a)  This case is set for ***Jury*** trial on October 31, 2022.

   (b)  This case will be tried in the G.W. Andrews Federal Building and U.S. Courthouse in Opelika, Alabama.

   (c)  The trial of this matter is expected to last seven (7) days.

It is **ORDERED** that the above provisions be binding on all parties unless modified by further order for good cause shown.

**Done** and **Ordered** on October 14, 2022.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE