# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# EASTERN DIVISION

**DR. MICHAEL L. STERN,**
    Plaintiff,

**v.**

                                  **Case No. 3:18-cv-807-CLM**

**DR. CHRISTOPHER B.
ROBERTS, et al.,**
    Defendants.

## ORDER
### Stern's posttrial motion

A jury found that the former dean of Auburn University's College of Liberal Arts, Joseph Aistrup, retaliated against Dr. Michael Stern by (a) removing Stern as Chair of the Department of Economics in 2018, (b) denying Stern a raise for the 2018–2019 academic year, and (c) denying Stern a one-time merit supplement. The jury found that Stern did not prove his claims against any other defendant.

This is the second of two orders that deal with the parties' posttrial motions. The first (doc. 246) dealt with Aistrup's motions that challenged the jury's verdict. This second order deals with Stern's motions that seek relief from Auburn University's President, Dr. Christopher B. Roberts. For the reasons stated within, the court rules as follows on Stern's motion:

- The court **DENIES** Stern's request to be reinstated as Chair of the Economics Department and instead awards Stern **$72,723.33** in front pay, which reflects one year's extra salary as Chair.
- The court will award Stern supplemental back pay in the amount of **$4,453.34**. The court will also order Auburn to pay Stern an additional **$1,113.34** in front pay and to adjust Stern's salary to reflect a 3.7% raise in October 2018. Finally, the court will award prejudgment interest on the jury's award and supplemental back pay award. The parties' final calculation of the cumulative back pay and interest owed is due by **July 14, 2023**.

## BACKGROUND

Stern was thrice elected to serve a three-year term as Chair of Auburn's Department of Economics. His first term was August 2010 to August 2013; his second was August 2013 to August 2016; and his third was supposed to be August 2016 to August 2019. But Dean Aistrup removed Stern from the Chair position in May 2018, about 14 months before his third term was set to expire.

The jury found that Aistrup removed Stern as Chair in retaliation for Stern exercising his First Amendment rights. The jury also found that Aistrup retaliated against Stern by giving him a 0% raise and 0% bonus later in 2018. The parties agree that the jury's verdict on Claim 3 fully compensates Stern for the one-time bonus. But Aistrup's denial of Stern's raise for the 2018-2019 academic year continues to affect Stern's salary.

Aistrup appointed Dr. Hyeongwoo Kim as interim Chair to finish Stern's term. Kim was then elected to serve a three-year term as Chair from 2019 to 2022. The new College of Liberal Arts Dean, Jason Hicks, then appointed Kim to serve a one-year term from 2022 to 2023. Kim testified that he will step down as Chair when that term expires on July 31, 2023.

Stern has asked this court to order President Roberts (and thus Dean Hicks) to reinstate him as Chair when the seat opens on August 1, 2023. Dr. Roberts opposes the request, and no one agrees on how long Stern should serve if reinstated. So the court starts by explaining how the Economics Department selects its Chair.

### A.    Chair Selection

The process for selecting an Economics Department Chair is governed by two documents: Auburn University's Faculty Handbook and the Economics Department's Bylaws. Auburn's faculty handbook says that departments should adhere to this process when selecting a Chair:

> The chair or head of a department, who serves as the chief representative of the department within an institution, should be selected by departmental election or by appointment following consultation with members of the department and of related departments; appointments should normally be in conformity with

the department members' judgment. The chair or department head should not have tenure in office; tenure as a faculty member is a matter of separate right. The chair or head should serve for a stated term but without prejudice to reelection or to reappointment by procedures that involve appropriate faculty consultation. . . . Department heads/chairs are appointed by the dean.

(Def. Ex. 22). Note that the Dean has the final appointment authority, and the Dean "should" follow, but need not follow, the department's election results.

The Economics Department's bylaws state that the Chair is elected by a majority vote of the tenured and tenure track faculty. (Def. Ex. 25 at 1). There are 10 tenured faculty members and 3 tenure track faculty, meaning that 13 people are eligible to vote for Chair. "If the department is unable to elect a Chair via majority vote, then the Dean will be notified." (*Id.* at 2). The Dean will work with the faculty "in regards to the appointment/election of an interim chair and/or the hiring of an external chair." (*Id.*). The Chair serves a three-year term with the option of reelection for another term. (*Id.* at 1). There is normally a two consecutive term limit for Chairs, but 3/4 of the tenured and tenure-track faculty can vote to waive the two-term limit. (*Id.*). And anyone serving as Chair without a majority vote of the tenured or tenure-track faculty members "shall serve for no more than one academic year." (*Id.*).

Read together, these documents suggest these rules:

1. The Dean should accept the department's election results when making appointments. If he does, the elected Chair serves a three-year term.
2. The Dean can, however, reject the election results, or he can appoint the Chair without an election. If there is no election, the Department's bylaws state that the Chair should not serve more than one year. But the faculty handbook says that the chair "*should* serve for a stated term," meaning that the Dean has the authority to set a different term than suggested by the Department's bylaws.

The following chart of department Chairs since 2010 show that Auburn has followed the rules as the court interprets them:

| Chair Term | Appointment Method | Chair |
|---|---|---|
| 2010-2013 (3 years) | Election | Dr. Stern |
| 2013-2016 (3 years) | Election | Dr. Stern |
| 2016-2019 (3 years) | Election | Dr. Stern (term finished by Dr. Kim) |
| 2019-2022 (3 years) | Election | Dr. Kim |
| 2022-2023 (1 year) | Dean's Appointment | Dr. Kim |

As discussed, Kim's current term as Chair ends on July 31, 2023. So the court's task is to determine whether it should order President Roberts and Dean Hicks to reinstate Stern as Chair, and if so, how long should Stern's term as Chair be.

## B.    Motions for Equitable Relief

Stern asks for two things. First, Stern asks the court to reinstate him as Chair for a 14-month term because that's how long he had left in the 2016-19 term when Aistrup removed him. Roberts responds that the court should not reinstate Stern because discord and antagonism between the parties would make reinstatement ineffective. Roberts also says that Stern isn't entitled to front pay as a substitute for reinstatement because Auburn paid Stern his full Chair's salary for the 2016-19 term, including the 14 months that he did not serve as Chair.

Second, Stern asks the court for various money awards. He asks the court to order Auburn to adjust his salary to account for his lost raise in 2018. Stern also asks the court to order Auburn to retroactively calculate the salary he would have earned as Chair beginning with November 15, 2022 (the day of the jury's verdict). Finally, Stern asks that the court award prejudgment interest from the date of the adverse actions until the date the court resolves the parties' post-trial motions.

The court held a two-day evidentiary hearing on Stern's motion. The court heard from seven witnesses and admitted dozens of exhibits.

STANDARD OF REVIEW

When § 1983 claims go to a jury, "the trial court may reserve determinations of equitable remedies." *Haskins v. City of Boaz*, 822 F.2d 1014, 1015 (11th Cir. 1987). "After the jury reaches its verdict, the court then may decide the propriety of equitable relief *based on the facts as found by the jury*." *Id.* (quotations omitted) (emphasis in original). But the court should also allow the plaintiff to present evidence supporting reinstatement and other requests for equitable relief in an evidentiary hearing. *See Welborn v. Reynold Metals Co.*, 868 F.2d 289, 391 (11th Cir. 1989) (reversing district court that didn't allow plaintiff to present evidence on post-trial back pay or reinstatement in evidentiary hearing).

DISCUSSION

The court will first address Stern's motion for reinstatement. The court will then address Stern's motion for supplemental back pay. The court will finally address Stern's motion for prejudgment interest.

## A.    Reinstatement

Stern asks the court to order President Roberts and Dean Hicks to reinstate him as Economics Department Chair to serve the remaining 14 months in his retaliation-shortened 2016-19 term.

"[R]einstatement is a basic element of the appropriate remedy in wrongful employee discharge cases and, except in extraordinary cases, is required." *Allen v. Autauga Cnty. Bd. of Educ.*, 685 F.2d 1302, 1305 (11th Cir. 1982). Reinstatement is also appropriate in case in which an employee was demoted from an administrator position. *See Lee v. Macon Cnty. Bd. of Educ.*, 453 F.2d 1104, 1108, 1114 (5th Cir. 1971). Reinstatement is a presumptive remedy because "[w]hen a person loses his job, it is at best disingenuous to say that money damages can suffice to make that person whole. The psychological benefits of work are intangible, yet they are real and cannot be ignored." *Allen*, 685 F.2d at 1306.

But when extenuating circumstances warrant, courts may award front pay in lieu of reinstatement. *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1339 (11th Cir. 1999). These circumstances may include when "discord and

antagonism between the parties would render reinstatement *ineffective* as a make-whole remedy." *Id.* "That said, . . . the presence of some hostility between parties, which is attendant to many lawsuits, should not normally preclude a plaintiff from receiving reinstatement." *Id.*

### 1. The proper term

The court starts by rejecting both parties' positions about the term at issue. Aistrup removed Stern during the 2016-19 term. Dr. Kim finished that term. So that term has *long* since passed, and the court is focused on the present—*i.e.*, the term that begins when Dr. Kim steps down on July 31, 2023, and the Dean replaces him by either appointing Stern under a court order or appointing an outside chair chosen by a search committee:

| Chair Term | Appointment Method | Chair |
|---|---|---|
| 2010-2013 (3 years) | Election | Dr. Stern |
| 2013-2016 (3 years) | Election | Dr. Stern |
| 2016-2019 (3 years) | Election | Dr. Stern (term finished by Dr. Kim) |
| 2019-2022 (3 years) | Election | Dr. Kim |
| 2022-2023 (1 year) | Dean's Appointment | Dr. Kim |
| 2023-TBD | Dean's Appointment | TBD |

The court thus rejects Stern's request to serve out the remaining 14 months of the 2016-19 term, which ended four years ago. The court similarly rejects Roberts' argument that Stern cannot be reinstated because Auburn paid Stern for the 2016-19 term and Stern did not run for election in 2019.

Roberts is right that Stern failed to prove that he would have served as Chair during the 2019 term and later terms if Aistrup hadn't removed him. But that misses the point. The court set aside Stern's compensatory damage award because he failed to meet his burden of proving damages as a matter of law. Stern's posttrial motion, however, presents a matter of equity, and reinstatement is the presumptive remedy. That means Roberts—not Stern—

has the burden to show that Stern isn't entitled to equitable relief. *See Allen*, 685 F.2d at 1305.

Stern's failure to prove monetary damages in 2018-19 is largely, if not wholly, irrelevant to satisfying Roberts' burden of showing that reinstatement is an ineffective equitable remedy in 2023. Here's an example. Stern says that he did not run for Chair in 2019 because he believed that Aistrup would make sure that Stern would not be reinstated, regardless of the election results. The Court rejected that argument as a basis for compensatory damages because, as a matter of law, Stern could not meet his burden of proving monetary damages based solely on speculation. But here, when the court sits in equity and the burden is on Roberts, the court finds Stern's point more compelling. In awarding punitive damages, the jury found that Aistrup retaliated against Stern out of malice, or out of reckless disregard for Stern's Constitutional rights, or both. Accepting the jury's verdict, as we must, means that Aistrup hung a dark cloud over Stern's head in 2018. So it is understandable why Stern did not try to run for Chair while Aistrup was still Dean, and while this litigation was ongoing. While it was proper for the court to hold Stern's choice not to run against him under Rule 50, it would be inequitable to do so here.

Having rejected both sides' arguments, the court finds that **one year** is the term of reinstatement at issue. As explained, the faculty handbook and department guidelines suggest that elected chairs serve three-year terms, and unelected chairs serve one-year terms, unless the Dean chooses otherwise. Recent history shows that Auburn has followed this practice, as every election resulted in a 3-year term (2010-13, 2013-16, 2016-19, 2019-22) and the lone Dean's appointment served a 1-year term (2022-23).

If the court ordered reinstatement, President Roberts (the target Defendant) would order Dean Hicks to appoint Stern as Chair. Auburn's rules and recent history suggest that appointment would be for one year. So the question is whether Stern can serve a one-year term, or whether he receives one year of front pay because reinstatement would be ineffective.

### 2. Discord + Antagonism

Having sat through a 10-day trial and 2-day evidentiary hearing, the court finds that Roberts has met his burden to show that extraordinary

circumstances preclude reinstating Stern as Chair. No matter who caused it, the evidence is clear that there is such discord and antagonism within the Economics Department that reinstating Stern as Chair would be ineffective and impracticable. Four categories of evidence lead to this finding.[1]

1. <u>Letters to Dean Hicks</u>: In the fall of 2022, most of the Economics Department's tenure track faculty voted for Auburn to conduct a national search for Department Head. Around the time that this proposal was being voted on, six of the tenured Economics Department faculty members wrote to Dean Hicks about his efforts to conduct the external search. (Def. Ex. 4.) These six professors were Kim, Tannista Banerjee, Aditi Sengupta, Gilad Sorek, Chris Vickers, and Nic Ziebarth. Though the letter was generally supportive of the search, it also stated that "a successful search for an external chair would represent only one small step in the process of fixing many problems in this department." (*Id.* at 2). And the letter hinted that the Economics Department wasn't operating effectively:

> If this proposal is approved, we are more than willing to further support you in this critical endeavor. However, a successful search for an external chair would represent only one small step in the process of fixing many problems in this department. For that reason, we would encourage you to consider other possible changes to how the department operates. We would also be grateful if you could clarify, in due course of time, on contingency plans if the search ends up failing.
>
> We hope that the university administration does not view this hire as a substitute for any other necessary measures and, if necessary, more direct interventions. A successful appointment of an external head depends not only on hiring the right person but also on providing him/her the means to address our core issues. Without these other actions, the next chair, internal or external, will find it extremely difficult to re-establish the appropriate standards of professional workplace conduct and to effectively deal with individuals who have violated those standards.

(*Id.*).

These same six professors wrote another letter to Dean Hicks about a week after the court set an evidentiary hearing on Stern's motion for

---

[1] At the evidentiary hearing, the court said that it would review Plaintiff's Exhibit 31, a student survey on an Econometrics course. The court has considered the survey, but the students' comments haven't affected the court's ruling on reinstatement.

reinstatement. (Def. Ex. 6). That letter expresses grave concerns about the court reinstating Stern as Chair and its effect on the Department:

May 3, 2023

Dear Dean Hicks-

Firstly, we would like to express our gratitude for your support in the search for an external head of the department. However, we have concerns about the impact of Michael Stern's legal case and his push for reinstatement on the search. We have learned that the judge has ordered the university to inform candidates that there is a possibility of Prof. Stern being reinstated. We understand that you have already communicated this to candidates.

Our primary concern is that, with no clarity on when the legal situation will be resolved, it is unlikely we will be in a position to have a completed search with a new hire by this fall. We support continuing the search, but we would like clarification on the backup plan if the search is not concluded on time. There is little time left before the new head is supposed to take over.

Our second concern is what the college's plan is if Prof. Stern is reinstated. We understand that it is difficult to answer this question without knowing the exact court order. However, we want to make it clear that we would find Prof. Stern's reinstatement unacceptable. Without a clear plan on how to handle such a contingency, many of us would have to reconsider our positions at Auburn if it were to happen.

We are not making this statement as a threat because we understand that you cannot prevent Prof. Stern's reinstatement. We want you to understand how negatively we would view this reinstatement and why we feel it is critical to discuss the college's contingency plan for such a scenario.

Sincerely,

Tannista Banerjee
Tannista Banerjee, Professor

Gilad Sorek
Gilad Sorek, Associate Professor

Hyeongwoo Kim
Hyeongwoo Kim, Professor

Chris Vickers
Chris Vickers, Associate Professor

Aditi Sengupta
Aditi Sengupta, Associate Professor

Nicolas Ziebarth
Nicolas Ziebarth, Professor

(*Id.*) (circle added). As you can see, the professors essentially threatened to quit if the court ordered Stern reinstated.

   2. <u>Witness testimony</u>: The witness testimony at the evidentiary hearing confirmed that there's a sharp divide between these six professors who oppose

Stern's reinstatement and the four tenured professors who support it (Michael Stern, Liliana Stern, Alan Seals, and Duha Altindag).[2] Kim testified that he feels like there's been several unfortunate incidents between him and the pro-Stern professors that have caused him to suffer trauma and desire to no longer serve as Department Chair. For example, during one incident, Kim said that Stern was hostile and threatening and that he feared Stern would physically attack him. Stern denies ever threatening Kim and instead says that Kim is the one who "invaded his space" during an argument in Vickers' office. Because of his conflicts with Stern, Kim testified that he feels that he cannot accept Stern as Department Chair. According to Kim, if the court reinstates Stern as Chair, he will ask to be relocated to the Business School or go on the job market and try to find a job at another university.

Kim also says that after many years of unprofessional behavior, several faculty members don't feel comfortable sitting in the same conference room together. Dean Hicks confirmed that it's his understanding that the Economics Department no longer has in-person faculty meetings because of personality conflicts within the Department. Hicks, who before coming to Auburn had served four years as a department chair, three years as an associate dean, and one year as a provost fellow, testified that the conflicts within the Economics Department were atypical and different than mere professional disagreements common to academia. Hicks also stated that it's his opinion that reinstating Stern as Chair would paralyze the Department because of the amount of animosity between Stern and the six professors on the other side of the divide.

Stern's witnesses, on the other hand, blame Aistrup, Kim, and Kim's supporters for the problems within the Economics Department. But they too acknowledge that the Department is split into two camps. For example, John Sophocleus, an instructor within the Economics Department until 2019, testified that "over time the faculty clearly became factioned." In fact, things became so bad that Kim asked Sophocleus to take minutes of faculty meetings because the tenure track professors couldn't agree on what happened during these meetings. And Sara Seals, an Economics Department instructor, testified that a fraction within the Department occurred after Kim became

---

[2] Kim testified that the senior faculty members try to insulate the three non-tenured junior faculty members from this conflict, and there's scant evidence of where the Department's non-tenure track instructors fall within this divide.

Chair. Several professors "barely talk to her in the hallway," but she is friendly with the Sterns, her husband Alan Seals, and Altindag. Altindag affirmed that there's division between the tenured faculty members saying that certain people make all the decisions with Kim. According to Altindag, this group of professors includes Banerjee, Sengupta, and Ziebarth. Altindag says that Kim excluding the other professors from the decision-making process has caused discord that didn't exist under Stern because he included everyone when he was Chair.

3. <u>Academic Program Review/Self Study</u>: The most contemporaneous documentary evidence on the Economics Department also shows that there's a conflict between Stern and other professors within the Department. One example is the 2022 Academic Program Review of the Economics Department. (Def. Ex. 1). As part of the Academic Program Review, Kim worked with other Economics Department faculty members to submit a self-study to the Academic Program Review committee. (Def. Ex. 2). One of the Department's weaknesses listed in the self-study was "[i]nterpersonal conflict between faculty members and lack of senior faculty leadership." (*Id.* at 43).

The Academic Program Review Committee, comprised of persons from outside the department, agreed that "[t]he Department faces vexing climate issues that were articulated in the Self-Study and were readily apparent during the site visit." (Def. Ex. 1 at 4). The committee added that "[t]he Department faces significant threats to its collegial workplace climate. . . . Faculty did not propose unified solutions to the climate issue, but it is clear that the well-being and productivity of the Department and its members is at risk." (*Id.* at 11). And the committee was "challenged to envision the emergence of an internal solution. Overcoming the climate issues we witnessed may require assistance of the College and University." (*Id.*).

4. <u>Climate survey</u>:  Because of the climate issues within the Economics Department, interim College of Liberal Arts Dean Ana Franco-Watkins sent the Economics Department faculty members an anonymous climate survey in January 2022. (Def. Ex. 3). Along with asking the Department members

several ranking questions, the survey gave the respondents space to provide short answers about the climate within the Department.[3]

One question asked respondents to "[l]ist and describe 2 things that are going well in the department and briefly explain why." (*Id.* at 29). Here are two choice responses that were pro-Kim, anti-Stern:

- The department is in a much better place than where it was under Dr. Stern's leadership. . . . Dr. Stern, Dr. Liliana Stern, and Dr. Seals continuously attack Dr. Kim. They also attack the faculty who participate in any positive environment in the department. They are angry for their removal from power. This anger is reflected in their behavior.

- Unlike Dr. Stern, Dr. Kim complies with the standard norms and etiquette of the profession. . . . No tenured professor ever questioned any decision of Dr. Stern. Such was the power of manipulation and intimidation.

Now here are two pro-Stern, anti-Kim / anti-Administration responses:

- I will just list the only things going "good" in my department. . . [G]enerally screwing up the division of labor in the department so bad that it has to be on purpose just to rub it in Mike Stern's face.

- People are now able to do very well for themselves by facilitating the corruption and the ongoing acts of retaliation against those who speak

---

[3] Stern contends that the responses to these survey questions are hearsay. But the court agrees with Roberts that the responses fit within the then-existing state of mind hearsay exception under Rule 803(3). *See Schering Corp v. Pfizer Inc.*, 189 F.3d 218, 229–30 (2d. Cir. 1999). And the court isn't considering these responses for the truth of the matter asserted but for what they reveal about the mental impressions of those within the Economics Department. For example, the court does not believe that a certain group of professors is actually "poison;" the court understands that word reflects the author's feelings toward that group. (Def. Ex. 3 at 29). To the extent that Stern questions the reliability and accuracy of these survey results, the court rejects Stern's arguments. Several witnesses, including Stern, testified that they received this survey and there's no reason to think that the responses weren't recorded accurately. Finally, the court notes that while the climate survey bolsters the court's finding that reinstating Stern would be ineffective, the survey isn't outcome determinative. The other evidence discussed above would have been enough on its own for the court to make that finding.

out. . . . Awesome! This wouldn't be possible of course without the CLA Dean's Office.

(*Id.*). The next question asked respondents to "[l]ist and describe 2 things that need improvement in the department and briefly explain why." (*Id.* at 30-31). The answers to this question were more venomous. We start again with examples from the anti-Stern contingent:

- The main problem is, quite obviously, the abhorrent behavior of three individuals (the Sterns and Alan Seals). It simply has to be addressed.

- Professor Michael Stern has been outwardly hostile and often unprofessional in his language, tone, and expressions during faculty meetings, especially toward the current department chair. . . . The behavior at best discourages more fruitful and constructive discussions and at worst borders on workplace bullying.

- Civility and professional attitude of Dr. Mike Stern, Dr. Liliana Stern, and Dr. Alan Seals. They would not stop unless they get back the power and authority they crave for to control the unit. And it would be stepping back to a very dark time if that ever happens.

- The university must do something with regard to the behavior of the Sterns and Alan Seals. They hurt the rest of the faculty so much. They even manipulate undergraduate students to attack their colleagues. They should be removed from the unit.

- [W]e need to separate the group of faculty who are creating problems for the entire department from the rest of the faculty. Maybe a separate school of "economic history" where Dr. Stern, Dr. Liliana Stern, Dr. Seals and Dr. Ziebarth can belong will solve the problems of the department of economics.

- The venom in the department needs extracting. A few makes it bad for the whole. . . . Leadership does not need to be changed, only established and respected.

Now for the anti-Kim, anti-Administration contingent:

- My god, you only want 2 things?? 1. We don't have a legitimate chair. . . . Hyeongwoo Kim is a complete and total disaster!

- Hyeongwoo Kim should have dismissal proceedings brought against him. Gilad Sorek, Tannista Banerjee and Adiliti Sengupta should be removed from the Dept./School of Economics. No one, including the administration would notice their departures, except for the increase in productivity.

- There are definitely more than two things that are going badly. There are two sources of the problems we have[:] the department chair and the college administration. . . . What is most striking is that the college is not only not taking action but also rewarding the chair for his behavior.

- Exclusion and retaliation against a group of faculty members by Hyeongwoo Kim.

(*Id.*). The next question asked "[h]ow can the department or college assist you with your professional development and reaching your career goals?" (*Id.* at 33). Again, the responses reflected the split between Dr. Stern on one side, and Dr. Kim and the Administration on the other. Here are some pro-Kim, anti-Stern responses:

- Remove the Sterns from the department. The rest of the faculty will be freed if that happens.

- Minimizing, as much as possible, the role of the three troublemakers. That's really it.

- The college can make Dr. Kim the chair or head for a few more years so that he can continue building the professional environment for junior and mid career faculty. . . . He cannot bring the sense of inclusion, professionalism in the department in the presence of Dr. Stern, Dr. Ziebarth, Dr. Liliana Stern and Dr. Seals.

And here are some anti-Kim, anti-Administration responses:

- Dr. Kim has to be fired (I don't understand why and how he hasn't been fired yet). He doesn't do his job as chair, is incompetent, and

malicious. . . . The strained environment at the department is the direct effect of Dr. Kim's incompetence and malice and has nothing to do with any personality conflicts.

- Fire Charles Israel, Cynthia Bowling, and Hyeongwoo Kim and eject the non-producing grifters who were never a problem before the administration decided to destroy us[.]

- College administration should stop closing their eyes to the wrongdoings of the department chair and keep him accountable.

(*Id.*) The court could go on, but the point is made. The climate survey was taken before Stern asked the court to reinstate him as Chair. And it shows a deep, well-defined fracture within the Economics Department that about half of the department members blames on Stern.

—

To rebut Roberts' evidence, Stern presented evidence that reinstating him as Chair wouldn't be ineffective or impracticable, despite the hostility and discord within the Economics Department. For example, Stern testified that he has a good relationship with several colleagues on the other side of the divide. And Stern's performance reviews while he was Chair (2010-18) were excellent.

Yet much of Stern's evidence focused on whether Kim was to blame for the discord within the Department and whether Auburn failed to stop the discord from festering while Kim was Chair. But Kim is stepping down as Chair on July 31st, so whether Kim was a good or bad Chair is irrelevant to Stern's request for reinstatement on August 1st. Besides, if the antagonism between the parties is so great that reinstatement is not feasible, it doesn't matter if someone else caused it. *See Farley,* 197 F.3d at 1339 ("On this record, we find that Farley's hostile work environment, coupled with his stress-induced disabilities, created sufficient special circumstances to support the trial court's award of front pay in lieu of reinstatement."); *Lewis v. Fed. Prison Indus., Inc.,* 953 F.2d 1277, 1281 (11th Cir. 1992) (affirming award of front pay instead of reinstatement when "Lewis emerged from an antagonistic, discriminatory work environment with an emotional disturbance that rendered him unfit to return to that environment").

What matters is whether the totality of the evidence shows that discord and antagonism between Stern and other members of the Economics Department would make Stern's reinstatement ineffective. The answer must be yes. There is a real possibility that if the court were to reinstate Stern, several tenured professors would seek jobs at other universities or ask to be transferred to another college within Auburn—thus harming professors and students who had nothing to do with Aistrup's retaliation against Stern. Plus, Stern testified that it would be untenable for the Department Chair to have no supervisory authority over these professors because the Chair must create the Economics Department's course schedule each year.

As a result, the court finds that discord and antagonism between Stern and several other Economics Department professors would make reinstating Stern as Chair ineffective. So the court will deny Stern's motion for reinstatement and decide whether to award him front pay instead.

## B.    Front Pay as a Substitute for Reinstatement

Dr. Roberts argues against front pay for three reasons. The court addresses each below.

1. <u>Windfall</u>: While front pay is the standard substitute for an ineffective reinstatement, courts must temper front pay awards because "of the potential for windfall." *See id*. Seizing on this standard, Roberts argues that "Stern's efforts to recover front pay must be based on rank speculation that he would have been elected and appointed Chair sometime after the end of his 2016-19 term." (Doc. 216 at 27). But again, even though Auburn paid Stern the Chair's pay until August 2019, Auburn's payments didn't make Stern whole from the intangible harm caused by Aistrup unlawfully removing Stern as Chair and thus preventing him from acting as Chair during the final 14 months of his third term.

As Stern correctly points out in his reply brief, serving as Chair not only conferred a financial benefit on Stern, but it also provided him other benefits, such as an opportunity to demonstrate leadership skills. And Stern is eager to serve as Chair—something he has been unable to do since his removal in 2018. So the court finds that awarding Stern one year's front pay to replace a year's term as Chair is not a forbidden windfall.

2. <u>Equitable estoppel</u>: The court also finds that the equitable concerns that Roberts asks the court to consider aren't adequate to depart from the normal rule that courts should award front pay when reinstatement isn't possible. Roberts says that the court should consider that Stern is different than many plaintiffs seeking front pay because he remains employed at Auburn and receives a substantial salary and benefits. Roberts also says that the discretionary nature of the Chair appointment should weigh against an award of front pay. But Roberts hasn't explained why Stern's employment status matters. And after spending considerable time with Stern, it's clear to the court that Stern desires reinstatement just as much as a plaintiff who no longer has a job because of retaliation would. The court also finds that the discretionary nature of the Chair appointment *supports* giving Stern front pay because discretion may give more incentive to use employment decisions to chill protected rights. So awarding front pay could serve as a deterrent.

3. <u>Failure to mitigate</u>: The court finally rejects Roberts' argument that the court shouldn't award Stern front pay because Stern failed to mitigate his damages by not participating in the 2019 election. Roberts is right that the failure to mitigate damages can limit the amount of front pay available. *See Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1562 (11th Cir. 1988). But again, the court is not awarding front pay equal to a full three-year term to make up for the 2019-22 term. Nor is the court giving Stern 14 months' salary to reflect the time remaining on Stern's 2016-19 term when Aistrup removed him. The court's award is limited to one year, in recognition of the 2023-24 term of reinstatement that Stern would be equitably entitled to but for the discord and antagonism within the Economics Department.

4. <u>The award</u>: As explained below, the court calculates Stern's current 9-month base salary absent Aistrup's retaliation as $146,170. At the evidentiary hearing, Stern testified that Auburn's current "step-up" calculation for Chair is (Base Salary x 12/9) + (2,000 x 12). Plugging in Stern's 9-month salary as the base salary, this equals $218,893.33. The difference between Stern's Chair's salary and Stern's 9-month base salary is $72,723.33. So the court will order Roberts to pay Stern **$72,723.33**.

C. **Supplemental Back Pay**

Stern also asks for supplemental back pay from the date of the jury's verdict to the date of final judgment on the lost wages and benefits resulting from his removal as Chair, lack of raise for the 2018-2019 academic year, and denial of a merit supplement in 2018. Roberts responds that Stern isn't entitled to supplemental back pay on the Chair removal claim because Stern's assertion that he would still be Economics Department Chair is speculative. Roberts says that supplemental back pay is also inappropriate for the merit supplement denial because this was a one-time supplement that the jury fully compensated Stern for. And though Roberts acknowledges that the denial of Stern's raise still affects his salary, Roberts says that Stern has waived the argument that he's entitled to supplemental back pay for the lost wages and benefits that have accrued since the jury rendered its verdict.

The court agrees with Roberts that Stern cannot recover supplemental back pay on his Chair removal claim because he hasn't shown that it's reasonably certain that he would've continued as Economics Department Chair from November 2022 until today. And the merit supplement was a one-time supplement independent of Stern's salary going forward. So the jury's verdict fully compensated Stern for the denial of the merit supplement. Thus, Stern isn't entitled to supplemental back pay on the merit supplement claim either. That leaves only the denial of raise claim.

1. Waiver: As for that claim, the court rejects Roberts' argument that Stern has waived the right to request supplemental back pay. The court doesn't read Stern's motion for equitable relief (doc. 200) as applying to only Stern's Chair removal claim, as Roberts suggests. Instead, the motion points out that the back pay award must extend until the date of final judgment. *See Nord v. U.S. Steel Corp.*, 758 F.2d 1462, 1472–73 (11th Cir. 1985). This argument applies just as much to Stern's raise denial claim as it does his Chair removal claim.

And even if Stern's motion covered only the Chair removal claim, Roberts hasn't been prejudiced by Stern not requesting supplemental back pay for his raise denial claim in his motion. That's because the court allowed the parties to file bare-bones motions for equitable relief and judgment as a matter of law

to give them time to mediate. As the court explained to the parties during the December 21, 2022 telephone conference, these motions could have been only one to two sentences long and have preserved the arguments in the parties' briefs in support of the motions. Plus, after Stern's brief argued for supplemental back pay for the raise denial claim, Roberts had three weeks to respond to the brief and then a two-day evidentiary hearing in which he could present evidence related to this issue. So the court will address the merits of Stern's request.

2. <u>Calculation of back pay</u>: The parties' briefs recognized that for the court to calculate the appropriate supplemental back pay award, the court needed more evidence than the evidence available at the time of briefing. So at the evidentiary hearing, Roberts submitted a declaration from Amanda Malone, who oversees the budget, financial, and human resources activities for Auburn's provost's office. (Def. Ex. 29). Attached to Malone's declaration are calculations of what Stern's salary would be if Aistrup had awarded Stern a 2.95%, 3%, or 3.5% merit raise in 2018.

In his briefs, Stern refers to his lost raise as a "3% raise." (*See* Doc. 209 at 14). But at the evidentiary hearing Stern said that he thought the raise should be at least 3.5% because that was the most common raise Aistrup awarded Department Chairs in 2018. And though Stern disagreed with Malone calculating his salary as if he were a regular faculty member instead of Chair, Stern otherwise agreed with Malone's calculations. After reviewing Malone's calculations and the jury's verdict, the court determines that a finding that Aistrup would have awarded Stern a 3.7% raise in 2018 is more consistent with the jury's verdict.

The following chart summarizes how the court calculated Stern's salary with a 3.7% merit raise in 2018 using Malone's method:

| Effective Date | Salary | $ Change from Prior Year | % Change from Prior Year |
|---|---|---|---|
| 10/1/2017 | $158,680 | $4,620 | 3.00% |
| 10/1/2018 | $164,550 | $5,870 | 3.70% |

| 8/16/2019 | $128,290 | ($36,260) | -22.04% |
|-----------|----------|-----------|---------|
| 10/1/2019 | $134,270 | $5,980 | 4.66% |
| 10/1/2020 | $134,270 | $0.00 | 0.00% |
| 10/1/2021 | $138,620 | $4,350 | 3.24% |
| 10/1/2022 | $146,170 | $7,550 | 5.45% |

The jury awarded Stern $31,020 for Aistrup's denial of Stern's raise and one-time merit supplement. The parties agree that it's reasonable to conclude that the jury assigned a value of $5,150.00 to the supplement because that's the amount Stern requested the jury award him. (Doc. 209 at 20; Doc. 216 at 38). That means the jury assigned a value of $25,870.00 to the loss for denial of the raise. If you substitute the 0.00% raise Aistrup gave Stern for 2018 with a 3.7% raise, the total amount of lost wages and benefits for Stern from the day the raise went into effect to the jury's verdict is $25,843.59. The court attributes the approximately $26 discrepancy between the jury's award and the court's calculation to the fact that the court, like Malone, rounded Stern's yearly raise and salary to the nearest $10.

In making this calculation, the court determined that a 3.7% raise to Stern's September 30, 2018 salary of $158,680 would increase Stern's salary by $5,871 ($158,680 x .037). That would mean that had Stern received the raise for 2018 to 2019 Stern's salary would be $164,550 ($158,680 + $5,871, rounded to the nearest $10). From October 2018 to July 2019 Stern received 10 equal payments of $13,223.33.[4] If Stern had received the 3.70% raise, those would have been 10 equal payments of $13,712.50. Thus, the difference between what Stern earned from October 2018 to July 2019 and what he would have earned is $4,891.67. On August 30, 2019, Stern received $6,611.67 in Chair compensation to cover August 1 to August 15. If Stern had received the 3.7%

---

[4] The court referenced https://auapps.auburn.edu/openalabama/ to determine the number of paychecks Stern received each fiscal year and how his paychecks were divided. Auburn divides Chair salary into 12 monthly payments. Regular faculty members' salaries are divided into 18 biweekly payments.

raise, that amount would instead be $6,856.25, or $244.58 more than what he earned.

Auburn used its step-down formula to convert Stern's Chair salary to a regular 9-month faculty salary, starting on August 16. Under this formula, Auburn added Stern's base salary of $82,160.00 to all the merit increases he earned while Chair. This revised salary showed that Stern's faculty salary for 2018 to 2019 was $122,422.00. If you add the 3.7% merit increase to this salary and round to the nearest $10, you get a salary of $128,290. From August 30, 2019 to September 30, 2019, Auburn paid Stern $20,403.67 in salary (making three payments of $6,801.22). If Stern had received the 3.7% raise, Auburn would have paid him $21,381.67 during this period, which is a difference of $978.00. Stern earned a 4.66% merit raise for the 2019 to 2020 academic year, which went into effect on October 1, 2019. To reflect this raise, Auburn increased Stern's salary to $128,132. If Aistrup had given Stern the 3.7% raise in 2018, Stern's salary would have instead been $134,270, a difference of $6,138.

Because of COVID-19, no Auburn employee received a merit raise in October 2020, so Stern's salary remained $128,132 for the 2020 to 2021 academic year, and he again should have earned $6,138 more than he did. Stern earned a 3.24% merit raise in October 2021, so Auburn increased his salary to $132,280. But Stern's salary from October 2021 to September 2022 would have been $138,620 without his lost raise, a difference of $6,340. Stern earned a merit raise of 5.45% in October 2022, which led Auburn to increase his salary to $139,490. Without the lost raise, Stern's current salary would be $146,170. From October 1, 2022 to November 15, 2022 (the date of the jury's verdict), Auburn paid Stern three paychecks of $7,749.44. If Stern's salary would have been $146,170, he would have instead received three paychecks of $8,120.56. That's a difference of $1,113.34. And if you add up the total difference between what Stern should have been paid if he'd received a 3.7% raise in October 2018 and what Stern made between October 1, 2018 and November 15, 2022, you get $25,843.59. Thus, the calculation shows that a finding that Stern would have received a 3.7% merit raise in 2018 is the percentage raise most consistent with the jury's verdict.

Because the court finds that Stern's current salary absent Aistrup's retaliation would be $146,170, the court will award Stern **$4,453.34** in supplemental back pay. This amount reflects the difference in the 12 paychecks Stern should have received between trial and judgment ($146,170/18 x 12) and the 12 paychecks that Stern received ($139,490/18 x 12). The court also agrees that as part of its equitable power to make Stern whole, the court should order Auburn to recalculate Stern's salary as if he had earned a 3.70% raise in 2018 going forward. So the court will order Auburn to pay Stern an additional **$1,113.34** in front pay to reflect the difference in Stern's paychecks for the final three paychecks of fiscal year 2023. The court will also order Auburn to calculate Stern's salary effective October 1, 2023, as if Stern's salary from October 1, 2022 to September 30, 2023 was $146,170.

**D.   Prejudgment Interest**

Stern finally asks the court to award prejudgment interest on the jury's award and the supplemental back pay award. Roberts responds that Stern has waived this argument and that because of Stern's personal circumstances the court shouldn't exercise its discretion to award Stern prejudgment interest. The decision to award prejudgment interest on back pay is discretionary. *See Tucker v. Hous. Auth. of Birmingham*, 507 F. Supp. 2d 1240, 1283 (N.D. Ala. 2006). "In determining whether to award prejudgment interest, courts take into account both the failure to mitigate damages and whether the back pay amount is easily ascertainable." *Id.* at 1284.

1.   <u>Roberts' arguments</u>: The court again rejects Roberts' waiver argument. Though the court agrees that Stern didn't clearly articulate that he was seeking prejudgment interest in his motion for equitable relief, Roberts hasn't been prejudiced by this because he had three weeks to respond to Stern's brief which did explain that Stern was seeking prejudgment interest. And the court agrees with Stern that cases rejecting motions for prejudgment interest filed more than 28 days post-judgment are inapplicable here. Though the court has entered judgment on the jury's verdict with respect to Aistrup and the dismissed defendants, the court has not entered final judgment because Roberts remains a party and the official capacity claims for equitable relief against him have yet to be resolved. In short, the court finds that Stern hasn't waived his right to prejudgment interest.

Roberts next says that Stern isn't entitled to prejudgment interest because he has suffered no real financial loss and still enjoys a healthy salary and cites a case in which the court said it was awarding prejudgment interest to help offset "the real financial consequences of termination." *See King v. CVS Health Corp.*, 198 F. Supp. 3d 1277, 1289 (N.D. Ala. 2016). As shown by the court's calculation of Stern's supplemental back pay award, Stern has and continues to suffer financial losses from Aistrup's retaliation. Plus, the back pay amount is readily ascertainable, and Roberts hasn't asserted that Stern failed to mitigate his damages caused by the lack of a raise in 2018. So to make Stern whole and compensate him for the value of money he has lost over time, the court will exercise its discretion to award Stern prejudgment interest on the $31,020 jury award for the denial of raise and supplement as well as the $4,453.34 supplemental back pay award.

2. <u>Calculation of interest</u>: The "interest rate for prejudgment interest on back pay awards . . . depends on the IRS prime rates calculated in accordance with 28 U.S.C. § 1961." *McKelvy v. Metal Container Corp.*, 854 F.2d 448, 453 (11th Cir. 1988). Section 1961 includes several potential interest rates, but Stern asks the court to apply the applicable interest rates from 28 U.S.C. § 1961(c)(1). And Roberts hasn't objected to the court computing the interest based on the rates that apply under § 1961(c)(1). So the court will apply the rates applicable to this section to the back pay award.

Subsection (c)(1) refers to 28 U.S.C. § 6621, which determines the interest rate that applies to over-payments and under-payments of income taxes to the federal government. The IRS Table of Underpayment Rates for (c)(1) can be found at https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/correction-programs/vfcp/table-of-underpayment-rates. Though the NLRB compounds interest daily, Stern proposes calculating and compounding interest monthly. Roberts hasn't objected to this method of calculating interest, so the court will use this formula to determine the amount of cumulative back pay and interest owed Stern. But before officially awarding Stern prejudgment interest, the court will invite the parties to submit, hopefully by agreement, a proposed calculation of prejudgment interest on the back pay award based on the revised back pay amount.

The parties' calculation should explain the quarterly rates, quarterly annualized rates, and monthly rates used in the calculation. The $25,870.00 loss the jury attributed to the raise should be allocated on a pro rata monthly basis, to the 50-month period from October 2018 to November 2022 ($517.40 per month). The $5,150.00 loss the jury attributed to the one-time merit supplement should be allocated to December 2018, the month in which Aistrup didn't pay Stern the one-time bonus. And the $4,453.34 in supplemental back pay should be allocated in a pro rata monthly basis, to the 9-month period from November 2022 to July 2023 ($494.82 per month). The parties' prejudgment interest calculations are due by **July 14, 2023**.

## CONCLUSION

For these reasons, the court **GRANTS IN PART** and **DENIES IN PART** Stern's motion (doc. 200). The court denies Stern's request for reinstatement as Chair of the Economics Department and will instead award Stern front pay in the amount of **$72,723.33.** The court will also award Stern supplemental back pay in the amount of **$4,453.34**. And court will order Auburn to pay Stern an additional **$1,113.34** in front pay and to adjust Stern's salary to reflect a 3.7% raise in October 2018. Finally, the court will award prejudgment interest on the jury's award and supplemental back pay award. The parties' final calculation of the cumulative back pay and interest owed is due by **July 14, 2023**.

**Done** and **Ordered** on June 29, 2023.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE