UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| **DR. MICHAEL L. STERN,**<br>     Plaintiff,<br><br>v.<br><br>**DR. CHRISTOPHER B. ROBERTS, et al.,**<br>     Defendants. | Case No. 3:18-cv-807-CLM |

**AMENDED ORDER**
**Aistrup's posttrial motions**

A jury found that the former dean of Auburn University's College of Liberal Arts, Joseph Aistrup, retaliated against Dr. Michael Stern by (a) removing Stern as Chair of the Department of Economics in 2018, (b) denying Stern a raise for the 2018–2019 academic year, and (c) denying Stern a one-time merit supplement. The jury found that Stern did not prove his claims against any other defendant.

Aistrup does not challenge the retaliation verdict; rather, his posttrial motions raise various challenges to the jury's damage awards. Stern has filed motions for additional equitable relief. The court addresses these arguments in separate orders. In this first order, the court addresses the arguments raised by Aistrup. In its second order, the court addresses Stern's arguments that affect Auburn University and its current President, Dr. Christopher B. Roberts. *See* (Doc. 247) (court's order). For the reasons stated within, the court rules as follows on Aistrup's motions:

- The court **GRANTS** Aistrup's motion to reduce the jury's compensatory award of $114,817 for Claim 2. The court awards Stern **$1** in nominal damages.
- The court **DENIES** Aistrup's motion to set aside or reduce the jury's punitive award of **$250,000** for Claim 2 and **$250,000** for Claim 3.

## BACKGROUND

Dr. Michael Stern is a current tenured professor at Auburn University and former Chair of Auburn's Department of Economics. After Stern spoke out about the alleged clustering of student athletes in Auburn's Public Administration major, Dean Joseph Aistrup removed Stern from his Chair position, denied Stern a raise for the 2018-2019 academic year, and prevented Stern from receiving a merit supplement in December 2018. Following a 10-day trial, a jury found that Dean Aistrup took each of these actions against Stern in retaliation for Stern speaking publicly about Public Administration. The jury awarded Stern $114,817.00 in compensatory damages plus $250,000 in punitive damages for his removal as chair, and $31,020.00 in compensatory damages plus $250,000 in punitive damages for the denial of his raise and merit supplement.

At the close of evidence and before the jury began its deliberations, Aistrup moved for judgment as a matter of law under Rule 50(a), arguing that Stern failed to establish damages for his removal as Chair and that there wasn't enough evidence to submit the question of punitive damages to the jury. The court deferred ruling on the motion and asked Stern if he would like to include an option to award nominal damages in the verdict form. Stern asked for nominal damages, so the court added a nominal damages section to the verdict form over Aistrup's objection. Aistrup has now moved for relief under Rules 50(b) and 59 renewing his argument that the court should set aside most of the damages awarded Stern.

## STANDARDS OF REVIEW

1. <u>Rule 50(b) motion</u>: In considering a motion for judgment as a matter of law, the court views the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 724 (11th Cir. 2012). Judgment as a matter of law is appropriate if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the" nonmoving party. Fed. R. Civ. P. 50(a). "Only the sufficiency of the evidence matters; what the jury actually found is irrelevant." *Hubbard*, 688 F.3d at 724.

2. <u>Rule 59 motion</u>: The court "should grant a motion for a new trial when the verdict is against the clear weight of evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quotations omitted).

3. <u>Punitive damages</u>: "[A] punitive damages award violates due process when it is grossly excessive in relation to the State's interest in punishment and deterrence." *McGinnis v. Am. Home Mortg. Serv., Inc.*, 901 F.3d 1282, 1288 (11th Cir. 2018) (quotations omitted). To determine whether an award violates due process, the court must consider (1) the degree of reprehensibility of the defendant's misconduct; (2) the ratio between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575–83 (1996).

## DISCUSSION

The court limited Stern to two types of damages: (a) lost wages and benefits (or nominal damages if none) and (b) punitive damages. The court asked the jury to award these damages by claim, which they did:

|  | Compensatory Damages | Punitive Damages |
|---|---|---|
| **Claim 2** (removal as chair) | $114,817 | $250,000 |
| **Claim 3** (denial of raise and 1-time supplement) | $31,020 | $250,000 |

(Doc. 193) (jury verdict). Aistrup does not challenge Count 3's compensatory award shaded green. Aistrup challenges the three awards shaded red. The court addresses each award in the order they appear above.

**Claim 2: Compensatory Damages for Removal as Chair**

Two time periods matter here. First is the 14-month period between Aistrup's removal of Stern as chair and the date that Stern's term would have ended if Aistrup hadn't removed him (2018-19). Second is the 3-year term that followed (2019-22). Dr. Hyeongwoo Kim served as chair for both terms; the first by appointment (2018-19), the second by election (2019-22).

For each term, Stern had to prove his lost wages with reasonable certainty. *See Fid. Interior Constr., Inc. v. Se. Carpenters Regions Council of United Brotherhood of Carpenters and Joiners of Am.*, 675 F.3d 1250, 1265 (11th Cir. 2012). "Compensatory damages must not be based on speculation or guesswork." 11th Cir. Civil Pattern Jury Instr. 4.1. But if Stern offered enough evidence to show he suffered damages, "proof of the amount of damages can be an estimate, uncertain, or inexact." *Fid. Interior*, 675 F.3d at 1265 (cleaned up).

As explained below, once you remove "speculation and guesswork," Stern offered no evidence that he lost wages or benefits for either term. So the jury's compensatory verdict cannot stand as a matter of law.

### A. Calculating Lost Wages and Benefits

Before we get to the terms Stern missed as Chair, let's properly define the monetary damage. Auburn pays faculty members a 9-month salary. Stern testified that, for the extra work, the Chair was instead paid an 11-month salary plus a monthly stipend. The letters setting Stern and Kim's salaries as Chair support this testimony.

Based on the evidence, this formula calculates annual lost wages—*i.e.*, the difference between the Chair salary and base salary:

$$(\text{Base Salary} \times 11/9) + (\text{Monthly Stipend} \times 12) - (\text{Base Salary})$$

During the posttrial trial proceedings, the parties agreed that the first two parts of this equation determine the Chair's annual salary, except Auburn switched the Chair to a 12-month salary (12/9) later in Dr. Kim's full term.

4

**B. The Rest of the 2016-2019 Term**

In 2016, the Economics Department elected Stern to serve a three-year term as Chair that would end in August 2019. Aistrup removed Stern about 14 months before that term ended. While Aistrup's decision may have injured Stern in non-monetary ways, Aistrup's removal of Stern didn't cost Stern any provable wages or benefits through the rest of the 2016-19 term because Auburn continued to pay Stern his full salary as Chair—*i.e.*, the 11-month salary plus monthly stipend—through the end of term, even though Stern wasn't serving as Chair. (*See* Trial Exhibit 24). In fact, Stern admitted that Aistrup's decision didn't cost him money when Stern argued against the University's posttrial request to continue its search for a new chair:

> Dr. Stern was elected by the faculty to serve as Chair of the Economics Department. Serving as Chair of a department carries with it a certain level of prestige and status. When he was unconstitutionally removed as Chair, ==even with no loss in pay, he experienced an adverse employment action because of the reduction in the prestige or responsibility he enjoyed==.

(Doc. 214, p. 10) (highlight added). The court thus finds that Stern presented no evidence to support a compensatory award for his early removal from the 2016-19 term.

**C. The Full 2019-22 Term**

Knowing that he did not suffer a money loss for the 2016-19 term, Stern argues that the jury could have found that Stern would have been reelected Chair for the 2019–2022 term absent Aistrup's retaliation and thus awarded him money to compensate for that loss. But as explained below, Stern bases this argument solely on speculation and guesswork, which again, cannot support a compensatory damage award.

1. <u>Chair selection</u>: Auburn's faculty handbook says that departments should adhere to this process when selecting a Chair:

> The chair or head of a department, who serves as the chief representative of the department within an institution, should be selected by departmental election or by appointment following

> consultation with members of the department and of related departments; appointments should normally be in conformity with the department members' judgment. The chair or department head should not have tenure in office; tenure as a faculty member is a matter of separate right. The chair or head should serve for a stated term but without prejudice to reelection or to reappointment by procedures that involve appropriate faculty consultation. . . . Department heads/chairs are appointed by the dean.

(Trial Exhibit 500 at 40–41). The Economics Department's bylaws state that the Chair is elected by a majority vote of the tenured and tenure track faculty. (Trial Exhibit 335 at 1). The Chair serves a three-year term with the option of reelection for another term. (*Id.*).  There is normally a two consecutive term limit for Chairs, but 3/4 of the tenured and tenure-track faculty can vote to waive the two-term limit. (*Id.*).

In short, the Dean has final authority to appoint the Chair. The Dean is expected (but not required) to follow the department's electoral choice.

2. <u>The 2019 election</u>: The Economics Department held an election for the 2019-22 term. Associate Dean Charles Israel conducted the election, and Israel allowed nominations from the whole department. So to prove that he lost money because he did not serve as Chair for the 2019-22 term, Stern needed to prove either that Aistrup barred him from running for Chair or that Stern won the election and Aistrup refused to accept the department's choice.[1] Stern proved neither.

Instead, Stern chose not to run in the 2019 election. As his wife testified, Stern "could have but he never [did] nominate[ ] himself." (Trial Tr. Volume 6, 148:7–10). Stern's replacement, Dr. Kim, was the only nominee. Eight people voted for Kim, and four did not vote. Stern offered no evidence that any of the eight persons who voted to retain Kim would have voted for Stern if he ran.

---

[1] It's debatable whether Stern needed 75% of the vote because he won the previous two elections or 50% of the vote because he was not the incumbent because of his removal. The court needn't decide which number is correct because Stern did not run for Chair.

3. <u>Futility</u>: Stern says that it would have been pointless for him to run for Chair in 2019 because Aistrup intended to permanently bar him from being Chair. But Stern bears the burden of proof on damages, and he offered no evidence that Aistrup would have refused to appoint Stern if the faculty had elected him. Aistrup's memo releasing Stern from his responsibilities as Chair simply states, "[e]ffective immediately, you are released from your responsibilities as Chair of the Department of Economics. You will continue at your current salary until August 15, 2019." (Trial Exhibit 24). Aistrup did not say that Stern was forever barred from running in future elections.

While Stern's speculation that Aistrup would have overruled a Stern victory might have proved true, Stern's speculation cannot overcome his need to offer some *proof* that he could win the 2019 election and force Aistrup's hand. Without some showing that Stern could have gotten enough votes to win the election, it is "contingent and uncertain" whether Aistrup's removal of Stern as Chair in 2018 caused Stern to not be selected as Chair for the 2019-2022 term. *See Fidelity Interior*, 675 F.3d at 1265.

The facts of *Fidelity Interior* show why Stern needed to offer some evidence that he would have won the election before he can collect damages for lost wages. Fidelity Interior was a subcontractor that sued a labor union for starting an unlawful picket that cost Fidelity business. The jury agreed with Fidelity and awarded it damages for lost business opportunities. The Eleventh Circuit held that Fidelity proved its damages because several "contractors testified that they would have continued to award Fidelity work absent the fear of future pickets." *Id.* And the court held that the award for lost future profits wasn't speculative because "at least two . . . contractors testified that they would have invited Fidelity to bid on their projects had the union not picketed," and Fidelity "presented evidence about the percentage drywall subcontract work that it had historically performed for various contractors and its historic profit margin." *Id.*

Unlike Fidelity, Stern offered no testimony from any of the eight persons who voted for Kim in the 2019 election who said that he would have instead voted for Stern absent Aistrup's retaliation.

Given that the trial evidence shows (a) Stern was not precluded from running in the 2019 election and (b) Stern chose not to run in the 2019 election, the evidence establishes that factors other than Aistrup's retaliation led to Stern not being Chair for the 2019-2022 term. So the court finds as a matter of law that Stern failed to offer the jury sufficient evidence to base an award of $114,817 as compensation for Stern's failure to serve as Chair for the 2019-22 term.

### D. Nominal Damages

Having decided that the jury could not award $114,817 in lost wages and benefits for Stern's removal as Chair, the question becomes: What is the proper award? The parties disagree. Aistrup argues that the court should either set aside the jury's verdict on Claim 2, or the court should award $1 in nominal damages. Stern responds that Aistrup has waived the argument that Stern should get nominal damages because Aistrup argued against the nominal damage instruction at trial. And both sides seem to agree that the court must give Stern the option of asking for a new trial before reducing the award to $1.

The court disagrees. As explained below, a $1 nominal damage award is appropriate, and the court needn't offer a new trial before imposing it.

1. <u>Setting aside the verdict</u>: Aistrup asks the court to set aside the jury's verdict related to Stern's removal as Chair (Claim 2), suggesting that Stern's failure to prove money damages defeats a necessary element of Stern's claim. But "[w]hen constitutional rights are violated, a plaintiff may recover *nominal* damages even though he suffers no compensable injury." *Kelly v. Curtis*, 21 F.3d 1544, 1557 (11th Cir. 1994) (emphasis in original). And "in some circumstances, punitive damages may be awarded in a § 1983 action even without a showing of actual loss by the plaintiff if the plaintiff's constitutional rights have been violated." *Id.* (cleaned up). So the court finds that Aistrup isn't entitled to a directed verdict on Count 2 just because Stern failed to prove his claim for lost wages and benefits. Aistrup injured Stern for exercising his First Amendment rights, just not monetarily.

2. <u>Waiver</u>: As a result, the court must decide whether to grant Aistrup's alternative request to reduce the compensatory award to $1.00 in nominal damages. Stern says that Aistrup waived the right to ask that Stern receive

8

only nominal damages because Aistrup objected to the court instructing the jury on nominal damages, argued against nominal damages to the jury in closing, and didn't ask for nominal damages in his Rule 50(a) motion.

But defendants routinely argue against damage awards—be it for $1 or $10 million. While a plaintiff can waive his right to nominal damages, *see Oliver v. Falla*, 258 F.3d 1277, 1282 (11th Cir. 2001), Stern has cited no case in which a court has held that a *defendant's* argument against a nominal damages jury instruction waived the defendant's right to later ask the court to reduce the damages award to nominal damages. Like nearly all defendants, Aistrup contended that he didn't violate Stern's Constitutional rights or injure Stern monetarily, so the only proper award was $0. The court finds no authority to support a rule that punishes defendants for arguing their case—particularly where Aistrup was right about the lack of money damages. The court has seen, however, plenty of cases that support an award of nominal damages for constitutional rights violations that did not cause actual injury. *See, e.g., Carey v. Piphus*, 435 U.S. 247, 266-67 (1978) (holding that a $1 nominal damage award is appropriate for the violation of procedural due process, even "without proof of actual injury"); *Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir. 2003) (remanding for the district court to consider nominal damages for mistreatment by police).

### E. Reduction vs. New Trial

That leaves us with the parties' argument that the court must give Stern the option of a new trial before it can reduce the jury's award to $1. The parties correctly note that "[a] federal court has no general authority to reduce the amount of a jury's verdict," and "[t]he Seventh Amendment prohibits re-examination of a jury's determination of the facts, which includes its assessment of the extent of plaintiff's injury." *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1328 (11th Cir. 1999). So "[a] court which believes the jury's verdict is excessive" must "order a new trial unless the plaintiff agrees to remit a portion of the jury's award." *Id.*

But there's a difference between reweighing facts and noting that facts don't exist. "[I]f legal error is detected, the federal courts have the obligation and the power to correct the error by vacating or reversing the jury's verdict."

9

*Id.* at 1330. As a result, "where a portion of a verdict is for an identifiable amount that is not permitted by law, the court may simply modify the jury's verdict to that extent and enter judgment for the correct amount." *Id.*

Applying these principles, the Eleventh Circuit has held that district courts may reduce a punitive damages award that exceeds the constitutional limit without giving the plaintiff an option for a new trial. *See id.* at 1331–33. The Eighth Circuit has extended this rationale to some reductions of compensatory damages to nominal damages. *Corpus v. Bennett*, 430 F.3d 912, 916–17 (8th Cir. 2005). The key question under the Seventh Amendment is "whether the district court substituted its own evaluation of the evidence regarding damages for the jury's factual findings or whether the reduction of damages was based on a determination that the law does not permit the award." *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, 249 F. App'x 63, 81 (10th Cir. 2007) (cleaned up).

The court hasn't reweighed the evidence or reduced Stern's damages award because of a fact disagreement. Instead, the court finds that nominal damages of $1.00 are the most damages possible because Auburn paid Stern through the end of the 2016–19 Chair term and Stern has no competent evidence that absent his removal he would have served as Chair from 2019–22. Again, Stern has admitted posttrial that "**even with no loss in pay**, he experienced an adverse employment action because of the reduction in the prestige or responsibility he enjoyed." (Doc. 214, p. 10) (emphasis added).

So the court isn't reexamining the evidence; it's pointing out what Stern admits and the record establishes: Aistrup's decision to remove Stern as Chair didn't cause Stern to lose wages or benefits. Retrying the case to prove a monetary loss would be pointless because nothing can change the facts that Auburn continued to pay Stern his Chair salary through the end of his 2016-19 term and Stern didn't run for Chair in 2019. So by reducing the jury's unsupported award of $114,817.00 to a $1 nominal award, the court is correcting a legal error that does not require a retrial. *See Tronzo v. Biomet, Inc.*, 236 F.3d 1342, 1351 (Fed. Cir. 2001) (finding it appropriate to not offer a new trial when, "as a matter of law, the compensatory damages could not exceed the $520 already awarded").

10

* * *

In sum, the court finds as a matter of law that no evidence supports an award of $114,817.00 for lost wages and benefits on Claim 2 and that $1.00 in nominal damages is the maximum award supported by the evidence.

### Claim 2: Punitive Damages for Removal as Chair

The court now addresses whether (a) Stern presented enough evidence to support a punitive damage award for Claim 2 and, if so, (b) whether the Constitution allows $250,000 in punitives on top of $1 in nominal damages.

#### A. Sufficiency of the Evidence

Aistrup argues that Stern failed to present enough evidence to sustain a punitive damage award. "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, *or* when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983) (emphasis added).

Having reviewed the trial evidence, the court finds that the jury could have awarded punitive damages under either standard. Aistrup argues that he didn't act recklessly or with an evil motive because he testified that he understood the importance of the First Amendment and free speech. But that testimony cuts both ways. Aistrup told the jury that he believed it was important to allow employees to speak on matters of public concern and to not retaliate against those who do. The jury could have viewed this evidence as showing that Aistrup ***knew*** he was violating Stern's First Amendment rights when he removed Stern as Chair. That state of mind would be enough to support awarding Stern punitive damages under the reckless or callous indifference standard. *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999) (applying *Smith* standard to Title VII context and holding that employer who discriminates "in the face of a perceived risk that its actions will violate federal law [can] be liable in punitive damages").

The jury also could have found that Aistrup acted with evil motive or intent. Aistrup testified that he removed Stern as Chair because of Stern's disruptive behavior and insubordination. And Aistrup pleaded this motive as

an affirmative defense. The jury rejected it, finding as a matter of fact that Aistrup would *not* have removed Stern if Aistrup "had not considered Dr. Stern's speech about the alleged clustering." (Doc. 193, p.3). This finding, which Aistrup doesn't challenge in his Rule 50(b) motion, shows that the jury believed that Aistrup's motive was to punish Stern for speaking out on a matter of public concern—*i.e.*, an evil motive or intent.

Certain pieces of evidence could support that inference. For example, the day after Stern first spoke out about alleged clustering in the Public Administration major, Aistrup emailed him with the subject line "lecture on diplomacy?" and asked Stern to apologize to his Public Administration colleagues for his speech. (Trial Exhibit 32). According to Aistrup, Stern's speech wasn't diplomatic because it caused "collateral damage on PA, in a public way." (*Id.*). And Aistrup's email referred to Stern as Aistrup's "most favorite chair," which the jury could have believed was a sarcastic way for Aistrup to express his displeasure with Stern. (*Id.*). Aistrup also talked (at least twice) with Economics Department faculty about his desire to replace Stern with an external head. (Trial Tr. Vol. 2, 122:1–128:11; 131:1– 136:25).

Another example is Aistrup's confrontation with Stern at a leadership retreat at Callaway Gardens. Stern testified that, as he was leaving the retreat, Aistrup came up to him acting "quite agitated" and told Stern that "he didn't want to see any articles, that it would destroy the college." (Trial Tr. Vol. 6, 190:11–20). Stern's wife testified that she observed this confrontation and became so nervous about Aistrup's behavior that she locked herself in her car. (*Id.* at 124:7–22). This confrontation happened the day after Stern asked the University Faculty Senate Steering Committee to place him on the agenda to discuss Public Administration. When the Steering Committee turned Stern down, Stern said that he'd gather documents and publish an article on the Public Administration issue. Three months later, the *Wall Street Journal* published an article about student athletes majoring in Public Administration with documents and information that Stern provided.

A third example comes from January 2018, when Jack Stripling was working on a similar article for the *Chronicle of Higher Education*. When Aistrup found out that Stripling was working on the article, Aistrup wrote in an email: "As you might guess, Mike Stern is behind this. He is trying to paint

12

the PA degree and me as being racist, discriminating against Black Males. But to be blunt, Mike is retaliating against me for blocking his attempt to leave the college." (Trial Exhibit 351 at 1). A month later, the *Chronicle* published Stripling's article, and Stern continued to speak out about Public Administration. Three months later, Aistrup removed Stern from his Chair position. That same day, Aistrup removed Stern's Public Administration co-critic, Alan Seals, from his position as the Economics Department's Graduate Program Officer.

Viewing this evidence in a light most favorable to Stern, the jury could have found that Aistrup intended to punish Stern for his speech. Thus, there was sufficient evidence for the jury to find that Aistrup had an evil intent or motive for his actions. So the court rejects Aistrup's argument that the issue of punitive damages shouldn't have gone to the jury.

### B. Constitutionality of the Award

The court now must decide whether the Constitution allows a $250,000 award of punitive damages on top of a $1 award of nominal damages. In assessing the constitutionality of the punitive damages award, the court must first "identify the state's interest in deterring the relevant conduct and the strength of that interest." *Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1218 (11th Cir. 2010). The court must then consider (1) the degree of reprehensibility of Aistrup's misconduct; (2) the disparity between the actual or potential harm suffered by Stern and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and civil penalties authorized or imposed in comparable cases. *See Gore*, 517 U.S. at 575.

1. <u>State's interest</u>: The Government's interest in deterring violations of a public employee's First Amendment rights is strong. We have "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964). And this First Amendment principle extends to Government employees who speak on matters of public concern. *See Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1563 (11th Cir. 1995).

2. <u>Reprehensibility</u>: Reprehensibility is the most important factor when determining whether a punitive damages award is excessive. *See Gore*, 517 U.S. at 575. "To determine the reprehensibility of a defendant's conduct the court must consider several issues: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1283 (11th Cir. 2008).

The first two factors weigh against the jury's punitive damages award because Aistrup didn't physically harm Stern and removing Stern from the Chair position never put Stern's health or safety in danger. The third factor also weighs against the punitive damages award because Stern remains a tenured professor at Auburn who makes a six-figure salary.

The final two factors, however, weigh heavily in favor of the punitive damages award. Aistrup says that the court should consider only two actions when assessing the constitutionality of the cumulative punitive damages award: his removal of Stern as Chair and denial of Stern's raise and bonus for the 2018-2019 academic year. But it's appropriate for the court to also consider Aistrup's other actions related to the Public Administration debate when deciding whether Aistrup's actions involved repeated incidents. *See id.* (considering that "[t]hree other employees who had filed EEOC charges or complained about racial slurs were terminated before Goldsmith"). As discussed, the day after Stern first spoke about Public Administration, Aistrup emailed him questioning Stern's diplomacy and asking Stern to apologize to his Political Science colleagues. Aistrup also proposed several times for the Economics Department to replace Stern with an external department head. As Stern pointed out in closing, each of these proposals was close in time to Stern engaging in protected activity, such as his participation in the *Wall Street Journal* article. And Aistrup's confrontation with Stern at Callaway Gardens is another incident in which Stern testified that Aistrup tried to chill his speech by saying that "he didn't want to see any articles." (Trial Tr. Vol. 6, 190:11–20). Finally, Dr. Alan Seals testified that Aistrup removed him (Seals) as the

14

Economics Department's Graduate Program Officer after he spoke out against Public Administration. This evidence suggests that Aistrup repeatedly attempted to chill his employees' speech about the alleged clustering of student athletes in the Public Administration major, and the jury could have found this behavior reprehensible.

As discussed, the same evidence when viewed in Stern's favor suggests that Aistrup's actions resulted from intentional malice rather than a mere accident. Aistrup was "quite agitated" over Stern's actions at the Steering Committee Meeting and repeatedly expressed his displeasure over Stern speaking out about Public Administration. So there's evidence that Aistrup intended to chill Stern's First Amendment rights by removing Stern from the Chair position. In short, after considering the reprehensibility factors given the jury's verdict and the Government's deterrence interest, the court finds that the reprehensibility guidepost favors upholding the jury's $250,000 punitive damages award for Stern's removal as Chair.

3. <u>Civil penalties</u>: "The third factor, which is accorded less weight in the reasonableness analysis than the first two guideposts, involves a comparison between the punitive damages award and the civil penalties authorized or imposed in comparable cases." *Kemp v. AT&T Co.*, 393 F.3d 1354, 1364 (11th Cir. 2004). Neither party has identified a comparable civil or criminal penalty that can be imposed for conduct like Aistrup's. And the court hasn't found a penalty that's useful for assessing the fairness of the punitive damages award. Aistrup says that the lack of a comparable penalty means this factor weighs in his favor. The court disagrees and finds that this factor is neutral. In any event, the court gives this factor much less weight than the reprehensibility and disparity factors.

4. <u>Disparity of harm</u>: Finally, the court must compare the jury's punitive damages award to the harm that Aistrup caused, *Gore*, 517 U.S. at 575, mindful that "single digit multipliers are more likely to comport with due process, while still achieving the State's goal of retribution and deterrence, than awards with ratios in range of 500 to 1, or in this case, of 145 to 1." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) (citations omitted).

Aistrup asks the court to compare the jury's $250,000 punitive damages award to the court's $1 nominal damage award and find that a 250,000:1 ratio is constitutionally excessive. It obviously would be, if the $1 nominal damage was the proper consequent in the ratio.

But neither Supreme Court nor Eleventh Circuit case law "impose a requirement that the punitive damages bear a relationship to compensatory damages specifically." *SE Prop. Holdings, LLC v. Judkins*, 822 F. App'x 929, 936 (11th Cir. 2020). "The appropriate ratio … is not based on a comparison of compensatory damages to the punitive damages award, but on **harm** likely to occur or that has actually occurred." *Id.* at 937, citing *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 461–62 (1993) (accepting that punitive damages can be based on "potential harm" that defendants' conduct could have caused, "as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred"); *see also Kemp*, 393 F.3d at 1364 (11th Cir. 2004) ("a mechanical application of the Supreme Court's single-digit multiplier formula would not adequately take account of the seriousness of [the Defendant's] misconduct").

The court's task, therefore, is to assign a value to the harm that Aistrup caused Stern when he removed Stern as Chair in May 2018. Harm is not just about losing money: "When a person loses his job, it is at best disingenuous to say that money damages can suffice to make that person whole. The psychological benefits of work are intangible, yet they are real and cannot be ignored." *Allen v. Autauga Cnty. Bd. of Educ.*, 685 F.2d 1302, 1306 (11th Cir. 1982). Having presided over the trial and the posttrial hearing, the court finds that Stern greatly values the Chair position, far beyond the extra salary it offers. Indeed, both Stern's supporters and detractors have noted Stern's desire to regain the Chair position. So it is hard to assign a monetary value to the intangible harm as Stern perceives it.

It's much easier to assign an economic value from Auburn's point of view. When Aistrup removed Stern in 2018, Auburn 'stepped-up' the Chair's salary by extending the Chair from a 9-month base to an 11-month base and adding a monthly stipend of $1,500. Again, here's the equation to determine the difference between annual salary as Chair and non-Chair:

16

> (Base Salary x 11/9) + (Monthly Stipend x 12) — (Base Salary)

Stern's base salary was $122,422 when Auburn stopped paying him the Chair salary in August 2019. (Trial Exhibit 28). Plugging that base salary into the above formula shows that, in 2018-19, Aistrup's decision would cost Stern about $45,205 per year. Converting that amount from 12 to 14 months—*i.e.*, the time left on Stern's 2016-19 term when Aistrup removed him—raises the monetary value of Aistrup's action to about $52,740.

As discussed, Auburn paid Stern this extra $52,740 even though Stern was no longer acting as Chair. This payment gives us a floor for the value of the harm—*i.e.*, a monetary amount that Auburn must acknowledge the remaining time as Chair was worth to Stern at the time Aistrup removed him. Comparing the $52,740 value of the 14 months Stern lost as Chair to the jury's punitive award of $250,000 renders a **4.74 to 1** ratio. Stern would argue the ratio should be even lower because (a) the court has not factored in the intangible value of being Chair, *see Allen*, 685 F.2d at 1306, and (b) Stern could have remained Chair well beyond 2019. But the court needn't tack on additional harm because the single-digit ratio of 4.74 to 1 does not "raise[] a red flag that the punitive damage amount likely violates the due process clause." *Williams v. First Advantage LNS Screening Solutions Inc.*, 947 F.3d 735, 755 (11th Cir. 2020), citing *State Farm*, 538 U.S. at 425. So the court finds that this guidepost also favors upholding the punitive award.

—

To sum up, the court finds that Stern presented enough evidence to allow the jury to find that Aistrup acted with malice or reckless indifference to Stern's First Amendment rights. The court also finds that Aistrup's misconduct was sufficiently reprehensible, and the ratio between the jury's punitive damage award and the harm Aistrup caused was sufficiently low, to avoid violating the Due Process Clause. As a result, the court finds that the $250,000 punitive damage award on Claim 2 was supported by evidence and was not excessive.

Claim 3: Punitive Damages for Removal as Chair

In Claim 3, the jury found that Aistrup retaliated against Stern by denying him a raise and one-time merit supplement. The jury awarded Stern $31,020 in compensatory damages and $250,000 in punitive damages. Aistrup only challenges the punitive award, on the same grounds he challenged the punitive award for Claim 2. So the court conducts the same punitive damage analysis for Claim 3.

### A. Sufficiency of the evidence

Aistrup denied Stern's raise and one-time supplement after he removed Stern as Chair. So all the evidence that supported punitive damages for Claim 2 apply to the punitive award for Claim 3. The court adopts its analysis of sufficiency for the Claim 2 punitive award and thus reaches the same result here.

### B. Constitutionality of the Award

The Government interest is the same here as it was for Claim 2. So the court jumps straight to the *Gore* factors.

1. Reprehensibility: As discussed above, the reprehensibility factor favors the punitive damages award because there's evidence that Aistrup engaged in a pattern of intentionally chilling speech on a matter of public concern. And the denial of Stern's raise for the 2018-2019 academic year is particularly reprehensible because, but for this litigation, withholding Stern's raise would have affected his salary for the rest of his academic career.

2. Disparity of harm: The jury awarded Stern $31,020 in compensatory damages for Aistrup's denial of Stern's raise for the 2018-2019 academic year and one-time merit supplement. So the ratio of punitive damages to compensatory damages is **8.05 to 1.**

"The Supreme Court has stated that a 4:1 ratio will typically be close to the line of constitutional propriety and that few awards exceeding the single-digit ratio to a significant degree will satisfy due process." *Williams*, 947 F.3d at 763. Though the punitive damages award for this claim doesn't exceed a

single-digit ratio, it is greater than a 4:1 ratio, which Aistrup suggests makes it constitutionally impermissible.

But the court declines to discard the jury's award for two reasons. First, the potential harm to Stern was greater than the $31,020 compensatory award because the denial of Stern's raise in 2018 affected Stern's salary going forward. Second, the Eleventh Circuit has upheld higher ratios than 8.05:1 when defendants disregarded the plaintiff's protected federal rights. *See Goldsmith*, 513 F.3d at 1285 (upholding award with 9:1 ratio); *U.S. EEOC v. W&O, Inc.*, 213 F.3d 600, 616–17 (11th Cir. 2000) (upholding aggregate award of 8.3 to 1 and individual awards of 3.8 to 1, 26.3 to 1, and 16.1 to 1). This district court will not set aside a verdict based on a smaller ratio than ratios affirmed by the Circuit Court when the verdict suggests that the jury found that Aistrup engaged in a pattern of threatening Stern's First Amendment rights, which ended with multiple violations of Stern's First Amendment rights.

3. <u>Civil penalties</u>: Once again, the civil penalties factor weighs in neither side's favor, and the court has given it little weight in assessing the constitutionality of the punitive damages award for the denial of Stern's raise and one-time merit supplement.

–

In short, Stern presented enough evidence to allow the jury to award punitive damages. And the *Gore* factors favor the jury's $250,000 punitive award. So the court will deny Aistrup's motion to reduce the award.

**Claim 2-3: Aggregate Punitive Award**

Finally, Aistrup argues that the aggregate punitive damages award of $500,000 is unconstitutionally excessive when compared to the harm he caused Stern. The only *Gore* factor that changes here is the ratio. Assuming that you value the harm caused by Stern's removal as Chair as $52,740 (*i.e.*, the 14-month difference in salary) and the harm caused by Aistrup's failure to give Stern a raise or supplement as $31,020, then the punitive to harm ratio is **6.45 to 1**. This ratio fits within the single-digit ratio metric that the Supreme Court has endorsed. And though it's on the higher end of single-digit ratios, the court

again reiterates that (a) the Eleventh Circuit has affirmed higher ratios and (b) "a mechanical application of the Supreme Court's single-digit multiplier formula would not adequately take account of the seriousness of [Aistrup's] misconduct." *Kemp*, 393 F.3d at 1364. Further, the court's monetary valuation of harm is conservative because it does not account for the potential harm Aistrup caused Stern by (a) affecting Stern's base salary every year after 2018 and (b) potentially impacting Stern's ability to return as Chair of the Economics Department.

For these reasons, the court finds that the $500,000 aggregate award doesn't violate Aistrup's due process.

## CONCLUSION

For these reasons, the court **GRANTS IN PART** and **DENIES IN PART** Aistrup's motion for judgment as a matter of law and motion for a new trial (doc. 202) and **DENIES** his alternative motion to reduce the punitive damages award (doc. 203). The court will reduce the compensatory damages award for Claim 2 to $1.00 but will not change the jury's award of punitive damages for Claims 2 and 3.

**Done** and **Ordered** on June 30, 2023.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE