## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

**DR. MICHAEL L. STERN,**
        Plaintiff,

**v.**                                                  **Case No. 3:18-cv-807-CLM**

**DR. CHRISTOPHER B.**
**ROBERTS, et al.,**
        Defendants.

## <u>ORDER</u>

A jury found that the former dean of Auburn University's College of Liberal Arts, Joseph Aistrup, retaliated against Dr. Michael Stern by (a) removing Stern as Chair of the Department of Economics in 2018, (b) denying Dr. Stern a raise for the 2018–2019 academic year, and (c) denying Dr. Stern a one-time merit supplement.

Dr. Stern now petitions the court for an award of attorney's fees and costs. (Docs. 253, 254). Dr. Stern also moves for discovery in support of his attorney's fees petition (doc. 261) and asks the court to exclude declarations attached to Defendants' opposition to the attorney's fees petition (doc. 275). Finally, after Dr. Stern filed his attorney's fees petition, a dispute arose between Dr. Stern and his attorneys over how to divide the attorneys' fees, if the court awards them. So Dr. Stern's trial attorneys have filed claims for attorney's fees and statutory liens. (Docs. 269, 270). Defendants move to strike these liens (doc. 271), and Dr. Stern moves for the court to disburse 60% of the fees awarded directly to him (docs. 278, 279).

For the reasons stated within, the court **GRANTS IN PART** and **DENIES IN PART** Dr. Stern's petition for attorney's fees, costs, and litigation expenses. (Docs. 253, 254). The court will award **$795,765.47** in attorney's fees, **$8,753.77** in costs, and **$18,462.26** in litigation expenses.

The court **DENIES** Dr. Stern's motion for discovery (doc. 261) and **DENIES AS MOOT** Dr. Stern's motion to exclude the declarations (doc. 275). The court also **DENIES AS MOOT** Defendants' motion to strike (doc. 271) and Dr. Stern's motion for disbursement (docs. 278, 279).

## A. BACKGROUND

Dr. Michael Stern is a current tenured professor at Auburn University and former Chair of Auburn's Department of Economics. Dr. Stern brought this First Amendment retaliation case against several Auburn University officials, asserting that various alleged adverse employment actions were retaliation for Dr. Stern speaking out about the alleged clustering of student athletes in Auburn's Public Administration major. Three of Dr. Stern's retaliation claims went to trial: (a) a claim that former Auburn Provost Timothy Boosinger retaliated against Dr. Stern by not having Dr. Stern receive an annual evaluation in 2017, (b) a claim that Dean Aistrup retaliated against Dr. Stern by removing him as Chair of the Economics Department, and (c) a claim that Dean Aistrup and former Auburn Provost Bill Hardgrave retaliated against Dr. Stern by denying him a raise for the 2018-2019 academic year and one-time merit supplement in December 2018.

The jury found that Dr. Boosinger and Dr. Hardgrave didn't retaliate against Dr. Stern. But the jury found that Dean Aistrup removed Dr. Stern from his Chair position, denied Dr. Stern a raise for the 2018-2019 academic year, and prevented Dr. Stern from receiving a merit supplement in December 2018 in retaliation for Dr. Stern speaking out about Public Administration. Following post-trial briefing and an evidentiary hearing on Dr. Stern's request for equitable relief, the court entered final judgment for Dr. Stern in the amount of $42,836.35 in cumulative back pay and prejudgment interest, $1.00 in nominal damages, and $500,000 in punitive damages. (Doc. 251). The court also awarded Dr. Stern $73,836.67 in front pay and ordered Auburn's President to calculate Dr. Stern's salary for the 2024 fiscal year as if he had received a 3.7% raise in 2018. (*Id.*).

Dr. Stern has since filed a petition, along with briefs, affidavits, and other evidentiary submissions, seeking an award of attorney's fees and expenses. (Docs. 254, 276). Defendants argue that Dr. Stern's proposed fees and expenses are excessive and unreasonable. (Doc. 265).

## B. MOTION FOR DISCOVERY

Before addressing the reasonableness of Dr. Stern's proposed fees, the court addresses Dr. Stern's motion for discovery related to the attorney's fees petition. To support his fee petition, Dr. Stern asks the court to allow limited discovery on (a) the billing rates for defense counsel and support staff; (b) to the extent there is a difference from the billing rates, the hourly rates charged by defense counsel and support staff; (c) the number of hours actually spent by defense counsel and support staff on this case including an itemization similar to that provided by Plaintiff's counsel; and (d) the number of hours billed by defense counsel and support staff on this case including an itemization similar to that provided by Plaintiff's counsel. (Doc. 261, p. 5). Defendants oppose the court allowing discovery on these topics. (Doc. 264).

The number of hours spent by defense counsel on a case is often of little relevance to determining a reasonable fee award for a prevailing plaintiff. *See Johnson v. Univ. Coll. of Univ. of Ala. in Birmingham*, 706 F.2d 1205, 1208 (11th Cir. 1983). That's because "[t]he amount of hours that is needed by one side to prepare adequately may differ substantially from that of opposing counsel, since the nature of the work may vary dramatically." *See id.* The same is true "[w]ith respect to the hourly rate," because "one side may employ far more experienced counsel." *Id.* That said, in special circumstances, it can be an abuse of discretion for this court not to allow a prevailing plaintiff to conduct discovery on a defendant's attorney's fees. *See Henson v. Columbus Bank & Tr. Co.*, 777 F.2d 1566, 1575 (11th Cir. 1985). For example, this court should permit discovery if it has trouble determining from the available evidence the reasonableness of the requested fee. *See id.*

That's not the case here. The court has ample evidence to determine a reasonable hourly rate for Dr. Stern's attorneys and their support staff, including affidavits from Dr. Stern's attorneys, declarations of four other attorneys in support of Dr. Stern's attorney's fees petition, and opinions from

other judges on the appropriate hourly rate for Dr. Stern's attorneys. The court can also tell from the time sheets submitted by Dr. Stern's attorneys, Defendants' objections to several of the entries on those time sheets, and Dr. Stern's responses to those objections which hours were reasonably expended on this case. Neither Dr. Stern nor this court need anything else. So the court **DENIES** Dr. Stern's motion for discovery (doc. 261).

## C. MOTION TO EXCLUDE DECLARATIONS

Defendants submitted declarations from attorneys Bill Baxley and Shannon Holliday to support their opposition to Dr. Stern's fee petition. Dr. Stern asks the court to exclude the declarations. (Doc. 275). But the court needn't go that far because the Baxley and Holliday declarations do not affect the court's ruling on Dr. Stern's petition for attorney's fees and expenses in any material respect. So the court **DENIES AS MOOT** the motion to exclude the Baxley and Holliday declarations (doc. 275).

## D. PETITION FOR ATTORNEY'S FEES AND EXPENSES

The court now addresses Dr. Stern's petition for attorney's fees and expenses. The court starts by determining an appropriate award for attorney's fees; then it determines an appropriate award for litigation expenses. In making these determinations, the court has considered the petition and all related briefs and evidentiary submissions (again, with the caveat that while the court considered the declarations of Attorneys Baxley and Holliday, they did not materially affect the court's ultimate award).

In a § 1983 case, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs" awarded. *See* 42 U.S.C. § 1988(b). "[T]he starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). This amount is known as the lodestar amount. Once a court has determined the lodestar, the court may then adjust the lodestar to reflect the results obtained. *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994).

## 1. Calculating the Lodestar

### A. Reasonable Hourly Rates

"The first step in the computation of the lodestar is determining the reasonable hourly rate." *Id.* "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1306 (11th Cir. 1988).[1] "The party seeking attorney's fees bears the burden of producing satisfactory evidence that the requested rate is in line with prevailing market rates." *Loranger*, 10 F.3d at 781. Dr. Stern can meet this burden "by producing either direct evidence of rates charged under similar circumstances or opinion evidence of reasonable rates." *Duckworth v. Whisenaut*, 97 F.3d 1393, 1396 (11th Cir. 1996) (emphasis omitted).

This chart shows the hourly rate requested by Dr. Stern, followed by the reduced rate proposed by Defendants:

|  | Dr. Stern's request | Defendants' request |
|---|---|---|
| John Saxon | $600 | $450 |
| Alicia Haynes | $545 | $425 |
| Cynthia Wilkinson | $525 | $400 |
| Charles Guerrier | $590 | $425 |
| Karli Guyther | $275 | $185 (as attorney) |

---

[1] To determine the reasonable hourly rate for the services performed by Dr. Stern's attorneys and their support staff, the court has considered the *Johnson* factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Bivins v. Wrap it Up, Inc.*, 548 F.3d 1348, 1350 n.2 (11th Cir. 2008).

| Karli Guyther | $275 | $100 (as law clerk) |
|---|---|---|
| Lauren Branham | $145 | $125 |
| Gary Weaver | $125 | $100 |
| David Waters | $125 | $100 |
| Cheryl Helms | $145 | $100 |
| Lindsay McKeller | $145 | $100 |
| Morgan Vardaman | $100 | $100 |
| Mackey Willis | $100 | $100 |
| Abby Raber | $100 | $100 |

One reason for the differing rates is the parties' disagreement whether the relevant legal community is the entire State of Alabama or the Middle District of Alabama specifically. The difference matters because, thanks to Birmingham, Northern District rates tend to be higher than Middle District rates. So the court starts by choosing the appropriate region.

1. Relevant legal community: Dr. Stern bases his request on statewide rates, including Birmingham. To support his request, Dr. Stern submitted the declarations of four Plaintiff's attorneys who have experience in the field of labor and employment law. (*See* Docs. 254-16; 254-17; 254-18; 254-19). These attorney's estimates for the prevailing market rate in employment discrimination cases range from $275-$575 an hour to $375-$650 an hour. (Docs. 254-16, p. 9; 254-17 pp., 5-6; 254-18, pp. 5-6; 254-19, p. 4). Ms. Haynes and Ms. Wilkinson—who practice in Birmingham—have also submitted affidavits in support of Dr. Stern's fee petition. Ms. Haynes estimates that the prevailing market rate is $325-$850 an hour, and Ms. Wilkinson estimates that it is $350-$650 an hour. (Docs. 254-1, p. 9: 254-3, p. 7).

Defendants argue that Dr. Stern's rates are inflated because they include Birmingham, which is outside the Middle District. As Defendants point out, around four months before Dr. Stern's trial, this court awarded Ms.

Wilkinson $400 per hour for her work on another § 1983 case in the Middle District. *See Wiggins v. City of Montgomery*, No. 2:17-cv-425-KFP, Doc. 165, p. 12, (M.D. Ala. July 1, 2022). And it appears that the highest awarded rate for a § 1983 or employment discrimination case in this district is an award of $450 per hour to Hank Sherrod in 2022. *See Gartman v. Brady*, 2022 WL 4000349, at *8 (M.D. Ala. Sept. 1, 2022). That said, the court did approve rates of $650 per hour and $525 per hour in a 2019 False Claims Act case. *See United States ex rel. Foley v. Mitchell*, 2019 WL 6134159, at *3 (M.D. Ala. Nov. 18, 2019).

"The general rule is that the relevant market . . . is the place where the case is filed." *Am. Civil Liberties Union of Ga. v. Barnes*, 168 F.3d 423, 437 (11th Cir. 1999) (quotations omitted). But as this court recognized in *Wiggins* and *Gartman*, it is common for attorneys whose offices are in the Northern District of Alabama to practice in the Middle and Southern Districts. *See Wiggins*, Doc. 165, pp. 7–8; *Gartman*, 2022 WL 4000349, at *6. In fact, Defendants acknowledge that "Mr. Saxon and Ms. Wilkinson have represented plaintiffs in many employment-related claims against Auburn and its officials before this litigation." (Doc. 265, p. 26 & n.11). So they are part of the relevant legal community that this court has to consider in arriving at a reasonable rate. The court, however, recognizes that this isn't a Northern District, Birmingham-based case. Nor has Dr. Stern shown that there were *no* local attorneys who could have handled his case. Thus, like this court did in *Wiggins*, the court will moderately reduce Dr. Stern's requested rates to account for this case being filed in the Middle District and this court's own experience and knowledge of the differences in the Birmingham and Auburn legal markets. *See Norman*, 836 F.2d at 1303.

As explained below, based on the court's consideration of the *Johnson* factors, the parties' evidentiary submissions, and the court's own knowledge of the Alabama legal market, the court finds that a reasonable hourly rate is $450 for Ms. Wilkinson, $475 for Ms. Haynes, $485 for Mr. Saxon and Mr. Guerrier, $200 for Ms. Guyther's work as an associate, $100 for Ms. Guyther's work as a law clerk, $125 for Ms. Branham, $100 for Mr. Weaver and Mr. Waters, $125 for Mr. Saxon's paralegals, and $100 for Ms. Haynes' law clerks.

Cynthia Wilkinson: Ms. Wilkinson has been practicing law since 1989 and has focused on employment discrimination matters since 1994. As Ms. Wilkinson points out in her supplemental affidavit, this means that she began practicing law the same year as Hank Sherrod, who Judge Thompson recently awarded a reasonable hourly rate of $450. (*See* Doc. 276-3, p. 7). The court finds that **$450** is also a reasonable hourly rate for Ms. Wilkinson.

It's true that Ms. Wilkinson was awarded a $400 per hour rate by this court just a few months before she began working for Dr. Stern. But that case was based out of Montgomery, and this case is an Auburn-based case against Auburn University. Plus, several of the *Johnson* factors support awarding Ms. Wilkinson a higher rate than what she received in *Wiggins*. For example, though Ms. Wilkinson didn't enter a notice of appearance until October 2022, she spent long hours in October and November 2022 to adequately prepare for the 10-day jury trial. She was again required to spend quite a bit of time on this case in the spring and summer of 2023 on Dr. Stern's motion for equitable relief. It also required a high degree of skill to perform the legal services that Ms. Wilkinson performed here, including being the attorney who conducted Dr. Stern's direct examination and gave the bulk of Dr. Stern's closing arguments. Finally, though all civil rights cases are somewhat undesirable, *see Stokes v. City of Montgomery*, 706 F. Supp. 811, 815 (M.D. Ala. 1988), the court finds this case particularly undesirable. As Mr. Saxon put it in his supplemental affidavit, "[n]ot every lawyer would accept [the] challenge" of bringing a case to protect speech critical of one of the two most popular college athletics programs in Alabama. (*See* Doc. 276-4, p. 6). Based on these factors and the court's own knowledge of the Alabama legal market, the court finds that $450 per hour is a reasonable rate for Ms. Wilkinson.

Alicia Haynes: Ms. Haynes has practiced law since 1987, and the last 32 years of her practice have been devoted to Plaintiff's employment discrimination and civil rights litigation. (Doc. 254-1, pp. 2–3). It's Ms. Haynes' belief that she has tried over 70 jury cases and 20 or more bench trials. (*Id.*, p. 3). In 2017, Judge Bowdre awarded Ms. Haynes a rate of $475 an hour. *See King v. CVS Health Corp.*, 2017 WL 6336323, at *5 (N.D. Ala. Dec. 12, 2017). Around a year later, Judge Kallon also found that an hourly rate of $475 was a reasonable rate for Ms. Haynes. *See Anderson v. Surgery Ctr. of Cullman, Inc.*, 2018 WL 8807149, at *10 (N.D. Ala. Aug. 27, 2018). In

awarding Ms. Haynes this rate, both Judge Bowdre and Judge Kallon recognized that she is "among the best employment discrimination attorneys in this [state]." *See Anderson*, 2018 WL 8807149, at *10 & n.12.

The court finds that **$475** an hour is the reasonable hourly rate for Ms. Haynes' services here too. I recognize that in a 2022 Northern District case I set Ms. Haynes' law partner, Kenneth Haynes, reasonable hourly rate at $465 by applying a 2.5% rate of annual increase to the rate of $420 that Judge Bowdre and Judge Kallon found reasonable for him in *King* and *Anderson. See Miles v. Walmart Assocs., Inc.*, 2022 WL 2720, at *3 (N.D. Ala. Jan. 28, 2022). But *King*, *Anderson*, and *Miles* were all Northern District cases based out of Birmingham and the surrounding communities. And the court is unaware of any employment or § 1983 Middle District case (until today) in which the court approved a reasonable hourly rate of more than $450. Plus, unlike in this case, the firm of Haynes & Haynes participated in *King*, *Anderson*, and *Miles* from the filing of the complaint through trial. So Ms. Haynes was precluded from more employment opportunities because of those cases than she was here. As a result, the court will not increase the $475 hourly rate that Judge Bowdre and Judge Kallon found reasonable to adjust for the cost of inflation.

That said, the *Johnson* factors support awarding Ms. Haynes a top billing rate for Auburn-based, Middle District cases. As explained, Ms. Haynes is one of the most experienced and well-qualified labor and employment attorneys in Alabama. And her contributions to this case, like Ms. Wilkinson's, required considerable skill. Plus, Ms. Haynes had to spend much time on this matter in the fall of 2022 and then again in the spring and summer of 2023. Finally, the undesirability of this particular case supports setting Ms. Haynes' rate on the high-end of the market rate in the Middle District. Based on all these considerations, the court finds $475 per hour a reasonable hourly rate for Ms. Haynes.

John Saxon: Mr. Saxon began practicing law in 1977 and has specialized in employment law for around 25 years. (Doc. 254-2, pp. 2, 5). Mr. Saxon also routinely represents parties in non-contingent fee-based cases and charges them $485 an hour. (*Id.*, p. 8). In 2015, the Eleventh Circuit affirmed an attorney's fees award from the Northern District that set Mr. Saxon's

reasonable hourly rate at $385 per hour, which matched his billing rate for non-contingency fee clients then and fell within the middle of his expert's range of market rates in Alabama. *See Maner v. Linkan, LLC*, 602 F. App'x 489, 494 (11th Cir. 2015).

After considering the *Johnson* factors and the court's knowledge of the Alabama legal market, the court finds that **$485** is a reasonable hourly rate for Mr. Saxon. Mr. Saxon has been practicing law for over 40 years and is an active member of this state's labor and employment bar. Mr. Saxon has also represented Dr. Stern from the beginning of this case and was first retained over five and a half years ago. (Doc. 254-2, p. 9). As explained, the skill required to prosecute this case, plus the undesirability of taking the lead on a case that involves speech critical of Auburn athletics, support awarding Mr. Saxon a rate slightly higher than previous Middle District awards. Finally, that the fee was contingent, meaning that Mr. Saxon incurred expenses that he wasn't guaranteed to be compensated for, supports setting Mr. Saxon's Middle District hourly rate at the fixed-fee rate he charges clients in Birmingham. As a result, the court finds that $485 per hour is a reasonable hourly rate for Mr. Saxon.

<u>Charles Guerrier</u>: The court finds that **$485** per hour is also an appropriate rate for Mr. Guerrier. Mr. Guerrier began practicing law in 1972 and was employed as a Trial Attorney and Regional Attorney for the EEOC from 1983 through March 2012. (Doc. 154-4, pp. 1–2, 5). After retiring from the EEOC, Mr. Guerrier joined the firm of Haynes & Haynes in an "Of Counsel" role. (*Id.*, p. 5). In *King* and *Anderson*, Judge Bowdre and Judge Kallon determined that $500 an hour was a reasonable hourly rate for Mr. Guerrier. *King*, 2017 WL 6336323, at *5; *Anderson*, 2018 WL 8807149, at *10. I then awarded Mr. Guerrier a $545 hourly rate in *Miles,* the rate Mr. Guerrier asked for and the Defendant didn't contest. *Miles*, 2022 WL 275520, at *3.

Again, *King*, *Anderson*, and *Miles* were Northern District cases in which Haynes & Haynes represented the plaintiff from the filing of the case through trial. And the court is unaware of any Auburn-based or Middle District employment related case that has found reasonable the $545 hourly rate that Mr. Guerrier received in *Miles*. So the court finds it appropriate to

reduce the rate Mr. Guerrier received in *Miles* to account for the different market rates in Alabama. But based on Mr. Guerrier's qualifications and experience, the time he spent on this case during the trial and posttrial periods, and the undesirability of this case, the court finds that a $485 hourly rate is a reasonable hourly rate for Mr. Guerrier's services.

Karli Guyther: Ms. Guyther is an associate who began working for Mr. Saxon after she graduated law school in 2019. (Doc. 276-4, p. 5). Ms. Guyther was admitted to the North Carolina bar in September 2019 and the Alabama bar in January 2020. (*Id.*). She entered a notice of appearance in this case in April 2020 and withdrew from the case in June 2022. (Docs. 64, 127).

As Defendants note, even though Ms. Guyther wasn't admitted to the North Carolina bar until September 2019, Dr. Stern has asked the court to apply an associate rate to hours billed under Ms. Guyther's name in late 2018 and early 2019. (*See, e.g.*, Doc. 254-6, pp. 9–12). Defendants assert that for hours billed by Ms. Guyther before she was admitted to practice law the court should set the reasonable hourly rate at a $100 law clerk rate and that Ms. Guyther's work as an associate should be compensated with a $185 per hour rate. Mr. Saxon responds that Ms. Guyther never worked for his firm as a law clerk and was hired by him as an associate. He attributes her name being listed in his firm's time sheets before 2019 as a clerical error that converted all associate work on Dr. Stern's case to work associated with Ms. Guyther. (Doc. 276-4, p. 5). According to Mr. Saxon, his office employed one associate at a time, and the two other associates who worked on this case had more experience than Ms. Guyther, so the court should apply the $275 per hour rate he requests for Ms. Guyther's work to all work billed under her name.

The court accepts Mr. Saxon's explanation for why Ms. Guyther's initials appear next to hours billed before she graduated law school and started working for Mr. Saxon. So the court will apply an associate's rate to work next to her initials for hours billed between October 2018 and January 2019 and October 2019 and June 2022. But the court finds that it should apply a law clerk rate to Ms. Guyther's work in August and September 2019. The billing records from Mr. Saxon's firm regularly include Ms. Guyther's initials next to time entries from October 2018 to January 2019. (Doc. 254-6, pp. 7–12). There is then no billing under her initials until August 2019. (*Id.*,

pp. 12–15). And in August 2019 time entries, Ms. Helm billed for an "[o]ffice conference with Karli" and for "[d]ownload[ing] additional documentation for Karli to use." (*Id.*, p. 15).

Based on these time entries and Mr. Saxon's statement that he employed only one associate at a time, the court finds that an associate other than Ms. Guyther worked on this case from October 2018 to January 2019, left Mr. Saxon's firm around January 2019, and was replaced by Ms. Guyther around August 2019. Because Ms. Guyther wasn't admitted to practice law until September 2019, the court finds that **$100** per hour (the rate the parties agree is appropriate for Ms. Haynes' law clerks) is the reasonable rate to apply to her work in August 2019 and on September 3, 2019.[2]

The court finds that a **$200** hourly rate is reasonable for time that Ms. Guyther and the other associate billed as associates. In *Miles*, I found $225 a reasonable hourly rate for Ivey Best, a newly minted associate with experience much like Ms. Guyther's. *See Miles*, 2022 WL 275520, at *3. And in 2014, this court found that associates in the Middle District "may expect to receive $150–185 an hour." *Weekes-Walker v. Macon Cnty. Greyhound Park, Inc.*, 31 F. Supp. 3d 1354, 1360 (M.D. Ala. 2014). To account for inflation, this case being an Auburn-based employment related case against Auburn University officials, the time and labor involved in prosecuting Dr. Stern's claims, and the undesirability of taking on this case, the court finds that adjusting this rate to $200 per hour is appropriate.

Paralegals: Dr. Stern asks the court to apply a $145 per hour rate to work by paralegals Lauren Branham, Cheryl Helms, and Lindsay McKellar. (Doc. 256-15). He seeks a $125 per hour rate for paralegals Gary Weaver and David Waters. (*Id.*). Defendants say that the court should set Ms. Branham's rate at $125 per hour and the other paralegals' rates at $100 per hour.

The court finds that **$125** per hour is an appropriate rate for Ms. Branham and that **$100** per hour is a reasonable rate for Mr. Weaver and Mr. Waters. $125 is a reasonable rate for the paralegals who worked for Mr.

---

[2] Ms. Guyther's only time entry for September 2019 was on September 3, 2019, and the North Carolina state bar's website says that she was admitted to practice law on September 4, 2019. So the court will apply a law clerk rate to Ms. Guyther's work in both August and September 2019.

Saxon. Ten years ago, the market rate for paralegals in the Middle District was "between $50 and $85 an hour." *Weekes-Walker*, 31 F. Supp. 3d at 1360. And just last year, this court reduced requested paralegal rates of over $200 per hour to $125 per hour, noting that this rate is "appropriate for . . . more experience[d] paralegals." *See Valley Nat'l Bank v. Czapla*, 2023 WL 3638269, at *4 & n.1 (M.D. Ala. May 3, 2023).

Ms. Branham was the paralegal who assisted Dr. Stern's attorneys at trial. In this court's view, she provided excellent assistance and showed that she is a skilled paralegal. Still, $125 per hour is at the high-end of the market rate for paralegals in Auburn and Middle District-based cases, so the court finds that it is a more reasonable rate for Ms. Branham's services than the $145 per hour rate that Dr. Stern requests. The court notes that this rate is $25 more per hour than the rate I set for Ms. Branham in *Miles*, 2022 WL 275520, at *3, but finds that the *Johnson* factors support awarding her an increased rate here.

Mr. Weaver and Mr. Waters were new paralegals at Haynes & Haynes when they worked on this case. (Doc. 254-1, pp. 23–24). And review of their time sheets shows that they spent much less time and labor on this case than Ms. Branham did. (Doc. 254-10; Doc. 254-11). So after considering the *Johnson* factors and the court's knowledge of paralegal rates in this state, the court finds that $100 per hour is a reasonable hourly rate for Mr. Weaver and Mr. Waters' work.

The court finds that **$125** an hour is a reasonable hourly rate for Mr. Saxon's paralegals. According to Mr. Saxon, Ms. Helms is a paralegal with over 22 years' experience who has worked for four Birmingham-based firms. (Doc. 254-2, p. 11). Other paralegals, all with at least 10 years' experience, entered time under Ms. Helms' name, including Edith LeBerte, Casey Barton, and Rachel Goodson. (*Id.*). Because these paralegals all have varying years of experience and qualifications and the court cannot discern who performed which tasks, the court finds that $125 per hour is a reasonable rate for all time entries billed under Ms. Helms' name. In this court's experience, $125 per hour is the typical market rate for paralegals who performed the services that Mr. Saxon's paralegals performed. *See Valley Nat'l Bank*, 2023 WL 3638269, at *4; *King*, 2017 WL 6336323, at *5. Plus,

each of these paralegals has more experience than Mr. Weaver and Mr. Waters, and Mr. Saxon's support staff, who have worked on this case from the beginning, have spent much time and labor on this matter.

The court notes that Dr. Stern's lodestar summary of attorney, paralegal, and law clerk hours attributes 1.5 hours of gross time to Lindsay McKellar, Mr. Saxon's legal assistant and firm administrator. (Doc. 254-15). The cover sheets of the time entries for Mr. Saxon's firm also attribute 1.5 hours of billed time to Ms. McKellar. (Doc. 254-6, pp. 2–3). But after scouring the time entries from Mr. Saxon's firm, the court hasn't found any time entries associated with "LLM," which are Ms. McKellar's initials. (*See generally* Doc. 254-6). There are, however, 0.8 hours billed under the initials "RG," (*see id.*), which the court finds are likely hours Ms. Goodson, who the court has found commands a $125 per hour rate, billed. So the court finds that it needn't determine Ms. McKellar's reasonable hourly rate and that the reasonable hourly rate for any hours billed under the initials "RG" is $125.

Law clerks:  The parties agree that $100 per hour is a reasonable rate for law clerks Morgan Vardaman, Mackey Willis, and Abby Raber. After reviewing the work these law clerks performed and awards for law clerk work in similar cases, the court finds that the suggested rate of **$100** per hour for these law clerks is reasonable.

—

In sum, the court finds that the reasonable hourly rate is $450 for Ms. Wilkinson, $475 for Ms. Haynes, $485 for Mr. Saxon and Mr. Guerrier, $200 for Ms. Guyther's work as an associate, $125 for Ms. Branham, $100 for Mr. Weaver and Mr. Waters, $125 for services billed under Ms. Helms' and Ms. Goodson's names, and $100 for the work of each law clerk, including the work that Ms. Guyther did before being admitted to practice law.

### B.    Reasonable Hours Billed

The court must next determine the reasonable hours expended on this case by Dr. Stern's attorneys. Accounting for the reasonable hourly rates that the court has set and the reduction of hours accepted in the supplemental evidentiary submissions, (*see* docs. 276-1 to 276-7), Dr. Stern's proposed lodestar calculation looks like this:

### Table 1: Requested Hours at Court's Hourly Rates

| Timekeeper | Submitted Time | Hourly Rate | Lodestar |
|---|---|---|---|
| Ms. Wilkinson | 530.83 | $450 | $238,873.50 |
| Ms. Haynes | 713.90 | $475 | $339,102.50 |
| Mr. Saxon | 617.08 | $485 | $299,283.80 |
| Mr. Guerrier | 141.05 | $485 | $68,409.25 |
| Ms. Guyther (associate) | 145.30 | $200 | $29,060.00 |
| Ms. Branham | 335.20 | $125 | $41,900.00 |
| Mr. Weaver | 10.20 | $100 | $1,020.00 |
| Mr. Waters | 4.30 | $100 | $430.00 |
| Ms. Helms | 97.50 | $125 | $12,187.50 |
| Ms. Goodson | 0.80 | $125 | $100.00 |
| Ms. Guyther (law clerk) | 18.3 | $100 | $1,830.00 |
| Ms. Vardaman | 25.90 | $100 | $2,590.00 |
| Ms. Willis | 37.70 | $100 | $3,770.00 |
| Miss Raber | 16.50 | $100 | $1,650.00 |
| **TOTAL** | | | **$1,040,206.55** |

Defendants contend the court should reduce Dr. Stern's proposed number of hours because he cannot recover time spent doing (1) work that was block billed, (2) clerical work, (3) excessive work, (4) duplicative work, (5) work that resulted in partial success, and (6) work related to unsuccessful claims. If a "district court finds the number of hours claimed is unreasonably high, the court has two choices: it may conduct an hour-by-hour analysis or it may reduce the requested hours with an across-the-board-cut." *Bivins*, 548 F.3d at 1350. The court addresses each asserted reason for reducing Dr. Stern's requested hours in turn, starting with block billing.

### 1.   Block Billing

"'Block billing' occurs when an attorney lists all the day's work on a case in a single entry, without separately identifying the time spent on each task." *Ceres Envtl. Servs., Inc. v. Colonel McCrary Trucking, LLC*, 476 F. App'x 198, 203 (11th Cir. 2012). The problem with block billing is that it "makes it difficult, if not impossible, to calculate with any precision the number of hours an attorney devoted to a particular task." *Barnes*, 168 F.3d at 429. To offset the problems block billing cause with assessing the reasonableness of an attorney's requested hours, the court may reduce the number of hours claimed after finding block billing occurred. *See Ceres*, 476. F. App'x at 203.

But the court must keep in mind that "the mere fact that an attorney has included more than one task in a single billing entry is not, in and of itself, evidence of impermissible block-billing." *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 2011 WL 13108095, at *3 (S.D. Fla. Apr. 7, 2011). And "when multiple listed tasks in a billing entry are intertwined or related, including a thorough description of the activities performed clarifies, rather than obscures, the record and does not constitute improper block-billing." *Id.* (quotations omitted).

Defendants identify over 130 time entries that they say include impermissible block billing.[3] (*See* Doc. 265-5). The court agrees with Defendants that, at times, nearly every timekeeper engaged in some form of

---

[3] These time entries don't include entries for hours that Defendants said were improperly drafted but that Dr. Stern's attorneys agreed to reduce in the supplemental evidentiary submissions.

impermissible block billing. This most often happened by lumping together several unrelated tasks into one time entry. But there were also some time entries that claimed several hours' worth of work but only vaguely described the tasks being completed.

Here are some examples of block billed entries:

- Ms. Haynes billed 1.5 hours on October 28, 2022, for "Final trial team meeting," without providing any other details on the meeting.

- Ms. Haynes billed 6.00 hours on November 6, 2022, stating: "Meet with C. Wilkinson to go over witness order and exhibits needed; work on revising outlines for witnesses (Winn, L. Stern, M. Stern); work on rebuttal outline; review selected senate meeting minutes and transcripts to add to timeline and witness questions; review memo from L. Branham on work done on senate meeting minutes; reviewed new marked exhibits for inclusion of witness testimony, work with C. Wilkinson and J. Saxon on trial strategy for the week; pack up trial exhibits and witness work for travel to Opelika."

- Mr. Guerrier billed 3.2 hours on October 28, 2022, stating, "Work on memo for Alicia re: causation standard – substantial or motivating factor; listen to hearing."

- Ms. Branham billed for 4.4 hours on November 3, 2022, explaining that she "Prepared for next day's witnesses, redacted and marked new exhibits, and updated new exhibits to attorney iPads."

- Ms. Helms billed for 2.5 hours on November 15, 2018, stating, "Revise draft of amended complaint per JDS revisions/edits; efile same; prepare plaintiffs response to defendant Auburn University motion to dismiss plaintiffs complaint; efile same; receive and review efiled documents; save electronically; print and update pleading file."

17

- Mr. Saxon billed for 5.2 hours on September 23, 2022, stating, "Work on framing issues for trial. Review email from LKB to client re Defendants' recent filings. Review email from LKB re: draft of our objections to Defendants' exhibit list. Review email from LKB re: my notes re: meeting w/client. Email LKB, attaching same. Review, revise our objections to Defendants' exhibit list. Email LKB, attaching same. Review reply from LKB. Reply to same. Review reply with AKH. Reply to same. Review email from LKB attaching Plaintiffs' objections to Defendants' witness list (draft). Review, revise same. Scan, email to LKB. Review email from LKB attaching draft of Plaintiff's motion in limine. Review, revise same. Review email from LKB attaching draft of Plaintiffs' objections to Defendants' exhibit list. Scan, email revisions to motion in limine to LKB. Review e-notice of Defendants' filing objections to Plaintiff's witness list, exhibit list, Defendants' motion in limine."

- Ms. Guyther billed 1.7 hours on December 13, 2018, for "Notes on where leaving off, to do items/plan."

- Ms. Wilkinson billed 16.9 hours on November 6, 2022, for "Trial Preparation – Prepare Dr. Liliana Stern for trial testimony and go over trial exhibits, drafted direct questions for Dr. Liliana Stern, met with co-counsel re PL testimony, met with PL for trial preparation and reviewed exhibits. Worked with AKH to go over any changes in witness order and exhibits to use and lawyer for each remaining witness."

(*Id.*).

But the court finds that around half of the time entries that Defendants have identified as block billing were properly entered. For example, Defendants object to Ms. Haynes' entries for her time in trial, which read "Day 6 – Finish direct examination of Dr. Winn; assist co-counsel; present exhibits during C. Wilkinson's examination of plaintiff; prepared for Bruno direct and cross of defendant witnesses." (*Id.*, p. 3). As Ms. Haynes notes in her reply, these time entries aren't block billed because her specificity

"clarifies, rather than obscures, the record." *See Miller's Ale House*, 2011 WL 13108095, at *3. Other entries that Defendants say are block billed but the court finds proper include:

- Ms. Haynes billing 1.00 hours on November 14, 2023, for "Telephone conference with Court regarding trial, defendants' motions, plaintiffs response regarding punitive damages, and closing arguments."

- Mr. Guerrier billing .50 hours on November 17, 2022, for "Conference with Alicia re: post-trial injunctive relief; jury issue; damages."

- Ms. Willis billing 1.5 hours on September 30, 2022, stating, "Reviewed and analyzed declarations and exhibits of witnesses for timeline and exhibits."

(*See* Doc. 165-5).

As you'd expect, some entries present an even closer call. But it would be impracticable, unwieldy, and a waste of judicial resources for the court to go through 130+ objections and explain why each is or is not block billing. So the court finds that a 5% cut across-the-board is appropriate to address its concerns about deficiencies in the billing entries. This 5% cut balances the likelihood that the block billing caused Dr. Stern's claimed hours to be unreasonably high with the court's recognition of the time, labor, and skill required to prosecute this case. It is also the percentage cut that best reflects the level of block billing that took place as the court finds that around half the time entries that Defendants identified as improperly drafted weren't.

## 2.   Clerical Work

Defendants next assert that the court should reduce Dr. Stern's claimed hours because several time entries describe clerical work that is not compensable. (*See* Doc. 6-6). "A fee applicant is not entitled to compensation at an attorney's rate . . . [for] tasks which were mundane, clerical or which did not require the full exercise of an attorney's education and judgment." *Norman*, 836 F.2d at 1306. So the "court may award fees only for time spent

by attorneys or non-lawyers to the extent they perform work traditionally done by an attorney." *Valley Nat'l Bank*, 2023 WL 3638269, at *6.

"Work that may appropriately be performed by paralegals and billed to a client or a losing party includes factual investigation, including locating and interviewing witnesses; assistance with depositions, interrogatories, and document production; compilation of statistical and financial data; checking legal citations; and drafting correspondence." *Id.* (quotations omitted). Several time entries that Defendants object to fall into this category of work. For example, Defendants object to Dr. Stern billing for time spent e-filing documents on CM/ECF, even though this court has found that time spent electronically filing documents with the court is compensable. *See Dempsey v. Colvin*, 2013 WL 3280319, at *2 (M.D. Ala. June 27, 2013).

Other objected-to entries, including the preparation of trial subpoenas, organization and redaction of trial exhibits, and drafting of documents to be filed with the court, such as notices of appearance, could reasonably require an attorney's education or experience. *See Trantham v. Socoper, Inc.*, 2022 WL 952029, at *5 (N.D. Ala. Mar. 29, 2022) ("Preparing exhibits, exhibit lists, subpoenas, and other items to be presented to the court entails tactical decision making that requires legal expertise."). So the court finds that hours spent on these tasks are compensable too.

But the time entries for Dr. Stern's attorneys, paralegals, and law clerks also include entries for clerical work. And though Table 1 omits several hours that Ms. Haynes agreed to reduce as clerical, the remaining time entries include many examples of clerical work that district courts within this state have disallowed. One example is 2.70 hours that Ms. Vardaman claims for driving to and from Montgomery to retrieve juror information before trial. *See Kendrick v. Broadcast Media Grp.*, LLC, 2006 WL 2709846, at *3 (M.D. Ala. Sept. 20, 2006) (deducting as clerical time spent "driving to Montgomery to pick up jury questionnaires"). Another example is Ms. Branham's work for 0.40 hours on September 28, 2022, "preparing witness folders (one set for each attorney), pull[ing] relevant documents for each witness (i.e., declarations, depositions, and exhibits)." *See Hall v. Lowder Realty Co., Inc.*, 263 F. Supp. 2d 1352, 1365 (M.D. Ala. 2003) (deducting hours spent "reviewing and completing trial binders" and "organizing trial documents").

Perhaps the most common example of claimed clerical work are entries from attorneys and paralegals claiming time for calendaring deadlines and scheduling, including scheduling meetings with co-counsel. *See Valley Nat'l Bank*, 2023 WL 3638269, at *7 (clerical work includes calendaring scheduling order deadlines); *Johnson v. TMI Mgmt. Sys, Inc.*, 2012 WL 4435304, at *5 (S.D. Ala. Sept. 26, 2012) (clerical work included telephone call to client scheduling appointment). Another common example is Ms. Helms' practice of billing each time she received an e-filing, electronically saved it, and printed and updated the pleading file. For example, on November 20, 2018, Ms. Helms billed 0.30 hours for, "Receive and review efiled summons Issued as to Defendants; save electronically; print and update pleading file." (Doc. 265-6, p. 9). Though Ms. Helms says she reviewed these e-filings, the court finds that the nature of this work was clerical electronic file management especially considering that Mr. Saxon's office generated many filings that Ms. Helms reviewed, which means there was no need for her to review the documents for substance. So the court finds that these time entries were improperly billed. *See Johnson*, 2012 WL 4435304, at *5 ("Receipt and download of Order" is clerical work).

It would again be impractical for the court to detail each time entry that includes clerical work. But the above examples show that Dr. Stern's claimed hours are unreasonably high because he billed for work that wasn't compensable because it was clerical. After reviewing the time entries that Defendants say include clerical work, the court finds that the fairest and most efficient way to solve this issue is to apply another 5% across-the-board cut to Dr. Stern's claimed hours. The court recognizes that most of the clerical hours billed were billed by the paralegals who have lower billing rates than Dr. Stern's attorneys. But clerical hours were billed by attorneys, paralegals, and law clerks alike. In fact, the court finds that each of Dr. Stern's trial attorneys billed for some clerical tasks. (*See, e.g.*, Doc. 265-6, p. 1 (Ms. Haynes billing for emails about proposed mediation dates); p. 16 (Mr. Saxon billing for time spent scheduling meetings with his client and co-counsel); p. 19 (Ms. Wilkinson billing for emailing paralegal attachments to print)). So in the court's view, the best way to ensure that the fee award is reasonable is to apply another 5% across-the-board reduction to account for improperly billed clerical work.

### 3.      Excessive Work

Attorney's fees applicants must exercise "billing judgment." *See Norman*, 836 F.2d at 1301. So in calculating a reasonable fee, the court must exclude "excessive, redundant or otherwise unnecessary hours." *See id.* Defendants point to several time entries that they say show that Dr. Stern's claimed hours are excessive. *(See* Doc. 265-7).

The court rejects Defendants' argument that Ms. Haynes and Ms. Wilkinson's claimed hours are excessive because Ms. Haynes' time entries show that she worked more hours than Mr. Saxon and Ms. Wilkinson's time entries show that she worked around 80 hours less than Mr. Saxon. It's evident from the parties' evidentiary submissions that Ms. Haynes and Ms. Wilkinson put much work into this case during the trial and post-trial period. And though Defendants object to days in which Ms. Haynes and Ms. Wilkinson billed more than 16 hours, they point to only a few time entries that they say show that Ms. Haynes and Ms. Wilkinson spent too much time on any particular task. The court thus finds that a comparison of Mr. Saxon's claimed hours with the hours claimed by Ms. Haynes and Ms. Wilkinson isn't a reason to find Dr. Stern's claimed hours excessive.

But the court agrees that it was excessive for Ms. Haynes and Ms. Wilkinson to bill for around 20 hours a day several days of trial. For example, Ms. Wilkinson billed 20.6 hours on October 31, 2022, 22.3 hours on November 1, 2022, and 18.8 hours on November 7, 2022.[4] Ms. Haynes billed 19.5 hours on October 30, 19.6 hours on November 1, and 19.7 hours on November 7. Having litigated in his former life, the court recognizes that trial days require long hours. And the court witnessed firsthand that Ms. Haynes and Ms. Wilkinson put in long days during the 10-day trial. That said, the court finds that any hours billed over 18 hours in a given day was excessive. It is unlikely that an attorney exercising billing judgment would bill this amount to a client, so the court finds that it is unreasonably excessive to claim more than 18 hours in a day as compensable here. *See Norman*, 836 F.3d at 1301. Plus, the court encourages counsel to sleep at least 6 hours before trial.

---

[4] Ms. Wilkinson originally billed an impossible 29.6 hours on November 1, 2022, but explained that she entered a time entry for 7.3 hours in error. The court has excluded this time entry from its calculation of Dr. Stern's claimed hours in Table 1.

Having reviewed the other time entries that Defendants object to as excessive, the court finds that while some hours billed were excessive, much of the work that Defendants object to wasn't excessive. Defendants argue that the work on witness and exhibit lists in September 2022 was excessive because the parties had filed earlier versions of witness and exhibit lists in December 2020 and July 2021. But the court didn't enter its final summary judgment ruling until March 2022, and the court entered a scheduling order that allowed the parties to file revised witness and exhibit lists on September 16, 2022. (Docs. 122, 125). So the court finds the time spent revising the witness and exhibit lists after the summary judgment ruling clarified which claims would be tried to be reasonable.

The court also finds reasonable the hours Dr. Stern claims for work relating to witnesses who weren't ultimately called because time spent strategically narrowing down witnesses is good trial strategy. And though the court ultimately found that evidence of the Majdalani and Thomas cases weren't relevant at trial, the court doesn't find it unreasonable to bill for research on Majdalani and Thomas's claims. It was reasonable to investigate whether these cases related to Dr. Stern's claims.

Mr. Guerrier has also adequately explained why Dr. Stern's attorneys began working on a response to a Rule 50 motion before trial began and Defendants moved for a directed verdict. Mr. Guerrier says that he began working on the Rule 50 motion before trial to (a) identify potential evidentiary soft spots for the trial team; and (b) provide the court with a response that was as well researched as Defendants' motion because it's his experience that defense counsel work on Rule 50 motions before trial. (Doc. 276-2, p.3). The court accepts this explanation and finds the time spent working on the Rule 50 response to be reasonable.

Defendants object to several hours of legal research billed by Mr. Guerrier and others relating to topics that Defendants say are run-of-the-mill in First Amendment retaliation cases. This research includes research on the causation standard, separate trials for legal and equitable relief, and evidentiary issues related to the posttrial hearing. Having reviewed the parties' arguments, the court agrees with only one objection—the objection to Mr. Saxon's associate billing 2.00 hours researching Article III, 28 U.S.C. §

1331, and subject matter jurisdiction in December 2018. As Defendants note, these were common questions of law not specific to this case and 2.00 hours is too much time to spend on this research.

The court also finds excessive Ms. Branham billing 2.5 hours for her four trips between Birmingham and Opelika during trial. Ms. Haynes billed 2.0 hours for travel between Birmingham and Opelika, and the court finds those claimed hours more reasonable for the distance between the two cities. Other excessive entries include Mr. Saxon's entries related to text messages or voicemails between him and Dr. Stern. Indeed, Mr. Saxon's time sheets are liberally sprinkled with entries, such as this claim for .10 hours in May 2019: "Incoming cell phone call from client; reply can't talk right now. Text message to client re: in deposition. Will call later." The court agrees with Defendants that these non-substantive communications with Dr. Stern are a typical overhead expense that is not properly billed.

The court also finds that Mr. Saxon improperly claimed hours for reviewing news stories and responding to media requests about this case. These time entries do not reflect work performed by Mr. Saxon in support of Dr. Stern's claims. Other work impermissibly billed by Mr. Saxon was work for Dr. Seals in his separate lawsuit. The court disagrees with Defendants that any time entries mentioning Dr. Seals' case included excessive work. Because the facts, issues, and arguments in both cases were so similar, it was reasonable for Dr. Stern's attorneys to review the pleadings and rulings in Dr. Seals' case to help them prosecute Dr. Stern's case. But several entries from Mr. Saxon suggest that he was billing *for assisting* Dr. Seals' attorney, Parker Yates, with the Seals' case. For example, Mr. Saxon billed .10 hours in February 2020, for "Review email from Parker Yates re: copy of Dr. Stern's deposition." And in May 2023, around the time of the Seals' pretrial conference, Mr. Saxon billed .20 hours for "Review email from Parker Yates re: trial transcript. Reply to same." The court finds it excessive to bill for these communications with Dr. Seals' attorneys.

Finally, the court finds excessive Mr. Saxon's claimed hours for travel between his office and Ms. Haynes' office for meetings with Dr. Stern and joint work sessions. *See Bland v. Provident Life & Accident Ins. Co.*, 2003 WL 27381851, at \*7 (M.D. Fla. Oct. 17, 2003) (striking hours for local travel).

24

These examples are not an exhaustive list of the entries that Defendants say are excessive. And the court suspects that a more tedious review of Dr. Stern's time entries may reveal other excessive claimed hours. But based on the above analysis and the court's review of the evidentiary submissions, the court is comfortable finding that another 5% across-the-board cut will adequately account for the excessive hours—as well as hours that the court finds duplicative or unnecessary below.

### 4. Duplicative Work

Defendants next object to time entries that they say show that Dr. Stern has claimed hours for duplicative work. Most of these objections are to multiple timekeepers billing for the same trial strategy conferences and meetings or for work on the same filings, such as Dr. Stern's motion for equitable relief. "The use in involved litigation of a team of attorneys who divide up the work is common today for both plaintiff and defense work." *Johnson*, 706 F.2d at 1208. So while the court should not allow double compensation for "unnecessary duplication," this "reduction is warranted only if the attorneys are *unreasonably* doing the *same* work." *Id.* "An award for time spent by two or more attorneys is proper as long as it reflects the distinct contribution of each lawyer to the case and the customary practice of multiple-lawyer litigation." *Id.*

Having reviewed the hours that Defendants say are duplicative, the court finds that only a few amounted to "unnecessary duplication." It was not unreasonable for Dr. Stern's trial counsel to bill for time spent conferencing together about trial strategy and how they would divide the work load up during trial. As the court witnessed at trial, each of Dr. Stern's attorneys brought a unique skillset that contributed to Dr. Stern succeeding on his claims against Dean Aistrup. Nor was it unreasonable for the attorneys to claim hours for working together on key filings or for reviewing the work of paralegals or associates.

Many of Defendants' duplicative work objections are aimed at Mr. Guerrier's work on the proposed jury instructions, Rule 50 response, and motion for equitable relief. Mr. Guerrier adequately explains why his work wasn't duplicative of the work of others in his supplemental declaration. (*See*

Doc. 276-2). As for the jury instructions and verdict form, Mr. Guerrier explained that because he wasn't at trial, he was the one devoting his attention to the jury instructions and verdict form while Mr. Saxon, Ms. Haynes, and Ms. Wilkinson were in court. (*Id.*, p. 4). And Mr. Guerrier's work on the Rule 50 response included reviewing the daily trial transcripts, compiling the evidence, and preparing a response to Defendants' potential Rule 50 arguments. (*Id.*). Mr. Guerrier's job with respect to the posttrial proceedings was to prepare the motions and briefs supporting Dr. Stern's request for equitable relief. (*Id.*, pp. 5–6). As Mr. Guerrier points out, "[a] review of the time entries for all counsel . . . reveals that the other attorneys were not devoting substantial time to drafting these motions." (*Id.*, p. 6). The court is thus satisfied that Mr. Guerrier provided a distinct contribution with his trial and posttrial work.

After considering the parties' evidentiary submissions, the court finds that the following were the only unnecessarily duplicative hours claimed:

- Ms. Helms billing .10 hours for reviewing a conflict disclosure statement on September 20, 2018, when Mr. Saxon billed for reviewing the same conflict disclosure, and there's been no explanation for why both Mr. Saxon and his paralegal needed to review this filing.

- Ms. Helms twice billing for .20 hours and Mr. Saxon billing for .10 hours for reviewing an "order granting DSC's motion to withdraw."

- Mr. Saxon twice billing for reviewing the notice of reassignment of this case to Judge Watkins in December 2019 and twice billing .30 hours for conferencing with Ms. Guyther about Dr. Beard's testimony in August 2020.

- Mr. Saxon billing .30 hours in July 2023 for reviewing emails from Mr. Guerrier, Ms. Branham, and Ms. Wilkinson about the parties' calculation of prejudgment interest. As Defendants note, Mr. Saxon's time entry doesn't suggest that he provided any distinct contribution to the calculation of this interest.

26

- Ms. Guyther twice billing .10 hours in November 2018 to "[r]eview efile email reply to response to motion to dismiss."

- Ms. Guyther twice billing for review of Defendants' unopposed motion to extend discovery deadline in April 2020.

- Ms. Guyther billing two duplicate time entries of .20 hours for "Reviewed new pleading – Defendants response to order to show cause" in June 2020.

- Ms. Guyther billing two duplicate time entries of .10 hours for "Reviewed email to court re: redacted personal addresses" in December 2020.

- Ms. Wilkinson twice billing for drafting and filing her notice of appearance in October 2022.

- Ms. Wilkinson billing .80 hours in June 2023 for reviewing Dr. Stern's "brief in response to hearsay issues." As Defendants note, Ms. Wilkinson hasn't shown that she made any individual contributions to this brief.

Ms. Wilkinson agrees that her second time entry for drafting and filing her notice of appearance was duplicative and thus the court should reduce her claimed hours by .10. (Doc. 276-3, p. 23). This agreed-to reduction is reflected in the court's calculation of the claimed hours in Table 1, and the court hasn't considered this duplicative entry in deciding whether to further reduce Dr. Stern's claimed hours. As explained, the court finds that a 5% across-the-board reduction adequately addresses the court's findings that several of the claimed hours were excessive, duplicative, or unnecessary.

### 5.   Unsuccessful Claims

Defendants say that the court should further reduce Dr. Stern's claimed hours because several hours relate to unsuccessful claims. "A court should not award fees for time spent on unrelated, unsuccessful claims."

*Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 717 (11th Cir. 2002). That's because work on a discrete, unsuccessful claim "cannot be deemed to have been 'expended in pursuit of the ultimate result achieved.'" *Hensley*, 461 U.S. at 434–35. But if multiple claims "involve a common core of facts or [are] based on related legal theories . . . [they should not] be viewed as a series of discrete claims. . . ." *Id.* at 435.

At summary judgment, Dr. Stern argued that in response to his speech, he had suffered 23 acts of retaliation. (Doc. 123-1, p. 17). But only three of Dr. Stern's retaliation claims went to trial: (a) the claim against Dr. Boosinger related to Dr. Stern's 2017 annual evaluation, (b) the claim against Dean Aistrup for removing Dr. Stern as Chair of the Economics Department, and (c) the claim against Dean Aistrup and Dr. Hardgrave related to the denial of Dr. Stern's 2018 raise and one-time merit supplement. Dr. Stern also brought civil conspiracy claims under 42 U.S.C. § 1985(3) and Alabama state law, which Judge Watkins dismissed at summary judgment. (Doc. 113).

Because the jury found for Dr. Stern on only his claims against Dean Aistrup, Defendants argue that the court should reduce hours spent on Dr. Stern's claims against Dr. Boosinger and Dr. Hardgrave, the 20 alleged acts of retaliation that didn't make it to trial, and the conspiracy claims. The court disagrees. Dr. Stern's retaliation claims all involved a common core of facts and related legal theories because the protected speech asserted for each claim was the same—speech critical of alleged clustering by student athletes in the Public Administration major. And several of Dr. Stern's dismissed claims related to the claims he prevailed on against Dean Aistrup. For example, the claim that went to trial against Dr. Hardgrave related to the same raise and one-time merit supplement that the jury found Dean Aistrup liable for withholding. So the court doesn't view the different allegations of retaliation to raise a series of discrete claims.

Nor does the court view Dr. Stern's conspiracy claims as totally distinct from the retaliation claims that succeeded at trial. Dr. Stern's conspiracy claims asserted that several Auburn officials, including Dean Aistrup, Dr. Boosinger, and Dr. Hardgrave, conspired to violate his First Amendment rights by engaging in a campaign of retaliation. To push back against Defendants' argument that the intracorporate conspiracy doctrine barred

these claims, Dr. Stern pointed to threatening communications from Dean Aistrup and quotes from Dean Aistrup to the press about the Public Administration scandal. (Doc. 113, p. 10). Dr. Stern also asserted that the "series of discriminatory acts" that Defendants engaged in meant the intracorporate conspiracy doctrine didn't apply. (*Id.*, pp. 16–19). While Dr. Stern's intracorporate conspiracy arguments ultimately failed, he used several facts underlying these arguments to argue at trial that Dean Aistrup was liable and that the jury should assess punitive damages. As a result, the court doesn't find Dr. Stern's civil conspiracy claims to be unrelated to his successful retaliation claims.

That said, Defendants' "unsuccessful claims" argument show that Dr. Stern's claimed hours include three categories of unnecessary hours. These hours are: (1) hours spent on Dr. Stern's belated request for mental anguish damages, (2) hours spent on the parties' joint motion to contact jurors, and (3) hours spent on a potential expert witness. Dr. Stern didn't disclose an expert, so no work related to experts was necessary to prosecute Dr. Stern's claims. And Dr. Stern unjustifiably waited until the pretrial conference to request mental anguish damages. (*See* Doc. 162). The time spent asking the court to amend the pretrial order to add mental anguish damages was unnecessary because Rule 26's well-known initial disclosure requirements didn't allow Dr. Stern to inject mental anguish damages into this case on the eve of trial. Finally, this court routinely denies motions to contact jurors, and the parties should have known that there was no good cause for the court to grant their motion. So work on the motion to contact jurors was unnecessary. The court has thus considered claimed hours within these three categories in determining that a 5% reduction in the claimed hours is needed to address concerns of excessive, duplicative, and unnecessary hours being billed.[5]

### 6.    Partial Success

Defendants' final objection is to hours for work that they say garnered Dr. Stern only partial success. The court finds that it cannot account for Dr.

---

[5] As reflected in Table 1, Ms. Wilkinson has voluntarily agreed to reduce the hours she originally claimed for work on mental anguish damages and the motion to contact jurors. So the court hasn't considered these hours in deciding whether to apply another across-the-board reduction in hours.

Stern's partial success in calculating the lodestar. The court must instead consider whether a partial success reduction is warranted after the lodestar is calculated and the court is deciding whether an adjustment is needed to reflect the results obtained. *See Norman*, 836 F.2d at 1302.

### C.   Court Approved Lodestar Calculations

To calculate the lodestar, the court will apply a 15% across-the-board cut to Dr. Stern's claimed hours: 5% for the block-billing issues, 5% for clerical work, and 5% for excessive, redundant, and unnecessary hours being billed. The court will then multiply the reduced hours (*i.e.* "Allowed Time") by the hourly rates the court found reasonable. Applying this reduction, the court finds that the proper lodestar amount is $884,183.85:

### Table 2: Lodestar Calculation

| Timekeeper | Submitted Time | Allowed Time | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Ms. Wilkinson | 530.83 | 451.21 | $450 | $203,044.50 |
| Ms. Haynes | 713.90 | 606.82 | $475 | $288,239.50 |
| Mr. Saxon | 617.08 | 524.52 | $485 | $254,392.20 |
| Mr. Guerrier | 141.05 | 119.89 | $485 | $58,146.65 |
| Ms. Guyther (associate) | 145.30 | 123.51 | $200 | $24,702.00 |
| Ms. Branham | 335.20 | 284.92 | $125 | $35,615.00 |
| Mr. Weaver | 10.20 | 8.67 | $100 | $867.00 |
| Mr. Waters | 4.30 | 3.66 | $100 | $366.00 |
| Ms. Helms | 97.50 | 82.88 | $125 | $10,360.00 |
| Ms. Goodson | 0.80 | 0.68 | $125 | $85.00 |
| Ms. Guyther | 18.3 | 15.56 | $100 | $1,556.00 |

| (law clerk) | | | | |
|---|---|---|---|---|
| Ms. Vardaman | 25.90 | 22.02 | $100 | $2,202.00 |
| Ms. Willis | 37.70 | 32.05 | $100 | $3,205.00 |
| Ms. Raber | 16.50 | 14.03 | $100 | $1,403.00 |
| **TOTAL** | | | | **$884,183.85** |

### 2. Adjustment to the Lodestar

"After determining the lodestar amount . . . the court is entitled to adjust the amount of final fees awarded in light of the results obtained through the litigation." *Duckworth*, 97 F.3d at 1399. "[T]here is a 'strong presumption' that the lodestar is the reasonable sum the [prevailing] attorneys deserve." *Bivins*, 548 F.3d at 1350. So "[w]hen the hours and rate are reasonable, a downward adjustment to the lodestar is merited only if the prevailing party was partially successful in its efforts." *Resol. Tr. Corp. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1150 (11th Cir. 1993). To determine whether a partial or limited success adjustment is necessary, "the court must compare the plaintiff's overall relief with the number of hours reasonably expended on the litigation." *Popham v. City of Kennesaw*, 820 F.2d 1570, 1578 (11th Cir. 1987).

Defendants ask the court to apply a 20% partial success reduction to account for Dr. Stern's limited success. The court agrees with Defendants that a partial success reduction is warranted but finds that a 20% reduction is too high. Dr. Stern succeeded with his main goal—to show that an Auburn official retaliated against him for speaking out about alleged clustering in the Public Administration Major. And the claim that Dean Aistrup retaliated against Dr. Stern by removing him as Chair of the Economics Department was one of the most important claims litigated. Plus, the court disagrees with Defendants that Dr. Stern was only partially successful in his posttrial requests for equitable relief. Though the court didn't reinstate Dr. Stern to the Chair position, it did order Defendant Roberts to pay Dr. Stern a year's front pay, the equivalent of reinstatement. Defendant Roberts also had to pay

31

Dr. Stern supplemental back pay and recalculate his salary going forward as if he had earned a 3.7% raise in 2018.

Still, of Dr. Stern's 23 claims of retaliation, only three claims made it to trial. And both of Dr. Stern's claims of civil conspiracy were dismissed at summary judgment. Though Mr. Saxon has trimmed the number of hours claimed for his work at summary judgment, the court's review of the evidentiary submissions has found hours claimed for work mainly related to Dr. Stern's dismissed claims. For example, in January 2020, Ms. Guyther billed .40 hours for "[r]eview of email from Stern and his analysis of intracorporate conspiracy doctrine exceptions." (Doc. 165-10, p. 5). And the court is convinced that Dr. Stern's attorneys would have spent less time preparing for trial (before and during) if they had limited Dr. Stern's case to the two successful claims against Dean Aistrup and not included the claims against Dr. Boosinger and Dr. Hardgrave.

After considering these factors, the court finds that a 10% downward adjustment in the lodestar amount adequately accounts for the limited nature of Dr. Stern's success. Applying this 10% reduction to the $884,183.85 lodestar, results in a fee award of $795,765.47. The fees attributable to each timekeeper are as follows:

| Timekeeper | Fee Award |
|---|---|
| Ms. Wilkinson | $182,740.05 |
| Ms. Haynes | $259,415.55 |
| Mr. Saxon | $228,952.98 |
| Mr. Guerrier | $52,331.99 |
| Ms. Guyther (associate) | $22,231.80 |
| Ms. Branham | $32,053.50 |
| Mr. Weaver | $780.30 |
| Mr. Waters | $329.40 |

| | |
|---|---|
| Ms. Helms | $9,324.00 |
| Ms. Goodson | $76.50 |
| Ms. Guyther (law clerk) | $1,400.40 |
| Ms. Vardaman | $1,981.80 |
| Ms. Willis | $2,884.50 |
| Ms. Raber | $1,262.70 |

### 3. Costs and Expenses

The court will now evaluate Dr. Stern's proposed litigation expenses. Dr. Stern is seeking $9,676.40 in costs under 28 U.S.C. § 1920 (doc. 253) and $26,047.66 in expenses under 42 U.S.C. § 1988 (doc. 254-21).[6]

### A.    Bill of Costs

The costs that a prevailing party may recover in every case are set out in 28 U.S.C. § 1920. In his Bill of Costs, Dr. Stern seeks to recover: (1) the $400 filing fee; (2) $1,015.87 in fees for service of summons and subpoena; (3) $6,962.00 in fees for transcripts necessarily obtained for use in the case; (4) $474.23 in fees for witnesses; and (5) $824.30 in copying costs. Defendants object to Dr. Stern recovering costs for several subpoenas and witness fees. They also generally object to the excessiveness of Dr. Stern's copying costs.

1. <u>Service</u>: Private process server fees are taxable under § 1920 so long as they don't exceed the statutory fees authorized in 28 U.S.C. § 1921. *See EEOC v. W & O, Inc.*, 213 F.3d 600, 624 (11th Cir. 2000). Dr. Stern seeks to recover $970.00 in process server fees. These include fees for trial subpoenas served on Dr. Gogue, Dr. Laroque, Dr. Svyantek, and Bruce Melton. Dr. Stern also seeks to recover process server fees for subpoenas for Dr. Shelley, Dr.

---

[6] Defendants say that they cannot reconcile the differences in the costs claimed in Dr. Stern's bill of costs and summary of litigation expenses. The court reconciles this difference by finding that the costs sought in the bill of costs are costs sought under 28 U.S.C. § 1920 and the expenses sought in Doc. 254-21 are litigation expenses sought under 42 U.S.C. § 1988.

Kim, Dr. Altindag, Dr. Winn, Dr. Roberts, Dr. Hicks, Dr. Svyantek, and Dr. Bowling. Dr. Stern finally seeks to recover costs for his failed attempt to serve Dr. Ziebarth, Dr. Sengupta, and Dr. Brown with subpoenas for the evidentiary hearing. Defendants object to Dr. Stern recovering these costs for all witnesses except Dr. Gogue and Dr. Altindag.

The court agrees with Defendants that because Mr. Melton resides outside this court's subpoena power it shouldn't require Defendants to pay the cost of serving him. *See* Fed. R. Civ. P. 45(c)(1)(A); (Doc. 253, p. 20 (Melton served in Illinois)). So the court will deduct the $55.00 fee for serving Mr. Melton from Dr. Stern's process server fees. The court will also deduct the $120.00 spent serving Dr. Roberts and Dr. Shelley with subpoenas to attend the evidentiary hearing because, as the court explained in several emails and telephone conferences before the hearing, they had no information relevant to Dr. Stern's reinstatement request. And if Dr. Stern hadn't agreed not to call them as witnesses, the court likely would have granted the motions to quash subpoena that Dr. Roberts and Dr. Shelley filed.

But the court finds that the service of process costs for the other witnesses is taxable under 28 U.S.C. § 1920(1). Dr. Winn, Dean Hicks, and Dr. Kim all testified at the evidentiary hearing. And though Defendants state that Dean Hicks and Dr. Kim testified "voluntarily," that was only after the court responded to their motions to quash subpoenas (docs. 229, 231) by telling Defendants that it was imperative that Dean Hicks and Dr. Kim be at the hearing. It was also reasonable for Dr. Stern to seek Dr. Bowling, Dr. Ziebarth, Dr. Svyantek, Dr. Sengupta, and Dr. Brown's testimony at the evidentiary hearing. In fact, Dr. Sengupta and Dr. Ziebarth were put on Defendants' "may call" list for the hearing, and in email communications between the court and counsel, it was made evident that Dr. Bowling had information relevant to the hearing. The court also finds it reasonable for Dr. Stern to have subpoenaed Dr. Svyantek and Dr. Larocque to testify at trial even though they ultimately didn't testify. So the court will tax $795 in costs for private process server fees and $840.87 total in fees for service and summons ($795 in process server fees + $45.87 for service of the original and amended complaint).

2. <u>Witness fees</u>: Parties are to pay their witnesses a $40 attendance fee for each day's attendance at trial as well as all normal travel expenses. *See* 28 U.S.C. § 1921. Under § 1920(3), fees for witnesses are recoverable costs, and Dr. Stern seeks to recover the attendance and mileage costs for several witnesses. Defendants object to being taxed the fees for Dr. Svyantek, Dr. Hicks, Dr. Kim, and Dr. Winn.

Dr. Winn testified at the reinstatement hearing, but Defendants say the court shouldn't require them to pay his fees because his testimony was unnecessary. Although the court expressed frustration at Dr. Winn being called to testify at the evidentiary hearing, he did testify and was paid for his attendance. So the court finds that his witness fees are taxable under § 1920(3). Dr. Svyantek's witness fees are also taxable even though he didn't testify at trial or the posttrial hearing. *See Richardson v. Oswalt*, 2019 WL 6117608, at *2 (N.D. Ala. Nov. 18, 2019) ("Plaintiffs only seek reimbursement for one day of attendance and mileage, which is not unreasonable when a witness might be needed at trial but is ultimately not called to the stand."). But the court finds it unnecessary for Dr. Stern to have paid Dr. Hicks and Dr. Kim witness fees because, though originally subpoenaed by Dr. Stern, they were both called to testify by Defendants. The court will thus deduct the $102.93 in witness fees for Dr. Kim and Dr. Hicks from Dr. Stern's claimed witness fees and tax witness fees of $371.30.

3. <u>Copies</u>: Dr. Stern also asks the court to tax $824.30 in copying costs for 5 joint trial exhibit notebooks, 5 Plaintiff trial exhibit notebooks, and 3 Defendant trial exhibit notebooks. Section 1920(4) allows the court to tax costs for "the costs of making copies of any materials where the copies are necessarily obtained for use in the case." 28 U.S.C. § 1920(4). In general, "[t]he Court will allow photocopying charges that were necessary for discovery and trial presentation. The Court will not allow photocopying charges for the convenience, research, or records of counsel." *Richardson*, 2019 WL 6117608, at *4. The key question is "whether the prevailing party could have reasonably believed that it was necessary to copy the papers at issue." *EEOC*, 213 F.3d at 623.

The court required Dr. Stern to provide the court with two courtesy copies of the joint trial exhibits and Plaintiff's trial exhibits. So the court will

award Dr. Stern $179.60 in copying costs for those courtesy copies. But under § 1920, Dr. Stern cannot recover copying costs for the copies of exhibits made for his counsel's use at trial because "there is no indication that such copies were made for any purpose other than convenience." *Richardson*, 2019 WL 6117608, at *4. The court will address whether these costs are recoverable under § 1988 when discussing Dr. Stern's claimed litigation expenses.

—

In sum, the court will tax these costs against Defendants: (1) $400 filing fee; (2) $840.87 in fees for service and summons; (3) $6,962.00 in fees for transcripts; (4) $371.30 in witness fees; and (5) $179.60 in copying costs. Thus, the total amount of costs taxed under 28 U.S.C. § 1920 is **$8,753.77.**

## B.   Expenses

"[W]ith the exception of routine office overhead normally absorbed by the practicing attorney, all reasonable expenses incurred in case preparation, during the course of litigation, or as an aspect of settlement of the case may be taxed as costs under section 1988." *Dowdell v. City of Apopka*, 698 F.2d 1181, 1192 (11th Cir. 1983). So more costs are recoverable under § 1988 than § 1920. *See Evans v. Books-A-Million*, 762 F.2d 1288, 1298–99 (11th Cir. 2014). Still, it is the fee applicant's burden to establish that the court should award expenses under § 1988. *See Barnes*, 168 F.3d at 435. And Dr. Stern does not respond to Defendants' objections to his claimed expenses or explain the reason for claiming many expenses in his expense report. Though Mr. Saxon does clarify that "[f]or the record, [Mr. Saxon] is seeking no expense reimbursement in this case." (Doc. 276-4, p. 10). Based on this statement, the court will deduct the $3,825.79 in expenses for meals, mileage, hotel accommodations, and postage incurred by Mr. Saxon from Dr. Stern's claimed expenses. The court will address Mr. Saxon's copying and legal research expenses, along with everyone else's expenses, below.

1. <u>Pretrial meals</u>: Dr. Stern claims $127.72 in expenses for meals from Chick-Fil-A and Taziki's while working on trial prep. As Defendants note, it doesn't appear that these were out of town meals, so the court finds that the costs of these meals is routine office overhead. The court will thus not award the expense of these meals to Dr. Stern.

2. <u>Posttrial hearing expenses</u>: Defendants also make several objections to any expenses incurred at the posttrial evidentiary hearing citing partial success and Defendants' belief that the hearing would have been unnecessary if Dr. Stern hadn't sought reinstatement. But it was reasonable for Dr. Stern to seek reinstatement since that is the presumptive remedy for retaliation. And it was Defendants' burden at the hearing to convince the court that reinstatement was unworkable. Besides, the hearing also helped the court determine (a) the appropriate Chair term for the court to consider in awarding Dr. Stern front pay, and (b) that a finding that Dean Aistrup would have awarded Dr. Stern a 3.7% raise absent retaliation would best reflect the jury's verdict. So the court overrules this objection.

3. <u>Excessive mileage and hotel charges</u>: Defendants next object to certain members of Dr. Stern's trial team seeking reimbursement for mileage and hotel charges that they say are excessive in comparison to other members of the trial team's expenses. The court rejects Defendants' argument that Ms. Raber's claim for $186.02 in mileage to Opelika for the posttrial hearing was excessive. Ms. Raber's claimed mileage isn't that much more than Ms. Haynes and Mr. Saxon's, and there's no indication that she didn't drive the miles she claims. But the court agrees with Defendants that Dr. Stern hasn't adequately explained why Ms. Branham is claiming $675.63 in mileage for the trial when she booked a hotel room for the same number of nights as the rest of the trial team. Ms. Branham's mileage reimbursement form says that she went back to Birmingham for supplies but doesn't explain what those supplies were or why they were needed. (See Doc. 254-21, p. 65). So the court finds this claimed mileage unreasonable and will reduce the mileage awarded Ms. Branham for trial to $423.75. This amount equals what Ms. Branham would have billed if she had only gone back to Birmingham on the weekends and billed the same number of miles that Ms. Haynes billed per round trip ($141.25 each round trip).

Dr. Stern also hasn't explained why certain trial team members hotel rooms cost more than others. For example, Ms. Haynes and Ms. Wilkinson's hotel stay for the first week of trial cost $1,004.57 each but Mr. Saxon and Ms. Branham's hotel stays were $944.68 each. The second week of trial Ms. Wilkinson's hotel stay cost $837.59 and Ms. Haynes' hotel stay cost $848.64 but Ms. Branham and Mr. Saxon's stays cost only $822.64. And though the

trial team stayed at the same hotel throughout trial, the hotel meeting room cost $1,000.00 week one of trial but only $800.00 for week two. Finally, Ms. Branham's hotel stay for the last two days of trial cost only $215.18, while Ms. Haynes and Ms. Wilkinson's hotel stays cost $439.88 and $429.83. Because Dr. Stern doesn't explain these discrepancies, the court will reduce Ms. Haynes and Ms. Wilkinson's hotel reimbursement to $944.68 for week one of trial, $822.64 for week two of trial, and $215.18 for week three of trial. The court will also reduce the meeting room cost for week one of trial to $800.00.

4. Legal research + postage:   Dr. Stern also seeks to recover the expenses of postage and conducting legal research on PACER, Westlaw, and Lexis. Defendants object to Dr. Stern being awarded these expenses saying that they are typical fees incurred by practicing attorneys as office overhead. "[R]easonable litigation expenses such as mediation, legal research, postage, and travel may be recovered under [§ 1988] *if it is the prevailing practice in the legal community to bill fee-paying clients separately for those expenses.*" *Evans*, 762 F.3d at 1299 (emphasis added). Dr. Stern has made no argument and provided no evidence to contradict Defendants' assertion that legal research and postage expenses are considered office overhead by attorneys within the relevant legal community. So the court finds that Dr. Stern has not met his burden to show that he's entitled to recover these litigation expenses. *See Shultz v. Aetna Life Ins. Co.*, 398 F. Supp. 3d 1188, 1197–98 (M.D. Ala. 2019) (excluding costs for legal research and postage when the plaintiff didn't meet his burden to show that it is the prevailing practice to charge these fees to clients).

5. Copies: Dr. Stern seeks to recover $3,531.00 in copying costs for 35,310 copies at $0.10 a copy. Defendants object that these copying costs are excessive and that they cannot tell from Dr. Stern's expense report whether Dr. Stern's copying expenses were reasonable. The court agrees with Defendants that the only copies Dr. Stern has explained are the copies of exhibits for use at trial. Though the court found the costs of making copies of exhibits for counsel's convenience unrecoverable under § 1920, the court finds that the $644.70 in copying costs for these exhibit copies are allowable under § 1988's more liberal reasonableness standard. The court, however, will award Dr. Stern only half of the $2,706.70 in copying costs not yet awarded

because without information about how these photocopies were necessary, the court must find that such a high number of photocopies was unreasonable. *See King*, 2017 WL 6336323, at *11 (applying same rationale to similar request for photocopy reimbursement in expense report).

The court will thus award Dr. Stern $1,998.05 in reasonable copying expenses under § 1988. This award is on top of the $179.60 in copying costs awarded under § 1920.

7. <u>Partial success reduction</u>: Defendants finally assert that the court should apply the partial success reduction that it applies to Dr. Stern's attorney's fees to his claimed expenses. The court recognizes that some judges within this district have applied a partial success reduction to expenses claimed under § 1988, but the court finds that a partial success reduction isn't warranted here. Unlike with Dr. Stern's attorney's fees, the court is unconvinced that Dr. Stern would have incurred less expenses had he only pursued claims of retaliation against Dean Aistrup. So the court will not apply a partial success reduction to Dr. Stern's allowable expenses.

—

Based on the above, the court awards Dr. Stern (1) $1,008.56 in meal reimbursements; (2) $1,091.55 in mileage reimbursement; (3) $8,723.33 in reimbursement for lodging; (4) $4,480.00 in mediation costs; (5) $0.00 in legal research fees; (6) $0.00 in fees for postage; (7) $1,142.78 in fees for supplies for trial; (8) $1,998.05 in copying expenses; and (9) $17.99 in miscellaneous fees. Thus, the total award for Dr. Stern's reasonable litigation expenses under § 1988 is **$18,462.26**.

## E. ATTORNEY'S LIEN DISPUTE

The court ends with the attorney's lien dispute between Dr. Stern and his trial counsel. As the court understands it, Dr. Stern's position is that his contingency-fee agreement with Mr. Saxon says that he's entitled to 60% of all fees awarded. Dr. Stern's trial counsel agree that Dr. Stern is entitled to 60% of the fees awarded to Mr. Saxon and his firm but argue that Dr. Stern isn't entitled to any of the fees attributable to Ms. Haynes, Ms. Wilkinson, or their support staff. Dr. Stern's trial attorneys have filed attorney's liens

under Ala. Code § 34-3-61 (docs. 269 & 270); Defendants have moved to strike the claims for attorney's fees and statutory lien (doc. 271); and, Dr. Stern proposes that the court disburse 60% of the fee award directly to him (docs. 278 & 279).

This court has original jurisdiction over this case under 28 U.S.C. § 1331 because Dr. Stern sued Defendants for First Amendment retaliation under 42 U.S.C. § 1983. When this court has original jurisdiction over a claim, the court has "supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). "The existence of an attorney's lien against a party's recovery in a lawsuit is part of the same case or controversy as the underlying lawsuit." *Moreno Farms, Inc. v. Tomato Thyme Corp.*, 490 F. App'x 187, 188 (11th Cir. 2012) (citing *Broughten v. Voss*, 634 F.2d 880, 383 (5th Cir. 1981)). So the court has supplemental jurisdiction to resolve the dispute between Dr. Stern and his trial counsel.[7]

But the court isn't *required* to exercise supplemental jurisdiction over the attorney's lien dispute. *See Faucher v. Rodziewicz*, 891 F.2d 864, 872 (11th Cir. 1990); *Moreno Farms*, 490 F. App'x at 188. In deciding whether to exercise supplemental jurisdiction, this court should consider if (1) the claim raises a novel or complex issue of State law; (2) the claim substantially predominates over the claim or claims over which the court has original jurisdiction; (3) the court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. *See* 28 U.S.C. § 1367(c).

Having considered these factors, the court finds that principles of federalism support letting the state courts decide what is, at heart, a state-law breach of contract dispute between Dr. Stern and his trial counsel. This trial took place almost a year-and-a-half ago. And the court entered final judgment, dismissing all claims over which it had original jurisdiction, over six months ago. It's not fair to continue to require Defendants to pay their attorneys to attend hearings and monitor this case when all that's left is a fee

---

[7] Dr. Stern and each of his trial counsel are citizens of Alabama, so the court doesn't have diversity jurisdiction over their fee dispute. *See* 28 U.S.C. § 1332.

dispute between Dr. Stern and his trial counsel. Nor is it a good use of judicial resources for this federal court to guess how the state courts would interpret this not so straightforward contingency fee arrangement. So the court declines to exercise supplemental jurisdiction over Dr. Stern's attorney's lien dispute with his trial counsel.

Because the court is not exercising supplemental jurisdiction over the attorney's lien dispute, the court **DENIES AS MOOT** Defendants' motion to strike (doc. 271) and Dr. Stern's motion concerning disbursement of attorney's fees (docs. 278 & 279). The court **ORDERS** Defendants to pay the attorney's fees and expenses awarded to the client trust account that they paid to satisfy the relief awarded in the final judgment.

Dr. Stern and his trial counsel should try to resolve their dispute over how to divide the attorney's fees. If they cannot reach a resolution, however, they can ask the state courts to resolve the state-law issue for them.

## CONCLUSION

For these reasons, the court **GRANTS IN PART** and **DENIES IN PART** Dr. Stern's petition for attorney's fees, costs, and litigation expenses. (Docs. 253, 254). The court awards **$795,765.47** in attorney's fees, **$8,753.77** in costs, and **$18,462.26** in litigation expenses.

The court **DENIES** Dr. Stern's motion for discovery (doc. 261) and **DENIES AS MOOT** Dr. Stern's motion to exclude the declarations (doc. 275). The court also **DENIES AS MOOT** Defendants' motion to strike (doc. 271) and Dr. Stern's motion for disbursement (docs. 278, 279).

**Done** and **Ordered** on March 11, 2024.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE